ACCEPTED
04-15-00066-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
4/9/2015 3:46:42 PM
KEITH HOTTLE
CLERK

**ORAL ARGUMENT REQUESTED**

## No. 04-15-00066-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
4/9/2015 3:46:42 PM
KEITH E. HOTTLE
Clerk

# In the Court of Appeals
# for the Fourth District of Texas
# San Antonio, Texas

CONOCOPHILLIPS COMPANY,

*Appellant,*

v.

VAQUILLAS UNPROVEN MINERALS, LTD.,

*Appellee.*

From Cause No. 2014 CVQ000 438 D4
406th Judicial District Court, Webb County, Texas
Honorable Oscar J. Hale, Jr., Presiding Judge

## BRIEF OF APPELLANT, CONOCOPHILLIPS COMPANY

Michael V. Powell
  State Bar No. 16204400
  Email: mpowell@lockelord.com
Cynthia K. Timms
  State Bar No. 11161450
  Email: ctimms@lockelord.com
Elizabeth L. Tiblets
  State Bar No. 24066194
  Email: etiblets@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Tel:   214-740-8520
Fax:   214-740-8800

Adolfo Campero
  State Bar No. 00793454
  Email: acampero@camperolaw.com
Campero & Associates, P.C.
315 Calle Del Norte, Suite 207
Laredo, Texas 78041
Tel:   956-796-0330
Fax:   956-796-0399

ATTORNEYS FOR APPELLANT
CONOCOPHILLIPS COMPANY

## IDENTITY OF PARTIES AND COUNSEL

| *Party* | *Counsel* |
|---|---|
| ConocoPhillips Company,<br><br>*Appellant* | Michael V. Powell<br>  State Bar No. 169204400<br>  *mpowell@lockelord.com*<br>Cynthia K. Timms<br>  State Bar No. 11161450<br>  *ctimms@lockelord.com*<br>Elizabeth L. Tiblets<br>  State Bar No. 24066194<br>  *etiblets@lockelord.com*<br>LOCKE LORD LLP<br>2200 Ross Avenue, Suite 2200<br>Dallas, Texas 75201-6776<br>Telephone: (214) 740-8000<br>Telecopier: (214) 740-8800<br><br>Adolfo Campero<br>  State Bar No. 00793454<br>  *acampero@camperolaw.com*<br>Campero & Associates, P.C.<br>315 Calle Del Norte, Suite 207<br>Laredo, Texas  78041<br>Telephone:  (956) 796-0330<br>Telecopier:  (965) 796-0399 |

| *Party* | *Counsel* |
|---|---|
| Vaquillas Unproven Minerals, Ltd.,<br><br>*Appellees* | Raul Leal<br>  State Bar No.  24032657<br>  *rleal@rl-lawfirm.com*<br>RAUL LEAL INCORPORATED<br>5810 San Bernardo, Suite 390<br>Laredo, Texas  78041<br>Telephone:  (956) 727-0039<br>Telecopier:  (956) 727-0369<br><br>Armando X. Lopez<br>  State Bar No. 12562400<br>  *mandox@rio.bravo.net*<br>LAW OFFICES OF ARMANDO X. LOPEZ<br>1510 Calle Del Norte, Suite 16<br>Laredo, Texas  78041<br>Telephone:  (956) 726-0722<br>Telecopier:  (956) 726-6049<br><br>Gregg Owens<br>  State Bar No. 15383500<br>  *gregg.owens@haysowens.com*<br>Robert G. Hargrove<br>  State Bar No. 09303300<br>  *rob.hargrove@haysowens.com*<br>Alicia R. Ringuet<br>  State Bar No. 24074958<br>  *alicia.ringuet@haysowens.com*<br>HAYS & OWENS L.L.P.<br>807 Brazos Street, Suite 500<br>Austin, Texas  78701<br>Telephone:  (512) 472-3993<br>Telecopier:  (512) 472-3883 |

| *Party* | *Counsel* |
|---|---|
|  | P. Michael Jung<br>  State Bar No. 11054600<br>  *michael.jung@strasburger.com*<br>STRASBURGER & PRICE, LLP<br>901 Main Street, Suite 4400<br>Dallas, Texas  75202-2794<br>Telephone:  (214) 651-4724<br>Telecopier:  (214) 659-4022 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... ii

TABLE OF CONTENTS ................................................................................... v

INDEX OF AUTHORITIES .............................................................................. vi

STATEMENT OF THE CASE ............................................................................ 1

STATEMENT REGARDING ORAL ARGUMENT ............................................. 2

ISSUE PRESENTED ....................................................................................... 3

STATEMENT OF FACTS ................................................................................. 4

SUMMARY OF THE ARGUMENT ................................................................. 11

ARGUMENT ................................................................................................ 14

1.    The Field Rules did not "*establish*" different units of acreage per well. ...... 14

    A.    The parties' competing interpretations................................................. 14

    B.    Analysis of the retained acreage clause in light of the Field Rules ...................................................................................... 16

2.    If there were any doubt about the proper interpretation of Sentence (2), the Court should apply the strong presumption in Texas law against making that sentence a "limitation on the grant." ............................ 27

PRAYER FOR RELIEF .................................................................................. 31

CERTIFICATE OF COMPLIANCE ................................................................. 33

CERTIFICATE OF SERVICE ......................................................................... 34

APPENDIX TO APPELLANT'S BRIEF ........................................................... 35

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*Anadarko Petroleum Corp. v. Thompson*,
94 S.W. 3d 550 (Tex. 2002)...................................................................13, 27, 29

*Birnbaum v. SWEPI LP*,
48 S.W.3d 254 (Tex. App.—San Antonio 2001, pet. denied)...........................16

*Chesapeake Exploration, L.L.C. v. Energen Resources Corp.*,
445 S.W.3d 878 (Tex. App.—El Paso 2014, no pet.) ..................................13, 30

*Clifton v. Koontz*,
325 S.W.2d 684 (Tex. 1959) .............................................................................23

*ConocoPhillips Co. v. Ramirez*,
No. 04-05-00488-CV, 2006 WL 1748584 (Tex. App.—San Antonio,
2006) (not designated for publication) .........................................................21, 22

*EOG Resources, Inc. v. Killam Oil Co., Ltd.*,
239 S.W.3d 293 (Tex. App.—San Antonio 2007, pet. denied)....................21, 27

*Fox v. Thoreson*,
398 S.W.2d 88 (Tex. 1966)................................................................................29

*Halbouty v. Railroad Commission*,
357 S.W.2d 364 (Tex. 1962) .............................................................................23

*Heritage Resources, Inc. v. NationsBank*,
939 S.W.2d 118 (Tex. 1996) .............................................................................16

*Humphrey v. Seale*,
716 S.W.2d 620 (Tex. App.—Corpus Christi 1986, no writ) ...........................28

*Jones v. Killingsworth*,
403 S.W.2d 325 (Tex. 1965) .............................................................................18

*Knight v. Chicago Corp.*,
183 S.W.2d 666 (Tex. Civ. App.—San Antonio 1944), *aff'd*, 188 S.W.2d
564 (Tex. 1945)..................................................................................................30

*Knight v. Chicago Corp.*,
   188 S.W.2d 564 (Tex. 1945) ....................................................29, 30

*Matthews v. Sun Oil Co.*,
   425 S.W.2d 330 (Tex. 1968) ...........................................................28

*Natural Gas Pipeline Co. v. Pool*,
   124 S.W.3d 188 (Tex. 2003) ...........................................................27

*Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.*,
   345 S.W.3d 537 (Tex. App.—San Antonio 2011, no pet.) ...............28

*Railroad Commission v. Woods Exploration and Producing Co.*,
   405 S.W.2d 313 (Tex. 1966) ...........................................................23

*Rogers v. Ricane Enterprises, Inc.*,
   773 S.W.2d 76 (Tex. 1989).............................................................29

*Rowley v. Braley*,
   286 S.W. 241 (Tex. Civ. App—Amarillo 1926, writ dism'd)...........17

*Shown v. Getty Oil Co.*,
   645 S.W.2d 555 (Tex. App.—San Antonio 1982, writ ref'd.)..........28

*Springer Ranch, Ltd. v. Jones*,
   421 S.W.3d 273 (Tex. App.—San Antonio 2013, no pet.) ..............14, 16, 18, 27

*State v. Bilbo*,
   392 S.W.2d 121 (Tex. 1965) ...........................................................16

*Tomlin v. Petroleum Corp. of Texas*,
   694 S.W.2d 441 (Tex. App.—Eastland 1985, no writ) ....................30


**STATUTES AND RULES**

TEX. CIV. PRAC. & REM. CODE § 37.009..................................................32

TEX. CIV. PRAC. & REM. CODE § 51.014(d) ...............................................1

TEX. R. APP. P. 43.2(c)...........................................................................14

16 T.A.C. §3.38(b)(1) ...........................................................................10

**OTHER AUTHORITIES**

BLACK'S LEGAL DICTIONARY at 626 (9th ed. 2009) ...........................................17, 18

J. Hayes, *Texas Railroad Commission: Some Basics Every Practitioner Should Know*, 28 State Bar of Texas, Oil, Gas and Mineral Law Section Report 3, 20 (June 2004)....................................................................................23

WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (1993)..........18

# STATEMENT OF THE CASE

This interlocutory appeal requests the Court to interpret, *de novo*, near-identical "retained acreage clauses" in two oil and gas leases. Plaintiff-Appellee Vaquillas Unproven Minerals, Ltd. ("Vaquillas"), the Lessor, claims the retained acreage clauses caused Defendant-Appellee ConocoPhillips Company ("ConocoPhillips"), a Lessee, to forfeit substantially more acreage than ConocoPhillips voluntarily released when ConocoPhillips' program of continuous drilling ended. ConocoPhillips disagrees, saying it retained the proper blocks of acreage under the leases.

Vaquillas sued ConocoPhillips in the 406th District Court, Webb County. (CR:190). ConocoPhillips filed a traditional motion for summary judgment based on its interpretation of the leases. (CR:27). Vaquillas filed a traditional cross-motion for partial summary judgment based on its interpretation of the retained acreage clause. (CR:200). The trial court, The Honorable Oscar J. Hale, Jr., denied ConocoPhillips' motion for summary judgment and granted Vaquillas' cross-motion. (CR:433, Appendix ("App.") B).

The trial court granted ConocoPhillips' unopposed motion for interlocutory appeal under TEX. CIV. PRAC. & REM. CODE § 51.014(d). (*Id.*) By Order dated February 13, 2015, this Court granted ConocoPhillips' Petition for Permission to Appeal. (App. A).

1

## STATEMENT REGARDING ORAL ARGUMENT

Appellant ConocoPhillips requests oral argument.

The question presented by this interlocutory appeal comes before the Court on cross-motions for summary judgment and presents a question of law. Nevertheless, the appeal requires the Court to construe retained acreage clauses in oil and gas leases in light of field rules adopted by the Railroad Commission of Texas, as well as that Commission's Statewide Rule 38.

ConocoPhillips believes oral argument could be helpful to the Court as the Court considers various provisions of the oil and gas leases and the Commission's rules. There is also a great deal at stake in this appeal. The trial court has decreed that ConocoPhillips has forfeited approximately 15,000 acres from decades-old Webb County oil and gas leases on which ConocoPhillips has drilled over 200 natural gas wells.

## ISSUE PRESENTED

Did the trial court err by denying ConocoPhillips' Motion for Summary Judgment and by granting Vaquillas' Cross-Motion for Partial Summary Judgment?  (App. B).

More specifically, the retained acreage clauses authorize ConocoPhillips to retain 640 acres around each existing gas well at the end of the continuous drilling program, unless Railroad Commission field rules provide for spacing or proration "*establishing* different units of acreage per well."  If that exception is triggered, those "*established* different acreages" are held in lieu of 640 acres.  Did the trial court err by holding that spacing requirements in the field rules, which require a *minimum* of 40 acres in order to obtain a drilling permit for a new well, caused ConocoPhillips' leases to terminate except for 40 acres around each existing gas well?

**The Oil and Gas Leases**. ConocoPhillips is Lessee, and Vaquillas the Lessor, under two oil and gas leases covering Webb County land. Sworn copies of the leases are in the record at CR:47-88 and 283-323, and copies are attached as Appendices C and D to this Brief (the "Leases") (CR:192).

By the Lease at Appendix C, granted in 1974 and amended in 1987, Vaquillas (and its predecessors) conveyed to ConocoPhillips' predecessor the mineral estate underlying 26,622.79 acres for "five years . . . and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder." (CR:192, 209). By the Lease at Appendix D, dated 1987, Vaquillas granted the mineral estate under an additional 6,740 acres, except the term of that Lease was for "three years . . . and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled." (*Id.*)

All of the wells at issue in this case are natural gas wells. For gas wells, both Leases authorize ConocoPhillips to pool units up to 640 acres in size. Paragraph 4 of the Leases, which grants pooling authority, states:

> . . .units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of ten percent (10%) thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, for the drilling or operation of a well at a regular location or for obtaining maximum allowable from any well to be drilled, drilling or already

4

drilled, units thereafter may conform substantially in size with those prescribed or permitted by governmental regulation.

Paragraph 4 gives the Lessee "the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with any other land covered by this lease and/or with any other land, lease, or leases in the immediate vicinity thereof . . . ." Paragraph 16 restricts that power somewhat by restricting pooling only to other lands owned in whole or part by Vaquillas, but that restriction is not pertinent here.

Vaquillas' claim in this action is based on one isolated provision in Paragraph 18, the retained acreage clause, of the Leases. In order to facilitate the discussion in this Brief, ConocoPhillips will separate and number the four phrases or sentences of that clause that are pertinent here, and then refer to those "Sentences" by number:[1]

> **Sentence (1)**: "On November 1, 1990, Lessee covenants and agrees to execute and deliver to Lessor a written release of any and all portions of this lease which have not been drilled to a density of at least 40 acres for each producing oil well <u>and 640 acres for each producing or shut-in gas well</u>,"

---

[1] The provisions quoted are from the 26,622.79-acre Lease at Appendix C. The only difference between the language of Paragraph 18 in the two Leases is that Paragraph 18 of the 6,740-acre Lease (App. D) starts with: "At the end of the primary term, Lessee covenants and agrees . . . ."

**Sentence (2):** "except that in case any rule adopted by the Railroad Commission of Texas or other regulating authority for any field on this lease provides for a spacing or proration <u>establishing different units of acreage per well, then such established different units</u> shall be held under this lease by such production, in lieu of the 40 and 640-acre units above mentioned;"

**Sentence (3):** "provided, however, that * * * if, after the completion or abandonment of any such well Lessee commences the drilling of an additional well within Ninety (90) days from the completion or abandonment of the preceding well, or continuously conducts drilling operations in good faith and with reasonable diligence on said lease without any cessation for longer than Ninety (90) days, said lease shall remain in full force and effect during such drilling operations and until the end of Ninety (90) days after the completion or abandonment of the final well, at which time Lessee shall execute and deliver to Lessor said written release, releasing all portions of the lease not then so developed."

**Sentence (4):** "Each retained unit shall contain at least one (1) well producing or capable of producing oil or gas in paying quantities, and the acreage within a unit shall be contiguous."

6

(Emphasis added).

Sentence (3), quoted above, established the continuous drilling program that extended the date after which ConocoPhillips had to release acreage. There is no dispute that by continuous drilling, ConocoPhillips maintained the 26,622.70-acre Lease in full force and effect for many years after November 1, 1990, and the 6,740-acre Lease in full force and effect many years after the end of its primary term. ConocoPhillips' continuous drilling program ended at or about the date alleged in Vaquillas' Petition, June 21, 2012. (CR:193; 242). Vaquillas counted that by that date, ConocoPhillips had drilled 208 wells on the two Leases. (CR:203, 224).

In early 2014, ConocoPhillips filed Partial Releases in the Webb County deed records that released all acreage covered by the Leases except for 640 acres around each producing or shut-in gas well, as permitted by Sentence (1) of the retained acreage clause. (CR:194; 90-179). Vaquillas contends those Partial Releases were insufficient and asserts that at the end of the continuous drilling program, ConocoPhillips' Leases terminated as to all acreage except 40 acres around each producing or shut-in gas well. (CR:195-96; 227). Vaquillas moved for summary judgment that 25,042 of the total 33,363 acres Vaquillas granted to ConocoPhillips by the Leases "reverted" to Vaquillas when the continuous drilling

7

program ended, and consequently, ConocoPhillips must release 15,351 more acres than those released by the Partial Releases it already filed. (CR:203, 204-05).

**The Field Rules**. Vaquillas bases its contention on the exception in Sentence (2) of Paragraph 18, quoted above, and the Railroad Commission's Field Rules for the Vaquillas Ranch (Lobo Cons.) Field, Webb County, Texas (the "Field Rules"). The Commission initially adopted Field Rules for the Lobo Consolidated Field in 1998 (App. E, CR:183, 245). It amended those rules in 2010 (App. F, CR:181, 254). There is no dispute that these Field Rules apply to the field that includes the Leases.

The Field Rules do not "establish" any mandatory units of acreage per well. Neither the Commission's adoption of Field Rules in 1998, nor its amendment of those rules in 2010, required ConocoPhillips to make any changes to its gas wells on the Leases.

Rule 3 in the original 1998 Field Rules is the *proration* rule for the field. (App. E). Unlike other forms of proration rules, Rule 3 of these Field Rules does not specify a *maximum* amount of acreage that may be allocated to a well as a factor in the proration formula.[2] Vaquillas correctly explains proration rules as

---

[2] There is an example in the record of another field rule that <u>does</u> limit the size of proration units to 160 acres. (CR:188-89). Rule 2 of the Temporary Field Rules for the Big Reef (Edwards) Field, Webb County, adopted June 2002, states: "No proration unit shall consist of more than ONE HUNDRED SIXTY (160) ACRES [plus a 10 percent tolerance]." *Id*.

8

follows: "[a] prescribed proration unit does not address the number of acres necessary to drill a well. It simply specifies the <u>maximum</u> amount of acres that an operator may assign to a well as a proration unit for that well. * * * Prescribed proration units are by their nature maximum-sized units, because they prescribe the maximum acreage that an operator may assign to a well as a proration unit for production allowable purposes." (CR:208-09, emphasis added). ConocoPhillips' point is that the Field Rules for this field contain <u>no</u> "prescribed proration units," and they do not specify, in any other way, a <u>maximum</u> amount of acres ConocoPhillips may pool for any well.

In the trial court, Vaquillas did not base its argument on the proration rule, Rule 3 of the Field Rules. Rather, it based its argument on Rule 2, the spacing rule. (CR:211-13; 222 n.59).

Rule 2 provides no different spacing from the Statewide Rules applicable before field rules were adopted for this field, *i.e.*, the spacing in the rule requires a <u>minimum</u> of 40 acres for obtaining a permit to drill a new well. (App. E). Rule 2 accomplishes that result by providing that wells may not be drilled closer than 467 feet to any lease line, or 1,200 feet from another well in the same reservoir. (App. F). These are the same spacing distances that are found in the Statewide Spacing Rule applicable in the absence of field rules. *See* 16 T.A.C. § 3.37(a)(1).

9

When, as here, a field rule contains only spacing rules, a Table in the Commission's Statewide Rule 38(b)(2) supplies the <u>minimum</u> acreage necessary for obtaining a Commission permit to drill a new well.[3]  For the 467 and 1,200 feet spacing in these Field Rules, the Table specifies a minimum drilling unit of 40 acres.  (Statewide Rule 38 and its Table are attached as Appendix G).  The Table shows the number of acres that are included in the "standard unit" associated with various spacing rules, *i.e.*, the smallest amount of acreage required for obtaining a drilling permit for a well, irrespective whether the well is ultimately completed as an oil or gas well.    But the only prohibition established by Rule 38 is that "[n]o well shall be drilled on substandard acreage."    16  T.A.C.  §3.38(b)(1). "Substandard acreage" means "[l]ess acreage than the smallest amount established for standard or optional drilling units." *Id.* at §3.38(a)(4).  Thus, as pertinent here,

---

[3]   The Table is as follows:

Figure: 16 TAC §3.38(b)(2)(A)

| Spacing Rule | Acreage Requirement |
|---|---|
| (1) 150 - 300 | 2 |
| (2) 200 - 400 | 4 |
| (3) 330 - 660 | 10 |
| (4) 330 - 933 | 20 |
| (5) 467 - 933 | 20 |
| (6) 467 - 1200 | 40 |
| (7) 660 - 1320 | 40 |

the only prohibition regarding acreage that may be derived from these Field Rules is that the Commission will not issue a permit for drilling a new well on less than 40 acres.

Statewide Rule 38 is titled "Well Densities," 16 T.A.C. §3.38 (App. G), and the 40-acre requirement for a <u>drilling</u> unit is a density, not a spacing, requirement. Statewide Rule 38 defines a "drilling unit" as "the acreage assigned to a well for *drilling* purposes." 16 T.A.C. § 3.38(a)(2) (App. G, emphasis added). As Vaquillas correctly explains: "[t]he density requirement [prescribes] the minimum number of acres the operator must have to drill a well. * * * Such units are by the nature minimum-sized units, because they prescribe the minimum acreage required to obtain a Railroad Commission permit to drill a well." (CR:208).

The Field Rules establish no density requirement, or other unit size requirement, that extends beyond the issuance of a drilling permit.

## SUMMARY OF THE ARGUMENT

The Leases granted ConocoPhillips a fee simple determinable estate in the minerals in and under 33,363 acres of Webb County land. By the time ConocoPhillips' continuous drilling program ended in 2012, ConocoPhillips had drilled more than 200 gas wells on that land. Under Sentence (1) in the retained acreage clause, ConocoPhillips was entitled to retain, under lease, 640 acres for

11

each gas well. ConocoPhillips was obligated to release the remainder of the acreage back to Vaquillas, which it did.

Contrary to Vaquillas' argument, the exception in Sentence (2) of the retained acreage clause does not apply. The Railroad Commission's Field Rules, adopted in 1998, did not provide "a spacing or proration establishing different units of acreage per well." The Field Rules did nothing but carry forward from the Statewide Spacing Rule the same requirement that an operator must assemble a minimum of 40 acres before the Commission will issue a permit to drill a new well. The Field Rules effected no change to ConocoPhillips' gas wells in the field. Consequently, when ConocoPhillips' continuous drilling program ended, no units different from 640 acres had been "*established*" in the field by Field Rules.

If Vaquillas were correct in contending that Sentence (2) of the retained acreage clause limits ConocoPhillips to retaining only the minimum acreage required to obtain a permit to drill a new well, that minimum acreage will likely be less than 640 acres. Accordingly, Vaquillas' interpretation erroneously makes the exception in Sentence (2) swallow the 640-acre general rule in Sentence (1).

In addition, Vaquillas' proposed interpretation would render illusory the pooling clause's authority to pool up to 640 acres for gas wells, and render superfluous Sentence (4)'s statement that ConocoPhillips must have *at least* one

12

well per block of retained acreage.  ConocoPhillips could not drill more than one well on Vaquillas' proposed retained 40-acre blocks.

Vaquillas' interpretation would also obliterate the parties' clear differentiation between the acreage assigned to oil wells (40 acres) and gas wells (640 acres) that is stated twice in the Leases.  Under Vaquillas' interpretation, both oil and gas wells would retain only 40 acres.

But most significantly, Vaquillas' erroneously interpretation of Sentence (2) violates the established rule of Texas law that "we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *E.g., Anadarko Petroleum Corp. v. Thompson*, 94 S.W. 3d 550, 554 (Tex. 2002). This rule applies when interpreting retained acreage clauses.  *E.g., Chesapeake Exploration, L.L.C. v. Energen Resources Corp*., 445 S.W.3d 878, 883 (Tex. App.—El Paso 2014, no pet.).

Specifically, Vaquillas claims Sentence (2) results in more than 15,000 additional acres "reverting" to Vaquillas under the retained acreage clause.  But Sentence (2) does not mandate that result "so clearly, precisely, and unequivocally" so that the Court could "reasonably give it no other meaning."

13

## ARGUMENT

**Standard of Review**.    This Court reviews the trial court's summary judgment ruling *de novo*.  *E.g., Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 279 (Tex. App.—San Antonio 2013, no pet.).  When, as here, both parties moved for summary judgment and the trial court granted one motion and denied the other, this Court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the Court determines the trial court erred, renders the judgment the trial court should have rendered.  *Id*.  *See* TEX. R. APP. P. 43.2(c).

1.    **The Field Rules did not "*establish*" different units of acreage per well.**

   A.    ***The parties' competing interpretations***

In Sentence (1) of the retained acreage clause, the parties agreed that ConocoPhillips was entitled to retain 640 acres "for each producing or shut-in gas well" when its continuous drilling program ended.    Consequently, when ConocoPhillips filed its Partial Releases of the Leases, it correctly retained 640 acres per gas well as agreed in Sentence (1).

Vaquillas, on the other hand, contends the *exception* in Sentence (2) controls.  Vaquillas claims that under the exception, the Field Rules "provide for a spacing or proration establishing different units of acreage per well," and thus,

14

"such established different units shall be held" in lieu of the 640-acre units specified in Sentence (1).

In the trial court Vaquillas offered no substantial analysis of the Field Rules, except to say those rules identify one kind of unit—a *minimum* 40-acre drilling unit to obtain a Commission permit to drill a new well. (CR:215). From that observation, Vaquillas leapt, erroneously, to the conclusion that the minimum 40-acre requirement for a drilling permit in those rules triggered the exception in Sentence (2). Vaquillas moved for (and was granted) partial summary judgment that ConocoPhillips "retains only 40 acres for each producing and shut-in-gas well drilled by [ConocoPhillips] on the oil and gas leases that are the subject of this lawsuit." (CR:202).

Consequently, the lease interpretation question for this Court is whether ConocoPhillips correctly retained 640 acres per well under Sentence (1) of the retained acreage clause, or whether (as Vaquillas contends) the Field Rules triggered the exception in Sentence (2) of that clause? As will be discussed in greater detail below, Vaquillas maintains that Sentence (2) operates as a <u>limitation on the grant</u> ConocoPhillips received by virtue of the Leases. Consequently, Vaquillas argues that all acreage granted by the Leases to ConocoPhillips "reverted" to Vaquillas at the end of the continuous drilling program, except for 40 acres around each existing well. Vaquillas' Petition expressly states: "At the

15

Release Date, the Reverted Minerals automatically reverted to Vaquillas."
(CR:195, see also CR:196).

### B. *Analysis of the retained acreage clause in light of the Field Rules*

The general rules for construing oil and gas leases are well known. The Court examines the entire lease "and consider[s] each part with every other part so that the effect and meaning of one part on any other part may be determined." *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.—San Antonio 2001, pet. denied). The Court gives terms in the lease "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage*, 939 S.W.2d at 121; *Birnbaum*, 48 S.W.3d at 257. When construing oil and gas leases, the Court should "avoid when possible a construction which is unreasonable, inequitable, and oppressive. *Springer Ranch*, 421 S.W.3d at 287.

Neither party contends the retained acreage clause is ambiguous, so the Court may interpret the clause as a matter of law. *E.g, Springer Ranch*, 421 S.W.3d at 279. Furthermore, the Court may interpret the Commission's Field Rules as a matter of law. *See, e.g., State v. Bilbo*, 392 S.W.2d 121, 122 (Tex. 1965) (interpretation of certificate issued by the Commission presents a question of law).

16

**"Establishing" and "established" different units**.  The contested language in the retained acreage clause is Sentence (2)'s statement that  "in case any rule adopted by the [Commission] . . . provides for a spacing or proration <u>establishing</u> <u>different units</u> of acreage per well, then such <u>established different units</u> shall be held under this lease by such production, in lieu of the  . . . 640-acre units above mentioned."

In that language, the parties twice used forms of the word, "establish."  The first time "establish" is used, the form is "establishing," which modifies the phrase "rule adopted by the Commission [that] provides for a spacing or proration."  That usage suggests the "establishing" of different units of acreage per well occurs <u>when</u> the Commission adopts a field rule.

The second time the parties used a version of "establish," they employed  the past tense, *i.e.*, they referred to "*established* different units," suggesting that different units had already been "established" in the past.  In the context of the entire phrase, the meaning is that different units were "established" when the Field Rules were adopted, as a result of the Field Rules.

The ordinary meaning of "establish" is "to settle, make, or fix firmly." BLACK'S LEGAL DICTIONARY at 626 (9th ed. 2009).  Similarly, an old Texas case says "established" means "[m]ake steadfast, firm, or stable, to settle on a firm or permanent basis."  *Rowley v. Braley*, 286 S.W. 241, 245 (Tex. Civ. App—Amarillo

17

1926, writ dism'd).  WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (1993) says "establish" means either "to make firm or stable," or to "settle or fix after consideration by enactment or agreement." *Id.* at 778.[4]

**<u>These Field Rules did not "establish" different units</u>**.  Using those common definitions of "establish," it is incorrect to argue that the Field Rules "made firm or stable," "settled on a permanent basis," or "settled or fixed after consideration by enactment or agreement" a requirement that units for gas wells must be different from the 640 acres granted by the pooling authority of the Leases and specified for retention under Sentence (1) of the retained acreage clause.  Upon the Commission's adopting of the Field Rules, those rules neither required nor made any change to ConocoPhillips' gas wells in the field, *i.e.*, the Field Rules imposed no requirement that different units be "established" for wells in production or shut-in awaiting production.

The Field Rules contain only one requirement that pertains to quantity of acreage.  They do that by means of the spacing rules—at least 467 feet from lease

---

[4]   The Supreme Court's opinion in *Jones v. Killingsworth*, 403 S.W.2d 325 (Tex. 1965), illustrates the importance of focusing on the specific words parties employ in oil and gas leases.  In *Jones*, the Court held that the word "prescribed" did not mean "permitted."  Consequently, before Sentence (2) comes into play, the Commission must "establish" units of a different size than 640 acres.  The parties did not say the exception in Sentence (2) comes into play if the Commission adopts a Field Rule that merely permits drilling on units of fewer than 640 acres, and that is all the Field Rules do.  They permit operators to drill on a minimum of 40 acres, but they do not "establish" 40-acre units.

lines and 1,200 feet from other wells—found in Rule 2. By applying those minimum spacing rules to the Table in Statewide Rule 38, 16 T.A.C. § 3.38(b)(2) (App. G, fn. 3, *infra*), one sees that the minimum density, or drilling unit size, is 40 acres. As Vaquillas correctly explains: "[t]he density requirement [prescribes] the minimum number of acres the operator must have to drill a well." (CR:208).

Thus, the sole acreage requirement imposed by the Field Rules is a *minimum* acreage requirement for the obtaining of a permit to drill a new well. The Field Rules do not say there is anything wrong with a 640-acre unit for any producing or shut-in gas well. Simply put, nothing in the Field Rules "established" different units from the 640-acre retained acreage units to which the parties agreed in Sentence (1) of the retained acreage clause.

**Two additional rules of oil and gas lease construction**. There are two additional reasons why Vaquillas' proposed interpretation of the retained acreage clause is wrong:

*First, under Vaquillas' interpretation that minimum drilling units control, the exception in Sentence (2) would swallow the general rule in Sentence (1).* Whether a particular field is governed by a special field rule or by Statewide Rules 37 and 38, the Commission requires an operator to assemble a minimum number of acres before the Commission will issue a drilling permit for a new well. And it is unlikely that the *minimum* number of acres the Commission would

19

require for a drilling permit would be more than 640. One may see that by reviewing the Table in Statewide Rule 38 on which Vaquillas relies, reproduced at fn. 3, *infra*. The largest "standard drilling unit" in the entire Table is 40 acres. *See* 16 T.A.C. § 3.38(b)(2)(A) (App. G). All other drilling units listed in the Table are smaller, ranging from 2 to 20 acres. *Id*.

Consequently, if what Vaquillas claims were correct—*i.e.*, that one would look to the *minimum* acreage required for a *drilling* unit by a Field Rule—then the general rule of 640-acres in Sentence (1) likely would never apply. Under Vaquillas' argument, if a field rule exists, one first would look to see what minimum drilling units were triggered by the spacing rules in that rule, by consulting either the rule itself or Statewide Rule 38's Table. Then as Vaquillas wants this Court to interpret the retained acreage clause, that minimum drilling unit—usually 40 acres, likely never more than 640 acres—will always prevail. Sentence (1)—the 640-acre general rule—would become meaningless. The exception will have swallowed the rule.

It would have been simple for the parties to write the interpretation for which Vaquillas contends into the retained acreage clause. To capture Vaquillas' proposed interpretation, the parties needed to write only that when the retained acreage clause operates, the lessee may retain around each well only the minimum amount of acreage required by the Commission to obtain a drilling permit. That is

20

the construction for which Vaquillas contends and the construction the trial court adopted. But as this Court has said, courts may not rewrite leases in the guise of interpreting them. *E.g., EOG Resources, Inc. v. Killam Oil Co., Ltd.*, 239 S.W.3d 293, 300 (Tex. App.—San Antonio 2007, pet. denied). Yet that is what Vaquillas wants this Court to do.

This Court considered a retained acreage clause very similar to the one in these Leases in *ConocoPhillips Co. v. Ramirez*, No. 04-05-00488-CV, 2006 WL 1748584 (Tex. App.—San Antonio, 2006) (not designated for publication). For one of the wells at issue in *Ramirez*, the Serafin No. 1, there were no applicable field rules. Instead, the Commission's Statewide Rules applied. Ramirez sought to limit ConocoPhillips' retained acreage for the Serafin No. 1 to 40 acres by relying on the minimum 40-acre drilling units resulting from application of Statewide Rule 37's spacing requirements to the Table in then-existing Statewide Rule 38. *See* 2006 WL 1748584 at *1. The spacing required by Statewide Rule 37 was 467 and 1,200 feet, the same spacing carried into the Field Rules at issue in this appeal. *See* 16 T.A.C. §3.37(a)(1). The Table in Statewide Rule 38 expressly applies both to Statewide Rules and field rules, so Statewide Rule 37's spacing triggered 40-acre drilling units, just like the Field Rules at issue here. *See Ramirez*, 2006 WL 1748584 at *3.

21

Although the trial court ruled for Ramirez, this Court reversed, rejecting Ramirez's attempt to limit ConocoPhillips to 40 acres of retained acreage around the Serafin No. 1 well by application of Statewide Rule 38 through the spacing requirements stated in Statewide Rule 37. The exception in the retained acreage clause in *Ramirez* required, as does the retained acreage clause here, for the Commission to adopt a rule "for a field." In *Ramirez*, this Court gave meaning to the phrase, "for a field," and held the Commission's Statewide Rules were not adopted "for a field." Consequently, Ramirez's attempt to apply the exception in that retained acreage clause failed at the threshold. 2006 WL 1748584 at *2.

But one of the reasons this Court gave for its holding in *Ramirez* is applicable here. This Court observed that if Ramirez's arguments had been correct, "the structure of [the retained acreage clause] is turned on its head: the first clause [here Sentence (1)] would never apply, while the 'except' clause [here Sentence (2)] would state both the general rule . . . and the exception." If Vaquillas were correct, the exact same would be true in this appeal. The general rule in Sentence (1) would never apply. The exception in Sentence (2) always will. As this Court wrote in *Ramirez*, that construction "would be not only nonsensical but contrary to general rules of construction." *Ramirez*, 2006 WL 1748584 at *3.

This certainly does not mean, as Vaquillas argued below, that the word "spacing" in Sentence (2), where that sentence refers to "spacing or proration," has

22

no meaning.  Over the years, the Commission has adopted field rules that establish *maximum* densities for wells in specific fields.  There are mentions of such field rules in decided cases.  *See, e.g., Railroad Commission v. Woods Exploration and Producing Co.*, 405 S.W.2d 313, 326 (Tex. 1966) (Smith, J., dissenting) (stating that field rules at issue "established a 320-acre spacing unit rule."); *Halbouty v. Railroad Commission*, 357 S.W.2d 364, 368 (Tex. 1962) (quoting field rule stating:  "the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each one hundred and sixty (160) acre proration unit"); *Clifton v. Koontz*, 325 S.W.2d 684, 695 (Tex. 1959) (stating that field rules at issue "provide for 320-acre units with 10 percent tolerance so that a maximum of 352 acres may be assigned.").[5]  But the Commission did not include such a provision in the Field Rules at issue in this appeal.

If the Field Rules for the Lobo Consolidated Field had established a maximum unit size for gas wells different from 640 acres (which they did not), ConocoPhillips would have been required to conform to the rules as soon as they became effective.  Different units would have been "established," and Sentence (2) would then apply when the continuous drilling program ended.  In other words, if

---

[5]    "Rule 38 establishes the minimum number of acres that must be assigned to each well in order to obtain a drilling permit.  *In the absence of special field rules*, the minimum requirement is 40 acres per well."  J. Hayes, *Texas Railroad Commission:  Some Basics Every Practitioner Should Know*, 28 State Bar of Texas, Oil, Gas and Mineral Law Section Report 3, 20 (June 2004) (emphasis added).

the Field Rules had "established" different units, those different units would have taken effect when the Field Rules were adopted. But the Field Rules effected no changes to acreages for producing wells.

*Second, under Vaquillas' interpretation, the power granted in Paragraph 4 of the Leases to pool up to 640 acres for gas wells would be destroyed.* As explained above, Paragraph 4 of both Leases granted ConocoPhillips the power to pool for gas wells up to 640 acres. Paragraph 4 also provides that if the Commission "prescribes or permits" the creation of larger units, ConocoPhillips' power to pool would include those larger units. (App. C & D). Also as explained above, the general rule in Sentence (1) of the retained acreage clause allows ConocoPhillips to retain 640 acres for each gas well.

That both Paragraphs associate gas wells with 640-acre blocks of acreage is not coincidence. Vaquillas' proposed interpretation of Sentence (2) would create three surprisingly negative results for the lessee.

(A) Even though the Lessor granted the right to pool up to 640 acres for gas wells, each 640-acre unit, although properly pooled and operated in good faith, would abruptly shrink to 40 acres when the retained acreage clause operates.[6] This

---

[6] Vaquillas argued in the trial court that ConocoPhillips would had to drill *16 gas wells* per 640-acres in order to "fully develop the acreage" and thereby earn the right to retain that 640 acres under the retained acreage clause. (CR:379). That argument conflicts with the authority Vaquillas granted ConocoPhillips in Paragraph 4 to pool 640 acres for gas wells, and it also directly conflicts with

24

would be true—and oddly so—even though Rule 2 of the Field Rules, on which Vaquillas relies, has been in effect since February 24, 1998, yet this "shrinking" did not occur when (or since) those Field Rules were adopted.

(B)   The retained acreage clause does not operate to terminate the Leases; it requires only a release of certain acreage from the Leases. Consequently, after the retained acreage clause operates, the pooling clause in Paragraph 4 should remain in full force in effect.

But, under Vaquillas' erroneous interpretation, the pooling clause becomes a dead letter. Under Vaquillas' interpretation, ConocoPhillips would retain under lease only 40 acre blocks around individual wells. It will be impossible for ConocoPhillips to exercise the power granted in Paragraph 4 to pool up to 640 acres, or even to drill a new gas well on an existing 640 acre unit. Consequently, Vaquillas' proposed interpretation of Paragraph 18, the retained acreage clause, cannot be harmonized with Paragraph 4 of the same Leases.

Furthermore, under Vaquillas' erroneous interpretation of Sentence (2), two words in Sentence (4) of the retained acreage clause are rendered superfluous.

the general rule in Sentence (1) of the retained acreage clause. Under Vaquillas' contentions, the pooling authority for gas wells under Paragraph 4 and Sentence (1) of the retained acreage clause would become illusory.

The Leases do <u>not</u> state, as Vaquillas erroneously claims, that ConocoPhillips was obligated to "drill . . . additional wells to develop the leasehold acreage to the density provided by Railroad Commission rules." (CR:203).

25

Sentence (4) states there must be "at least" one well per block of retained acreage. If Vaquillas' 40-acre argument were correct, there could never be more than one well per 40-acre block of retained acreage because the Commission would not issue a permit for a second well, either for oil or gas.

On the other hand, all paragraphs of the Leases harmonize under ConocoPhillips' interpretation of the retained acreage clause. ConocoPhillips retains 640-acre blocks of acreage around wells, the same as Paragraph 4, the pooling authority, allows it to do. Consequently, ConocoPhillips may continue to pool and maintain 640-acre gas units. Furthermore, ConocoPhillips may obtain permits to drill new wells on those 640-acre blocks, so as long as the Field Rule's from-lease-line and between-well spacing requirements are met.

(C)   The Leases plainly contemplate that the operator will assign different acreages to oil and gas wells. Paragraph 4 restricts pooling for oil wells to 40 acres, but allows pooling for gas wells up to 640 acres. Sentence (1) of the retained acreage clause allows ConocoPhillips to retain only 40 acres around producing oil wells, but 640 acres around gas wells. Vaquillas' proposed interpretation of Sentence (2) would completely destroy the differentiation the parties clearly intended between acreages assigned to producing oil and gas wells. Vaquillas' argument causes that result by relying, at bottom, on Statewide Rule 38, which does not distinguish, for *drilling* permit purposes, between oil and gas wells.

26

As this Court frequently has observed, courts should strive to harmonize and give effect to *all* provisions of the Leases "so that none will be rendered meaningless." *E.g., Springer Ranch*, 421 S.W.3d at 279; *EOG Resources*, 239 S.W.3d at 300. ConocoPhillips' is the only interpretation that gives meaning to all provisions of the Leases. Vaquillas' incorrect interpretation does not. Indeed, it is simply impossible to find within Sentence (2) the wholesale revisions to the Leases Vaquillas' erroneous interpretation would make.

**2.** **If there were any doubt about the proper interpretation of Sentence (2), the Court should apply the strong presumption in Texas law against making that sentence a "limitation on the grant."**

For the reasons above, the Commission's Field Rules covering these Leases do not trigger the exception in Sentence (2) of the retained acreage clause in the Leases. But even if there were any doubt, this Court should apply the strong Texas law presumption *against* construing a lease provision to effect a limitation on the grant. Under that presumption, the Court should not interpret Sentence (2) to work the forfeiture for which Vaquillas contends.

By way of background, these Texas oil and gas leases were conveyances by which Vaquillas and its predecessors granted to ConocoPhillips' predecessor the fee simple determinable in the mineral estate under the land described in the Leases. *Natural Gas Pipeline Co. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003); *accord Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002);

27

*Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 551-52 (Tex. App.—San Antonio 2011, no pet.). As described above, the Leases at issue conveyed mineral estates to ConocoPhillips for five and three year primary terms and "as long thereafter as oil, gas, or other mineral is produced from said land or land with which said land is pooled hereunder."[7]

Furthermore, "an oil, gas and mineral lease is indivisible by its nature. Production from any part of the lease keeps the lease in effect during the primary term as for so long as oil, gas and other minerals are being produced as to all lands described in the instrument." *Shown v. Getty Oil Co.*, 645 S.W.2d 555, 560 (Tex. App.—San Antonio 1982, writ ref'd.); *accord, Matthews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex. 1968); *Humphrey v. Seale*, 716 S.W.2d 620, 622 (Tex. App.—Corpus Christi 1986, no writ). ConocoPhillips had completed more than two hundred gas wells on the Leases by the time its continuous drilling program ended. (CR:203).

Accordingly, ConocoPhillips' production from the two Leases entitles ConocoPhillips to maintain the Leases in full force and effect until an event of

---

[7] Vaquillas attempted to minimize the legal effect of the Leases in the trial court, suggesting the Leases merely "transferred the rights to explore, drill, produce, and market the minerals to an oil and gas company with the skill and financial ability to do so." (CR:206). No doubt the Leases did that, but as discussed above, they did more. They conveyed the mineral estate in fee simple determinable to ConocoPhillips. The significance is that, as discussed in this section of this Brief, the presumption against construing lease clauses to effect limitations on the grant is fully applicable to the retained acreage clause.

defeasance, or limitation on the grant, occurs. The first limitation on the grant, found in the habendum clause in Paragraph 2 of the Leases, is cessation of production in paying quantities, which has not occurred. The second limitation on the grant is in Sentence (1) of the retained acreage clause, which obligates ConocoPhillips to release all but 640 acres around producing or shut-in gas wells. ConocoPhillips has complied. Under Vaquillas' erroneous argument, Sentence (2) of the retained acreage clause would operate as a third, very substantial "limitation on the grant." Consequently, in "limitation-on-the-grant" terminology, the question posed by this appeal is whether because of Sentence (2), ConocoPhillips forfeited and must now release over 15,000 additional acres because that additional, alleged limitation on the grant caused ConocoPhillips to forfeit all but 40 acres around producing and shut-in gas wells?

Texas law creates a strong presumption against giving Sentence (2) the limitation-on-the-grant effect for which Vaquillas contends. As the Supreme Court has held time and again, "we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Anadarko Petroleum Corp.,* 94 S.W. 3d at 554; *accord*, *Rogers v. Ricane Enterprises, Inc.*, 773 S.W.2d 76, 79 (Tex. 1989); *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966); *Knight v. Chicago Corp.*, 188 S.W.2d 564, 566 (Tex. 1945).

When the *Knight* case was before this Court, Justice Norvell, then a member of this Court, held that even if there are two reasonable constructions of a lease, the Court will choose the one that does *not* result in "a forfeiture (or termination of the estate upon limitation)." *Knight v. Chicago Corp.*, 183 S.W.2d 666, 671 (Tex. Civ. App.—San Antonio 1944), *aff'd*, 188 S.W.2d 564 (Tex. 1945).

Texas courts apply the presumption against a limitation on the grant when interpreting retained acreage clauses. *See Chesapeake Exploration, L.L.C. v. Energen Resources Corp.*, 445 S.W.3d 878, 883 (Tex. App.—El Paso 2014, no pet.) (citing *Anadarko Petroleum Corp.*, 94 S.W.3d at 554, and stating "adopting the construction [of a retained acreage clause] urged by Chesapeake imposes an unnecessary limitation on the kind and character of the estate the parties chose to convey, *i.e.*, an expansive one maintained by production from any part of pooled lands unless limited by language so clear, precise, and un-equivocal that no other conclusion could be reached."); *Tomlin v. Petroleum Corp. of Texas*, 694 S.W.2d 441, 442 (Tex. App.—Eastland 1985, no writ) (*citing Fox*, 398 S.W.2d at 92, and applying the presumption against a limitation on the grant to hold that retained acreage clause expressly referring only to oil wells did not mandate release of acreage around gas wells).

ConocoPhillips requests the Court to apply the presumption in this appeal. ConocoPhillips does not agree that Vaquillas' construction of Sentence (2) is

reasonable, equitable or unoppressive. Indeed, as described above in this Brief, when one gives the words "establishing" and "established" their plain and ordinary meaning, the exception in Sentence (2) is not triggered, and the general rule of Sentence (1) prevails. But whatever else one may say about Vaquillas' interpretation of Sentence (2), one certainly cannot say that sentence, when viewed in light of the Field Rules, is so clear and precise that no conclusion other than Vaquillas' proposed reading can be reached. Consequently, Vaquillas' interpretation of Sentence (2)—which would create a very significant additional limitation on ConocoPhillips' grant—should be rejected.

## PRAYER FOR RELIEF

ConocoPhillips prays this Court will reverse the trial court's Amended order on Cross-Motions for Summary Judgment (CR:433, App. B), grant ConocoPhillips' Motion for Summary Judgment, and deny Vaquillas' Cross-Motion for Partial Summary Judgment. The Court should reverse the declaration on page 1 of the trial court's Order and declare that ConocoPhillips did not breach the Leases by retaining 640 acres per producing and shut-in gas wells when ConocoPhillips' continuous drilling program ended, and is not required to release additional acreage, as Vaquillas contends.

ConocoPhillips also prays for recovery of its costs on appeal, remand to the trial court for determination whether ConocoPhillips is entitled to costs, including

31

reasonable attorneys' fees, under Texas Civil Practice & Remedies Code § 37.009, and for all other relief to which it is entitled.

Respectfully submitted,

*/s/ Michael V. Powell*
Michael V. Powell
  State Bar No. 16204400
  Email: mpowell@lockelord.com
Cynthia K. Timms
  State Bar No. 11161450
  Email: ctimms@lockelord.com
Elizabeth L. Tiblets
  State Bar No. 24066194
  Email: etiblets@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Tel: 214-740-8520
Fax: 214-740-8800

Adolfo Campero
  State Bar No. 00793454
  Email: acampero@camperolaw.com
Campero & Associates, P.C.
315 Calle Del Norte, Suite 207
Laredo, Texas 78041
Tel: 956-796-0330
Fax: 956-796-0399

**ATTORNEYS FOR APPELLANT
CONOCOPHILLIPS COMPANY**

32

# CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), as amended effective December 1, 2012, the undersigned certifies that this Petition complies with the length limitations of Rule 28.3(g) (which the undersigned understands now to be stated in Rule 9.4(i)) and the typeface requirements of Rule 9.4(e).

1.      Exclusive of the contents excluded by Rule 9.4(i)(1), this Brief contains 7,189 words as counted by the Word Count function (including textboxes, footnotes, and endnotes) of Microsoft Office Word 2010.

2.      This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version:  Microsoft Office Word 2010
Typeface Name:  Times New Roman
Font Size:  14 point

*/s/ Michael V. Powell*
Michael V. Powell

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April 2015, a true and correct copy of Brief of Appellant, ConocoPhillips Company, was served by eFile Texas and/or pdf on Appellees through its counsel of record listed below:

Gregg Owens
   Email: gregg.owens@haysowens.com
Robert G. Hargrove
   Email: rob.hargrove@haysowens.com
Hays & Owens L.L.P.
807 Brazos Street, Suite 500
Austin, Texas   78701
Tel: 512.472.3993
Fax: 512.472.3883

A. Michael Jung
   Email: michael.jung@strasburger.com
Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202-3794
Tel: 214-651-4724
Fax: 214-651-4330 (main)
Fax: 214-659-4022 (direct)

*Counsel for Vaquillas Unproven Minerals, Ltd.*

Raul Leal
   Email: rleal@rl-lawfirm.com
Raul Leal Incorporated
5810 San Bernardo, Suite 390
Laredo, Texas 78041
Tel: 956-727-0039
Fax: 956-727-0369

Armando X. Lopez
   Email: mandox@rio.bravo.net
Law Offices of Armando X. Lopez
1510 Calle Del Norte, Suite 16
Laredo, Texas  78041
Tel:  956-726-0722
Fax:  956-726-6049

*/s/ Michael V. Powell*
Michael V. Powell

# No. 04-15-00066-CV

# In the Court of Appeals
# for the Fourth District of Texas
# San Antonio, Texas

CONOCOPHILLIPS COMPANY,

*Appellant,*

v.

VAQUILLAS UNPROVEN MINERALS, LTD.,

*Appellee.*

From Cause No. 2014 CVQ000 438 D4
406th Judicial District Court, Webb County, Texas
Honorable Oscar J. Hale, Jr., Presiding Judge

**APPENDIX TO APPELLANT'S BRIEF**

**Tab**

Court of Appeals Order Granting Petition for Permission to Appeal................................................................................................ **A**

Trial Court Amended Order on Cross-Motions for Summary Judgment........ **B**

Oil, Gas and Mineral Lease (26,622.79 acres)......................................... **C**

Oil, Gas and Mineral Lease (6,740 acres)................................................ **D**

Railroad Commission Order Adopting Field Rules for the Vaquillas Ranch (Lobo Cons.) Field Dated February 24, 1998.................. **E**

Railroad Commission Final Order Amending Field Rules for the Vaquillas Ranch (Lobo Cons.) Field Dated November 2, 2010 .................... **F**

Railroad Commission Statewide Rule 38........................................................ **G**

FILE COPY



# Fourth Court of Appeals
## San Antonio, Texas

February 13, 2015

No. 04-15-00066-CV

**CONOCOPHILLIPS COMPANY,**
Appellant

v.

**VAQUILLAS UNPROVEN MINERALS, LTD**., 
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2014CVQ000438-D4
Honorable Oscar J Hale, Jr., Judge Presiding

# O R D E R

Sitting:     Sandee Bryan Marion, Chief Justice
             Karen Angelini, Justice
             Marialyn Barnard, Justice

The appellant's unopposed petition for permission to appeal from an interlocutory order is GRANTED. TEX. R. APP. P. 28.3. "A separate notice of appeal need not be filed" as "a notice of appeal is deemed to have been filed on [the date of this order]." *Id*. at 28.3(k). This appeal is governed by the rules for accelerated appeals. *Id*.

The clerk's record is due no later than February 23, 2015. *Id*. at 35.1(b). The clerk of this court is directed to file a copy of this order with the trial court clerk. *Id*. at 28.3(k).

_Sandee Bryan Marion_
Sandee Bryan Marion, Chief Justice

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the said court on this 13th day of February, 2015.

_Keith E. Hottle_
Keith E. Hottle
Clerk of Court

| | | |
|---|---|---|
| VAQUILLAS UNPROVEN MINERALS, LTD, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | WEBB COUNTY, TEXAS |
| CONOCOPHILLIPS COMPANY, | § § § | |
| Defendant. | § | 406TH JUDICIAL DISTRICT |

## AMENDED ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

On October 30, 2014, Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Partial Summary Judgment were heard. The Court, having reviewed the motion, briefs, responses, competent summary judgment evidence, and argument of counsel, rules on these motions as follows.

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendant's Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Plaintiff's Cross-Motion for Partial Summary Judgment is **GRANTED.** The Court **DECLARES** that Defendant has breached the 26,622.79-acre Lease and the 6,740-acre Lease by failing to release all acreage in excess of 40 acres for each producing and shut-in natural gas well capable of producing in paying quantities.

This Order of the Court decides the central question in this case, which is the number of acres under two oil and gas leases that Defendant ConocoPhillips Company retains under the "retained acreage" clauses of the leases at the conclusion of ConocoPhillips' continuous drilling operations. The Court finds that the question decided by this order is a controlling question of

**AMENDED ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** PAGE 1

law as to which there is a substantial ground for difference of opinion. The Court also finds that immediate appeal of the order will materially advance the ultimate termination of this litigation.

This Court's Order, and the underlying controlling question of law, involve the parties' competing legal interpretations of the language of the "retained acreage" clauses and certain Field Rules adopted by the Railroad Commission of Texas. Although the Court has ruled in favor of the Plaintiff lessor, Vaquillas Unproven Minerals, Ltd., the Court concludes there are substantial grounds for difference of opinion regarding whether the leases allow ConocoPhillips to retain 40 acres per well, as Plaintiff contends, or 640 acres, as ConocoPhillips contends.

An immediate appeal from this Court's Order will materially advance the final conclusion of litigation. Plaintiff seeks judgment ordering ConocoPhillips to execute releases of over 15,000 acres described in the leases, as well as possible direct and consequential damages flowing from ConocoPhillips' alleged breach of the "retained acreage" clauses of the leases. If ConocoPhillips is forced to release the acreage but later wins an appeal determining that ConocoPhillips' original interpretation is correct, significant problems could develop. On the other hand, the lessor, Vaquillas Unproven Minerals, Ltd. is interested in having the release of acreage as soon as possible. Furthermore, the Court and the parties anticipate that a determination of Plaintiff's damages, if any, will be costly and time-consuming.

ConocoPhillips desires to take an interlocutory appeal. The Court rules that such appeal shall be defined by the lease interpretation question addressed in the parties' cross-motions for summary judgment. More specifically, the question is whether the leases' retained acreage clause allows ConocoPhillips Company to retain only 40 acres per each producing or shut-in gas well it has drilled on the two leases, or whether ConocoPhillips is allowed to retain 640 acres (plus 10% tolerance) for each wells.

**AMENDED ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT          PAGE 2**

**IT IS HEREBY ORDERED** that, pursuant to Texas Civil Practice & Remedies Code § 51.014(d) (West. Supp. 2014) an interlocutory appeal is **ALLOWED** from this Order.

**IT IS FURTHER ORDERED** that trial of this action is stayed pending the interlocutory appeal. The Court's Pre-Trial Guideline Order and Scheduling Order are hereby **VACATED**. The parties may proceed with discovery and pretrial proceedings by agreement or with leave of Court.

SIGNED this ___ day of _____, 2015.

                       Hon. Oscar J. Hale, Jr.
                       Judge Presiding

APPROVED AS TO FORM:

Michael V. Powell
State Bar No. 16204400
Email: mpowell@lockelord.com
Elizabeth L. Tiblets
State Bar No. 24066194
Email: etiblets@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Tel: 214-740-8520
Fax: 214-740-8800

Adolfo Campero
State Bar No. 00793454
Email: acampero@camperolaw.com
CAMPERO & ASSOCIATES, P.C.
315 Calle Del Norte, Suite 207
Laredo, Texas 78041
Tel: 956-796-0330
Fax: 956-796-0399

**ATTORNEYS FOR DEFENDANT CONOCOPHILLIPS COMPANY**

APPROVED AS TO FORM:

 /s/ P. Michael Jung
P. Michael Jung
  State Bar No. 11054600
  Email: michael.jung@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202-3794
Tel: 214-651-4724
Fax: 214-651-4330 (main)
Fax: 214-659-4022 (direct)

Gregg Owens
  State Bar No. 15383500
  Email: gregg.owens@haysowens.com
Robert G. Hargrove
  State Bar No. 09303300
  Email: rob.hargrove@haysowens.com
HAYS & OWENS L.L.P.
807 Brazos Street, Suite 500
Austin, Texas   78701
Tel: 512-472-3993
Fax: 512-472-3883

Armando X. Lopez
  State Bar No. 12562400
  Email: mandox@rio.bravo.net
LAW OFFICES OF ARMANDO X. LOPEZ
1510 Calle Del Norte, Suite 16
Laredo, Texas  78041
Tel:  956-726-0722
Fax:  956-726-6049

Raul Leal
  State Bar No. 24032657
  Email: rleal@rl-lawfirm.com
RAUL LEAL INCORPORATED
5810 San Bernardo, Suite 390
Laredo, Texas 78041
Tel: 956-727-0039
Fax: 956-727-0369

**ATTORNEYS FOR VAQUILLAS**
**UNPROVEN MINERALS, LTD.**

Producers 88 (7-66)
With 640 Acres Pooling Provision

Pof Printing & Stationery Co., Houston, Texas

# OIL, GAS AND MINERAL LEASE AMENDING OIL, GAS AND MINERAL
## LEASE DATED JUNE 15, 1974 (AS AMENDED) BETWEEN LESSOR AND LESSEE HEREIN

THIS AGREEMENT made this _____1_____ day of _____November_____ 19_87_, between

Vaquillas Ranch Company, Ltd.; Vaquillas Unproven Mineral Trust; Vaquillas Proven Mineral Trust; acting by and through its general partners, J. O. Walker, Jr., E. Walker Quiros, Gene S. Walker and Evan B. Quiros.

Lessor (whether one or more), whose address is: **P. O. Box 1086, Laredo, Texas 78040**
and **Conoco Inc., P. O. Box 2197, Houston, Texas 77252**, Lessee, WITNESSETH:

1. Lessor in consideration of _____Ten Dollars and Other Good and Valuable Consideration_____ Dollars
($ 10.00 _____), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, injecting gas, water and other fluids, and air into subsurface strata, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessor adjacent and contiguous thereto, to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in _____Webb_____ County, Texas, to-wit:

26,622.79 acres of land, more or less, situated in Webb County, Texas more fully described in Exhibit "A" attached hereto and made a part of this Lease for all relevant purposes, including limitations upon warranty as specifically set out therein.

~~This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys, although not included within the boundaries of the land particularly described above.~~ For the purpose of calculating the rental payments hereinafter provided for, said land is estimated to comprise _____26,622.79_____ acres, whether it actually comprises more or less.

2. Subject to the other provisions herein contained, this lease shall be for a term of ~~ten~~ **five** years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

where the term one-eight is used in this paragraph it is changed to one-sixth

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipelines to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) ~~on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale;~~ while there is a gas well on this lease or on acreage pooled therewith but gas is not being sold or used, Lessee may pay as royalty, on or before ninety (90) days after the date on which (1) said well is shut in, or (2) the land covered hereby or any portion thereof is included in a pooled unit on which a well is located, or (3) this lease ceases to be otherwise maintained as provided herein, whichever is the later date, and thereafter at annual intervals on or before the anniversary of the date the first payment is made, a sum equal to the amount of the annual rental payable in lieu of drilling operations during the primary term on the number of acres subject to this lease at the time such payment is made, and if such payment is made or tendered, this lease shall not terminate, and it will be considered that gas is being produced from this lease in paying quantities; and (c) on all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur mined and marketed the royalty shall be fifty cents (50¢) per long ton. Lessee shall have free use of oil, gas, coal, and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, ~~gas~~ and ~~coal~~ shall be computed after deducting any so used. **and tanks,** **gas**

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, and/or either of them, with any other land covered by this lease, and/or with any other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be produced from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of ten percent (10%) thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, for the drilling or operation of a well at a regular location or for obtaining maximum allowable from any well to be drilled, drilling or already drilled, units thereafter created may conform substantially in size with those prescribed or permitted by governmental regulations. Lessee under the provisions hereof may pool or combine acreage covered by this lease or any portion thereof as above provided as to oil in any one or more strata and as to gas in any one or more strata. The units formed by pooling as to any stratum or strata need not conform in size or area with the unit or units into which the lease is pooled or combined as to any other stratum or strata, and oil units need not conform in size or area with gas units. The pooling in one or more instances shall not exhaust the rights of the Lessee hereunder to pool this lease or portions thereof into other units. Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; and upon such recordation the unit shall be effective as to all parties hereto, their heirs, successors, and assigns, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty, or other rights in land included in such unit. Lessee may at its election exercise its pooling option before or after commencing operations for or completing an oil or gas well on the leased premises, and the pooled unit may include, but it is not required to include, land or leases upon which a well capable of producing oil or gas in paying quantities has theretofore been completed or upon which operations for the drilling of a well for oil or gas have theretofore been commenced. In the event of operations for drilling on or production of oil or gas from any part of a pooled unit which includes all or a portion of the land covered by this lease, regardless of whether such operations for drilling were commenced or such production was secured before or after the execution of this instrument or the instrument designating the pooled unit, such operations shall be considered as operations for drilling on or production of oil or gas from land covered by this lease whether or not the well or wells be located on the premises covered by this lease and in such event operations for drilling shall be deemed to have been commenced on said land within the meaning of paragraph 6 of this lease; and the entire acreage constituting such unit or units, as to oil and gas, or either of them, as herein provided, shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this lease. For the purpose of computing the royalties to which owners of royalties and payments out of production and each of them shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis—that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease (or in each such separate tract) and included in the pooled unit bears to the total number of surface acres covered by this lease (or in the pooled unit. Royalties hereunder shall be computed on that portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land. The production from an oil well will be considered as production from the lease or oil pooled unit from which it is producing and not as production from a gas pooled unit; and production from a gas well will be considered as production from the lease or gas pooled unit from which it is producing and not from an oil pooled unit. The formation of any unit hereunder shall not have the effect of changing the ownership of any delay rental or shut-in production royalty which may become payable under this lease. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interest as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool as provided above with consequent allocation of production as above provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. If operations for drilling are not commenced on said land or on acreage pooled therewith as above provided on or before one year from this date, the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender (or shall make a bona fide attempt to pay or tender, as hereinafter stated) to Lessor or to the credit of Lessor in _____South Texas National Bank_____ ~~Bank~~ at _____Laredo_____, Texas, (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of _____Forty-Eight Thousand Eight Hundred Eleven and 26/100_____ Dollars ($ 48,811.26 _____), (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental under this paragraph and of royalty under paragraph 3 on any gas well from which gas is not being sold or used may be made by the check or draft of Lessee mailed or delivered to the parties entitled thereto or to said bank on or before the date of payment. If such bank (or any successor bank) should fail, liquidate or, be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument naming another bank as agent to receive such payments or tenders. If Lessee shall, on or before any anniversary date, make a bona fide attempt to pay or deposit rental to a Lessor entitled thereto according to Lessee's records or a Lessor, who, prior to such attempted payment or deposit, has given Lessee notice, in accordance with subsequent provisions of this lease, of his right to receive rental, and if such payment or deposit shall be ineffective or erroneous in any regard, Lessee shall be unconditionally obligated to pay to such Lessor the rental properly payable for the rental period involved, and this lease shall not terminate but shall be maintained in the same manner as if such erroneous or ineffective rental payment or deposit had been properly made, provided that the erroneous or ineffective rental payment or deposit be corrected within 30 days after receipt by Lessee of written notice from such Lessor of such error accompanied by such instruments as are necessary to enable Lessee to make proper payment. The down cash payment is consideration for this lease according to its terms and shall not be allocated as a mere rental for a period. Lessee may at any time or times execute and deliver to Lessor or to the depository above named or place of record a release or releases of this lease as to all or any part of the above described premises, or of any mineral or horizon under all or any part thereof, and thereby be relieved of all obligations as to the released land or interest. If this lease is released as to all minerals and horizons under a portion of the land covered by this lease, the rentals and other payments computed in accordance therewith shall thereupon be reduced in the proportion that the number of surface acres within such released portion bears to the total number of surface acres which was covered by this lease immediately prior to such release.

Original Lease 199129-001    DMI JUL 18 88    199129-001

47

6. If prior to discovery and production of oil, gas or other mineral on said land or on acreage pooled therewith, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil, gas or other mineral, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter or if it be within the primary term, commences or resumes the payment or tender of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of sixty days from date of completion of dry hole or cessation of production. If at any time subsequent to sixty (60) days prior to the beginning of the last year of the primary term and prior to the discovery of oil, gas or other mineral on said land, or on acreage pooled therewith, Lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith. Any pooled unit designated by Lessee in accordance with the terms hereof may be dissolved by Lessee by instrument filed for record in the appropriate records of the county in which the leased premises are situated at any time after the completion of a dry hole or the cessation of production on said unit. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within three hundred thirty (330) feet of and draining the leased premises, or acreage pooled therewith, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

7. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after there shall have been furnished by registered U. S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. In the event of the death of any person entitled to rentals hereunder, Lessee may pay or tender such rentals to the credit of the deceased or the estate of the deceased until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with evidence satisfactory to it as to the heirs or devisees of the deceased and that all debts of the estate have been paid. If at any time two or more persons be entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of said rentals to which each participant is entitled may be paid or tendered to him separately or to his separate credit in said depository...

9. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument. After the discovery of oil, gas or other mineral in paying quantities on said premises, Lessee shall develop the acreage retained hereunder as a reasonably prudent operator...

10. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties, delay rentals, and other monies accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided. Should any one or more of the parties named above as Lessors fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same. Failure of Lessee to reduce rental paid hereunder shall not impair the right of Lessee to reduce royalties.

11. Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises; and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

The attached addendum dated November 1, 1987, is attached hereto and made a part hereof for all intents and purposes.

STATE OF........................)
                               }  TEXAS SINGLE ACKNOWLEDGMENT
COUNTY OF......................)

Before me, the undersigned authority, a Notary Public in and for said County and State, on this day personally appeared..........................................................

known to me to be the person whose name.................subscribed to the foregoing instrument, and acknowledged to me that ....he.... executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this the...........day of..................................., A. D. 19.........

Notary Public in and for...................County, .....................

STATE OF........................)
                               }  TEXAS JOINT ACKNOWLEDGMENT
COUNTY OF......................)

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared.................and.................husband and wife, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed. And the said wife, having been examined by me privily and apart from her husband, and having had said instrument fully explained to her, she, the said wife, acknowledged the same to be her act and deed, and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the...........day of..................................., A. D. 19.........

Notary Public in and for...................County, .....................

Oil, Gas and Mineral Lease

Producers 88 (7-66)
With 640 Acres Pooling Provision

FROM ........................ No. ........................
TO ........................

Pound Printing & Stationery Co., Houston, Texas

12. Should Lessee be prevented from complying with covenants of this lease by reason of conditions or acts set forth in Paragraph '11' hereof, then Lessee agrees annually to pay to Lessor an amount equal to the delay rentals herein provided for during such period of prevention, whether same be during or subsequent to the primary term, and such payment shall be made at the end of each year of prevention either to Lessor or to the depository above named for credit to the account of Lessor.

13. This lease does not cover or include any right or privilege of hunting or fishing on any part of the above described land, and Lessee agrees with Lessor that neither he nor his assigns or agents or employees of his assigns, will bring firearms or dogs upon the leased premises, and should this provision against hunting and fishing be violated by any agents, servants, employees or contractors of Lessee's assigns, any such person so violating same shall have no further right to enter upon the leased premises, and such person shall be regarded as and shall be a trespasser on the premises of Lessor and be subject to the penalties imposed upon trespassers under the laws of the State of Texas.

14. It is expressly agreed and understood that after production of oil and gas in commercial quantities is obtained from the leased premises, the minimum annual income to Lessor from payment of rentals, shut-in royalty and royalty on production shall be sum of not less than Two ($2.00) Dollars per acre on the total acreage retained and then covered by this lease, but this provision shall not impair the right and privilege of Lessee, his successors and assigns, to release and surrender any part of the above described leased premises as herein provided. Lessee, his successors and assigns, shall determine within 90 days from the expiration of any lease year during which royalties have been paid on actual production the amount of any deficiency, and shall within said 90-day period pay such deficiency to Lessor or deposit same to Lessor's credit at

-1-

|COP 0012146 |

GWB2/dm 130(1)

49

the depository hereinabove designated. Default in the payment of such deficiency shall not operate to terminate this lease or any part hereof, but Lessee, his successors and assigns, agrees to personally pay such deficiency to Lessor at Laredo in Webb County, Texas, together with any reasonable cost, including attorney's fees, incurred by Lessor in collecting such deficiency if not paid within the 90-day period hereinabove provided for.

15. Nothwithstanding any other provision herein contained, this oil, gas and mineral lease is limited to oil, gas and sulphur and minerals produced with oil and gas, and does not include minerals other than oil, gas and sulphur and minerals produced with oil and gas, as Lessor herein excludes from the leasehold estate herein granted, and reserves unto himself, his heirs and assigns, all minerals other than oil, gas and sulphur and minerals that may be produced with oil and gas, but it is expressly agreed that 'gas' as used herein includes gas, condensate, distillate or any other gaseous substance or any other mineral produced with oil and gas, including sulphur.

16. The right to pool under Paragraph '4' of this oil, gas and mineral lease shall be limited to lease or leases on land belonging to Lessor herein, or in which Lessor owns an interest in the oil, gas and other minerals.

17. For the purposes of the annual rental payments due under paragraph 5, Lessor and Lessee agree that said payments have been timely paid and received, and that this Lease is perpetuated, without the necessity of further delay rental payments, until the expiration of the primary term.

18. On November 1, 1990, Lessee covenants and agrees to execute and deliver to Lessor a written release of any and all portions of this lease which have not been drilled to a density of at least 40 acres for each producing oil well and 640 acres for each producing or shut-in gas well, except that in case any rule adopted by the Railroad Commission of Texas or other regulating authority for any field on this lease provides for a

|COP 0012147 |

-2-

GWB2/dm 130(1)

50

spacing or proration establishing different units of acreage per well, then such established different units shall be held under this lease by such production, in lieu of the 40 and 640-acre units above mentioned; provided, however, that if at such date lessee is engaged in drilling or reworking operations the date for the execution and delivery of such release shall be postponed and the entire lease shall remain in force so long as operations on said well or wells are prosecuted with reasonable diligence, and if, after the completion or abandonment of any such well Lessee commences the drilling of an additional well within Ninety (90) days from the completion or abandonment of the preceding well, or continuously conducts drilling operations in good faith and with reasonable diligence on said lease without any cessation for longer than Ninety (90) days, said lease shall remain in full force and effect during such drilling operations and until the end of Ninety (90) days after the completion or abandonment of the final well, at which time Lessee shall execute and deliver to Lessor said written release, releasing all portions of the lease not then so developed. Each retained unit shall contain at least one (1) well producing or capable of producing oil or gas in paying quantities, and the acreage within a unit shall be contiguous.

If, after the date the partial release called for under this Paragraph 18 takes affect, all production from a retained unit around a well or wells cease to produce oil or gas in commercial or in paying quantities, Lessee shall have one hundred eighty (180) days thereafter within which to commence operations to establish or re-establish production therein in commercial or paying quantities, whether such production be from the same wellbore or other wellbore. If such operations result in commercial production, then this lease, as it applies to such unit shall continue until such commercial or paying production again ceases. However, if such operations do not result in commercial production, then Lessee shall have ninety (90) days after completion of such operations within which to commence drilling or reworking operations within such unit, and this lease, as it applies to said unit, shall remain in force so long as operations on said well or for drilling or reworking of any additional well therein are prosecuted with no cessation of more than ninety (90) consecutive days, and if they result in the production of oil or gas therein, so long thereafter

|COP 0012148 |

-3-

GWB2/dm 130(1)

as oil or gas is produced from said unit. As to any unit upon which commercial production may periodically terminate, the above right to timely resume operations and continue this lease as to such unit shall be reoccurring right.

The stipulation above as to the size of retained tracts around wells shall never be construed as a satisfaction of Lessee's right, duty and obligation to reasonably develop the leasehold held by Conoco or its successors or assigns. After November 1, 1990, Lessee agrees to drill such additional wells on the leased premises or such portions thereof as may be in force and effect from time to time, as may be necessary to reasonable develop the same for the production of oil and/or gas as a reasonable prudent operator.

19. A portion of paragraph 3 has been deleted and the following is in lieu thereof.

(b) on gas, including casinghead gas or other gaseous substances, produced from said land, the Lessors royalty shall be calculated and paid as follows:

a) Sales To Non-Affiliated Third Parties:
In the event Lessee enters into a gas sales contract with a non-affiliated third party, Lessor's royalty shall be one-sixth (1/6) of the gross proceeds received by Lessee from the sale of such gas.

b) Sales To Related Or Affiliated Entities For Resale:
In the event Lessee enters into a gas sales contract to sell gas to a related or affiliated entity, then Lessor's royalty shall be computed on the greater of the following:

1. One-sixth (1/6) of the gross proceeds received by Lessee or any affiliate or related entity from the sale of such gas to the first non-affiliated entity, or

2. One-sixth (1/6) of the highest price reasonably obtainable for gas by Lessee and other producers or operators in the

-4-

|COP 0012149 |

GWB2/dm 130(1)

52

east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity.

In this regard, it is understood that the "highest price reasonably obtainable" may be equal to, but is not necessarily, the highest price then being obtained by other producers or operators in the east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity.

c) **Taking, Selling Or Delivery Of Gas To Lessee Or Its Related Or Affiliated Entities For Use (Not For Resale):**

In the event Lessee takes gas for its own use, or sells or transfers gas to a related or affiliated entity for use, then Lessor's royalty shall be computed on the greater of the following:

1.  One-sixth (1/6) of the highest price reasonably obtainable for gas by Lessee and other producers or operators in the east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity.

    In this regard, it is understood that the "highest price reasonably obtainable" may be equal to but is not necessarily the highest price then being obtained by other producers or operators in the east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity, or

2.  One-sixth (1/6) of the quarterly weighted average of the prices being paid by "purchasers" (as hereinafter defined) in the east one-fourth of Webb County, Texas, who are purchasing gas of like kind and quality. For the purposes of calculating the average price under this Paragraph c2, prices paid shall be those as reported in the Energy Planning Book publication or as reported to the State of

GWB2/dm 130(1)

-5-

| COP 0012150 |

53

Texas for severence tax purposes. "Purchasers" shall mean the three largest purchasers based on volume of gas purchased for such calendar quarter, in the east one-fourth of Webb County, Texas. For an example of the calculation of the quarterly weighted average of such price, see Exhibit "B".

Lessor and Lessee shall meet within eleven (11) months after the end of each calander year. At least thirty (30) days prior to such meeting, Lessee should furnish to Lessor a statement or other documentation of the basis upon which royalties accrued to Lessor under the terms of the Lease for the previous calender year. Any additional royalties calculated by Lessee to be due, if any, shall be paid at such meeting. Within one (1) year from delivery of the above referred to statement or other documentation, Lessor shall notify Lessee of any discrepancies. Failure to notify Lessee timely of any discrepancies shall constitute final acceptance of royalty payments as covered by such statements or other documentation. The first period for which Lessee shall prepare such statements or other documentation shall begin on April 1, 1988 and end on December 31, 1988. Nothing in this paragraph shall preclude Lessor from claiming any royalty which Lessor is entitled to as a result of mistake in computation, oversight in computation, or error in computation of royalty or which may result from the subsequent disclosure of a discrepancy.

LESSOR'S royalty shall be without deduction for any costs, such as, but not limited to, costs of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and otherwise making the oil, gas and associated substances ready for sale or use, except for a) severance and related taxes, and b) reasonable transportation expenses which may be necessary to be paid to non-affiliated third parties or entities to get Lessor's gas to a market or point of sale off the leased premises and which sale or sales will result in a net price equal to or higher than if said gas had been sold at the wellhead.

LESSOR'S royalty on all production from depths below the stratigraphic equivalent of the top of the Cretaceous System as seen at 12,810 feet

|COP 0012151 |

-6-

GWB2/dm 130(1)

in the electric log of the Vaquillas #7 Well located 260' FNL and 1,700' FWL of Survey 987, A2061, Webb County, Texas, under the lands now held by Lessee under this Lease shall be one-fifth (1/5) instead of one-sixth (1/6).

LESSEE may submit a copy of a proposed gas sales contract to Lessor which is acceptable to Lessee and request that Lessor approve same for royalty computation purposes. Lessor shall have thirty (30) days after receipt of a gas contract to approve same. If Lessor approves same or does not timely decline to do so, then Lessor's royalty on gas sold under such gas sales contract shall be based on the gross proceeds received under said contract.

GAS contracts with a term in excess of three (3) years shall contain a provision for price redetermination no later than the end of the 3rd year and subsequent price redeterminations thereafter at intervals no greater than two (2) years apart.

20. Lessee agrees to fill all slush pits and level the same when they have ceased to be used and to restore the land to as near its original state as is practicable and to pay for damages to the surface of the land and the improvements, water wells, growing crops and livestock thereon, and to any other personal property of Lessor, Vaquillas Ranch Company, Ltd., occasioned by, arising out of, or resulting from operations by Lessee, his agents, employees or independent contractors on the land hereby leased to Lessee. Lessee also agrees, when requested in writing by Lessor, to divulge to Lessor true and correct information as requested by Lessor as to all drilling, producing and marketing operations conducted under this lease and to furnish to Lessor copies of all electric well logs taken hereunder; provided, however, Lessee shall not be obligated to release such information until it has been released to the industry.

21. Lessee hereby agrees to ensure that the two exit gates on F.M. 2895 (Forest Gate and Reynolds Gate) are guarded in an efficient and prudent manner during drilling, reworking or plugging operations and at other times as mutually agreed to by Lessee and Lessor. As to the exit

-7-

GWB2/dm 130(1)

| COP 0012152 |

gate on the north side of U.S. Highway 59, Lessee agrees to use its best efforts to work out an arrangement with other exploration companies using such gate to ensure that it is guarded in an efficient and prudent manner during drilling, reworking or plugging operations and other times as mutually agreed to by Conoco and Lessor. Further, Lessee agrees to use its best efforts to work out an arrangement with TransAmerican Natural Gas Corporation or its successors or assigns to ensure that the exit gate located 9 miles north of Aguilares, Texas, on F.M. 2895 is guarded in an efficient and prudent manner during drilling, reworking or plugging operations and at other times as mutually agreed to by Lessee and Lessor. In regard to gates used by Lessee and other exploration companies, Lessee agrees to pay its share of the cost of guarding such gates when such gate guards are required under this agreement. Lessee shall not be obligated to furnish a gate guard on any gate which has been abandoned or is not being used by Lessee.

22. Lessee agrees that before abandoning any well drilled on said lease for oil or gas purposes, it will notify the owner or the surface estate in person or by telephone of its intention to do so, and it will allow said owner of the surface estate a reasonable time, not exceeding twenty-four (24) hours thereafter, within which to elect to take over the hole for the purpose of attempting to make and complete a water well. Lessee agrees to consult with such surface owner as to the location of a potential water zone, without any liability or warranty for such consultation. Upon the owner of the surface estate election, within the specified time, to attempt to complete the well as a water well and complying with all rules and regulations of the Railroad Commission of Texas and applicable statutes, Lessee will, at its expense, set all plugs to just below the designated water sand as may be required by the Railroad Commission and thereafter deliver the well to said owner of the surface estate, leaving in such well all surface casing and such intermediate casing as may have been run and set to at least the depth of the designated water sand and thereafter the owner of the surface state shall own the well and shall be responsible for all subsequent matters in connection with the well and for compliance with the applicable statutes and regulations of all regulatory agencies having jurisdiction. Lessee shall have no liability to

-8-

Lessor in connection with any of the operations which may be conducted by the owner of the surface estate who shall thereafter bear all responsibility and liability with respect thereto. It is expressly understood that Lessee shall not be required to furnish any additional casing or other equipment for any well plugged back at the request of the owner of the surface estate under this paragraph. Should the owner of the surface estate elect not to attempt to make a producing water well out of any such hole, Lessee shall plug the well in accordance with all applicable rules, regulations and statutes.

23. It is expressly agreed and understood that for the purposes of this lease the following definitions shall apply:

"Commences" – A well shall be deemed commenced on the date which the drilling bit enters the earth for the drilling of a well.

"Abandoned" – A well shall be deemed abandoned on the day when it is finally plugged as a dry hole.

"Completed" – A well shall be deemed completed thirty (30) days after the day the Lessee sets production casing.

24. Lessor and Lessee agree to limit the commencement of actual drilling during deer hunting season to 1) those wells drilled in areas which would not disturb deer hunting, and 2) offset wells. If Lessee must commence a well during deer hunting season to perpetuate said lease, then Lessor will either a) not object to the drilling of such well during deer hunting season or b) agree to extend the commencement date for such well to a mutually agreeable date after deer hunting season ends. For the purposes of this paragraph "deer hunting season" shall be that period defined by State law.

25. Nothwithstanding anything contained herein to the contrary, the Lessor at any time and from time to time, upon not less than ninety (90) days notice to the holder of this lease, may elect to require the payment of any royalties accruing to such royalty owner under this lease to be made in kind; provided that any expenses incident to the exercise of such election shall be borne by Lessor and such election shall be for periods of not less than twelve (12) months. Lessor shall only be allowed to take in

| COP 0012154 |

-9-

GW82/dm 130(1)

kind when Lessee is producing for his own account. In the event of such an election by Lessor, Lessee shall cooperate fully with Lessor in allowing Lessor to take their royalty in kind, including permitting Lessor to use Lessee's wellhead equipment and, to the extent that Lessee has assignable rights, the use of Lessee's purchaser's transportation facilities in good faith and not to exceed prevailing charges for similar services in the industry at the time if Lessee or its affiliates are transporting the gas, but if Lessee has a third party contract for the transport of said gas, Lessor will be bound by said contract. Should Lessee desire to enter into a gas purchase contract having a term of more than one (1) year, then (a) Lessee shall include in such contract a provision that allows Lessor to elect to take its gas in kind and be released from such contract one hundred twenty (120) days after notice, or (b) Lessor may approve of such contract in writing, in which event, Lessor may elect to take its gas in kind either at the end of such gas contact or one (1) year after notice to Lessee, whichever happens sooner. Any equipment installed by Lessor necessary to take in kind must be approved by Lessee and maintained according to Lessee's specifications.

If Lessee is unable to obtain a more favorable gas contract because of Lessor's reservation of this election to take in kind, then Lessee may elect to give notice of its intention to sign a gas contract acceptable to Lessee and request that Lessor join in signing same, and if Lessor elects to sign same, then Lessor's royalty share of revenue shall be bound by such contract and Lessor may not elect to take its royalty in kind during the term of such gas purchase contract.

26. This Amendment is applicable to only that leasehold interest presently owned and held by Conoco Inc. Nothing contained herein shall in any way inure to the benefit of or be applicable to third parties who hold or claim any interest in said 26,622.79 acre lease or who claim an undivided interest therin either jointly or separately with Conoco. Nothing herein shall in any way prejudice any claim, demand or cause of action which Vaquillas may have or assert against third parties holding any leasehold interests in Vaquillas lands. Nothing herein shall be construed as a release or modification of any right, claim or cause of action which

GWB2/dm 130(1)

COP 0012155

58

Vaquillas may have against third parties who claim any interest in said 26,622.79 acre lease or any other Vaquillas lease.

27. Lessor does further RATIFY, CONFIRM and ADOPT all of the terms, provisions and conditions of said June 15, 1974 Lease, as amended and as it applies to those rights held by Conoco Inc. thereunder, and that such lease, as amended and as it applies to Conoco Inc. is in full force and effect as of this date. Further, nothing contained herein shall in any way inure to the benefit of or be applicable to any interest held by third parties in and to the June 15, 1974 Oil and Gas lease.

DATED this 9th day of January, 1988.


VAQUILLAS RANCH COMPANY, LTD.

By _____
    J. O. Walker, Jr.

By _____
    E. Walker Quiros

By _____
    Gene S. Walker

By _____
    Evan B. Quiros


VAQUILLAS UNPROVEN MINERAL TRUST

By _____
    J. O. Walker, Jr., Trustee

By _____
    E. Walker Quiros, Trustee

By _____
    Gene S. Walker, Trustee

By _____
    Evan B. Quiros, Trustee


VAQUILLAS PROVEN MINERAL TRUST

By _____
    J. O. Walker, Jr., Trustee

By _____
    E. Walker Quiros, Trustee

By _____
    Gene S. Walker, Trustee

By _____
    Evan B. Quiros, Trustee


CONOCO INC.

By _____
    Attorney-In-Fact


|COP 0012156 |

-11-

GWB2/dm 130(1)

| SURVEY | ABSTRACT | CERTIFICATE | GRANTEE | ACRES |
|---|---|---|---|---|
| 1649 | 1110 | 1158 | CCSD & RGNG | 640.0 |
| 1651 | 1112 | 1159 | CCSD & RGNG | 640.0 |
| 1652 | 2876 | 1159 | W. H. Taylor | 640.0 |
| 1661 | 1122 | 1164 | CCSD & RGNG | 640.0 |
| 1663 | 1123 | 1165 | CCSD & RGNG | 640.0 |
| 1633 | 1323 | 4/808 | GC & SF | 640.0 |
| 1634 | 2252 | 4/808 | GC & SF | 659.96 |
| 1665 | 1124 | 1166 | CCSD & RGNG | 640.0 |
| S.1/2 1666 | 2253 | 1166 | CCSD & RGNG | 328.75 |
| N.1/2 1666 | 3142 | 1166 | CCSD & RGNG | 328.79 |
| 468 | 2255 | 236 | AB & M | 659.14 |
| 467 | 799 | 236 | AB & M | 640.0 |
| 1635 | 1797 | 17 | TC Ry. | 640.0 |
| 865 | 1438 | 12/2541 | H & GN | 640.0 |
| 1683 | 1115 | 1175 | CCSD & RGNG | 640.0 |
| 1691 | 1267 | 5446 | GC & SF | 640.0 |
| 1696 | 2418 | 5448 | GC & SF | 640.0 |
| 1695 | 1268 | 5448 | GC & SF | 640.0 |
| 279 (pt. only) | 1353 | 3702 | GC & SF | 458.2 |
| 1004 | 2421 | 2/105 | J. Poitevent | 634.58 |
| 1692 | 2419 | 5446 | GC & SF | 613.04 |
| 1693 | 1269 | 5447 | GC& SF | 640.0 |
| 2112 | 2420 & 1925 | 631 | B. F. James | 627.12 |
| 276 | 2552 | 3700 | GC & SF | 640.23 |
| 228 | 2550 | 1344 | CCSD & RGNG | 636.93 |
| 227 | 1133 | 1344 | CCSD & RGNG | 640.0 |
| 988 | 2593 | 2/103 | J. Poitevent | 637.10 |
| 987* | 2061 | 2/103 | J. Poitevent | 640.0 |
| 273* | 1141 | 1349 | CCSD & RGNG | 640.0 |
| 275* | 1336 | 3700 | GC & SF | 640.0 |
| 277* | 1337 | 3701 | CCSD & RGNG | 640.0 |
| S.1/2 31, Block 2 | 1043 | 453 | CCSD & RGNG | 320.0 |
| 25, Block 2 | 1042 | 452 | CCSD & RGNG | 640.0 |
| 232* | 2148 | 1346 | CCSD & RGNG | 462.70 |
| 233* | 1117 | 1347 | CCSD & RGNG | 455.9 |
| N.1/2 51, Block 2 | 1045 | 460 | CCSD & RGNG | 320.0 |
| 259 (pt. only) | 1137 | 1074 | CCSD & RGNG | 600.0 |
| 1955 | 1328 | 4526 | GC & SF | 640.0 |
| 2057 | 985 | 302 | CCSD & RGNG | 652.25 |
| 2060 (pt. only) | 3329-30 | 303 | CT & M | 440.0 |
| E.1/2 2059 | 984 | 303 | CT& M | 320.0 |
| E.1/2 1953* | 1329 | 4527 | GC& SF | 320.0 |
| 1627 (pt. only) | 1324 | 4683 | GC & SF | 160.0 |
| 1629 (pt. only) | 1275 | 4682 | GC & SF | 292.65 |
| W.1/2 1662 | 2230 | 1164 | CCSD & RGNG | 329.31 |
| E.1/2 1648 | 2441 | 1157 | CCSD & RGNG | 325.75 |
| W.1/2 1648 | 3301 | 1157 | CCSD & RGNG | 325.75 |
| 26, Block 2* | | 452 | R. O. Barnsley | 640.0 |
| 2335 | 3025 | School | W. Brown | 27.3 |
| E.1/2 1956* | 2560 | 4526 | GC & SF | 327.34 |

Lessor's warranty hereunder as to all of Surveys 987, 273, 275, 277, 26, the E.1/2 of 1953, E.1/2 of 1956 and 401.9 acres out of Survey 233 (all except 54 acres out of SW corner of said Sur. 233) is expressly limited to 1/2 of the executive rights in the oil and gas rights in and under said lands, and as to all of Survey 232 is expressly limited to 4/5 of the executive rights in the oil and gas rights.

The following parts of surveys are expressly excluded herefrom, viz.:

(1) The SE 1/4 of SW 1/4, SW 1/4 of NE 1/4 (80 acs.) and N 1/2 of SW 1/4 and SW 1/4 of SW 1/4 (120 acs.) of CT&M Survey 2060.

(2) The W. 3/4 of GC&SF Survey 1627 described in O&G Lse. to Daniel A. Pedrotti dated September 24, 1973, as amended.

(3) Any part of a survey listed herein not included within any specific fractional reference preceding the survey reference.

(4) The NE 160 acres of GC&SF Survey 279.

(5) Block 11 as per the E.D.Claggett Subdivision of record 2 Plat Records 29, Webb County, containing 40 acres, being the NW 1/4 of SE 1/4 of CCSD & RGNG Survey 259.

(6) All of the W. 320 acres of Survey 1629 described and included in O&G Lse. to Daniel A. Pedrotti dated September 24, 1973, as amended.

COP 0012157

60

Calculation of royalty to be paid on gas delivered to Lessee or Affiliates for use (and not for resale) in accordance with paragraph 19.

Principal: Pay Lessor royalty based on the greater of the weighted average price paid by the three largest volumetric purchasers for the calendar quarter in the east quarter of Webb County or the weighted average of the prices used by the Lessor for royalty payment purposes.

Calculation: Determine additional royalty payments, if any.

Data Source: Energy Planning Book publication or as reported to the State of Texas for severance tax purposes.

Step 1. Calculate the weighted average price for the month for each of the three largest volume purchases for the quarter from the tax records.

### Month-January 1988

| Purchases from Company A | MCFD | $/MCF | $ |
|---|---|---|---|
| Lease 1 | 100,000 | 2.00 | 200,863 |
| Unit 16 | 80,000 | 1.51 | 120,800 |
| Purchases from Company B | | | |
| Well 42 | 180,821 | 1.62 | 291,733 |
| TOTAL United Texas Transmission | 360,821 | Calculate | 613,396 |

Monthly Weighted Average Price     613,396/360,821 = $1.70/MMBtu

Repeat procedure for remaining two months for this purchaser and for remaining two purchasers.

Step 2. Calculate the weighted average price of the three largest volumetric purchasers for the quarter using monthly values from Step 1.

| Purchaser | Month-January 1988 | | | Month - February 1988 | | | Month - March 1988 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ |
| United Texas Transmission | 360,821 | 1.70 | 613,396 | 397,130 | 1.58 | 627,465 | 320,306 | 1.58 | 506,083 |
| UTRADE | 400,223 | 1.55 | 620,346 | 350,723 | 1.60 | 561,157 | 500,126 | 1.55 | 775,195 |
| South Gulf | 375,000 | 1.60 | 600,000 | 299,156 | 1.62 | 484,633 | 301,000 | 1.58 | 475,580 |
| Totals | 1,136,044 | -- | 1,833,742 | 1,047,009 | -- | 1,673,255 | 1,121,432 | -- | 1,756,858 |

| | Sum of Volumes | Sum of Extensions | Weighted Average Price |
|---|---|---|---|
| Totals | 3,304,485 | 5,263,855 | 1.59 |

Step 3. Calculate weighted average price used by Lessee to calculate royalty payments on gas delivered to Lessee or affiliates and not for resale.

| Month-January 1988 | | | Month-February 1988 | | | Month-March 1988 | | |
|---|---|---|---|---|---|---|---|---|
| Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ |
| 155,000 | 1.60 | 248,000 | 140,000 | 1.62 | 226,800 | 155,000 | 1.58 | 244,900 |

| Sum of Volumes | Sum of Extensions | Weighted Average Price |
|---|---|---|
| 450,000 | 719,700 | 1.60 |

Step 4. Compare weighted average price calculated in Step 2 to the weighted average Lessee price calculated in Step 3.

$1.60/MCF is greater than $1.59/MCF so no additional royalty payments are required for this quarter.

Note: Volumes and prices used in this example are used for illustration and may not be reflective of actual conditions.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by J. O. WALKER, JR., General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.


THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by E. WALKER QUIROS, General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.


THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by GENE S. WALKER, General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.


THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by EVAN B. QUIROS, General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped    name    of    Notary.

-12-

GWB2/dm 130(1)

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by J. O. WALKER, JR., Trustee for The Vaquillas Unproven Mineral Trust.

Notary Public in and for
The State of Texas.
My Commission Expires: 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by E. WALKER QUIROS, Trustee for the Vaquillas Unproven Mineral Trust.

Notary Public in and for
The State of Texas.
My Commission Expires: 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by GENE S. WALKER, Trustee of the Vaquillas Unproven Mineral Trust.

Notary Public in and for
The State of Texas
My Commission Expires: 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the 9th day of January, 1988, by EVAN B. QUIROS, Trustee of Vaquillas Unproven Mineral Trust.

Notary Public in and for
The State of Texas
My Commission Expires: 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.

-13-

GWB2/dm 130(1)

63

THE STATE OF TEXAS §
                   §
COUNTY OF WEBB     §

This instrument was acknowledged before me on the ___9 th___ day of January, 1988, by J. O. WALKER, JR., Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


THE STATE OF TEXAS §
                   §
COUNTY OF WEBB     §

This instrument was acknowledged before me on the ___9 th___ day of January, 1988, by E. WALKER QUIROS, Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


THE STATE OF TEXAS §
                   §
COUNTY OF WEBB     §

This instrument was acknowledged before me on the ___9 th___ day of January, 1988, by GENE S.WALKER, Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


THE STATE OF TEXAS §
                   §
COUNTY OF WEBB     §

This instrument was acknowledged before me on the ___9 th___ day of January, 1988, by EVAN B. QUIROS, Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


-14-

GWB2/dm 130(1)

64

THE STATE OF TEXAS §
                     §
COUNTY OF WEBB       §

This instrument was acknowledged before me on the __8th__ day of January, 1988, by ___H. C. Sager___, Attorney-in-Fact for CONOCO INC., a Delaware corporation, on behalf of said corporation.

DELLA MARKERT
Notary Public, State of Texas
My Commission Expires Sep. 18, 1988.

_Della Markert_
Notary Public in and for
The State of Texas
My Commission Expires: _9-18-88_

_Della Markert_
Printed/stamped name of Notary.

-15-

GWB2/dm 130(1)

65


# OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this **1st** day of **November** 19**87**, between

**Vaquillas Ranch Company, Ltd.; Vaquillas Unproven Mineral Trust; Vaquillas Proven Mineral Trust; acting by and through its general partners, J. O. Walker, Jr., E. Walker Quiros, Gene S. Walker and Evan B. Quiros.**

Lessor (whether one or more), whose address is: **P. O. Box 1086, Laredo Texas 78040**
and **Conoco Inc., P. O. Box 2197, Houston, Texas 77252**, Lessee, WITNESSETH:

1. Lessor in consideration of **Ten Dollars and Other Good and Valuable Consideration** Dollars
($**10.00**), in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, conducting exploration, geologic and geophysical surveys by seismograph, core test, gravity and magnetic methods, injecting gas, water and other fluids, and air into subsurface strata, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon and on, over and across lands owned or claimed by Lessor adjacent and contiguous thereto, to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in **Webb** County, Texas, to-wit:

> 6,740 acres of land, more or less, situated in Webb County, Texas, more fully described in Exhibit "A" attached hereto and made a part of this Lease for all relevant purposes, including limitations upon warranty as specifically set out therein.

~~This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys, although not included within the boundaries of the land particularly described~~ above. For the purpose of calculating the rental payments hereinafter provided for, said land is estimated to comprise **6,740** acres, whether it actually comprises more or less.

2. Subject to the other provisions herein contained, this lease shall be for a term of **three** years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder. **Where the term one-eight is used in this paragraph 3, it is changed to one-fifth.**

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipelines to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) ... while there is a gas well on this lease or on acreage pooled therewith but gas is not being sold or used, Lessee may pay as royalty, on or before ninety (90) days after the date on which (1) said well is shut in, or (2) the land covered hereby or any portion thereof is included in a pooled unit on which a well is located, or (3) this lease ceases to be otherwise maintained as provided herein, whichever is the later date, and thereafter at annual intervals on or before the anniversary of the date the first payment is made, a sum equal to the amount of the annual rental payable in lieu of drilling operations during the primary term on the number of acres subject to this lease at the time such payment is made, and if such payment is made or tendered, this lease shall not terminate, and it will be considered that gas is being produced from this lease in paying quantities; and (c) on all other minerals mined and marketed, one-cent either in kind or value at the well or mine, at Lessee's election, except that on sulphur mined and marketed the royalty shall be fifty cents (50¢) per long ton. Lessee shall have free use of oil, gas, coal, and water from said land, except water from Lessor's wells, **and tanks** for all operations hereunder, and the royalty on oil, **gas** and shall be computed after deducting any so used.

4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof as to oil and gas, or either of them, with any other land covered by this lease, and/or with any other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated... [dense fine print omitted]

5. If operations for drilling are not commenced on said land or on acreage pooled therewith as above provided on or before one year from this date, the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender (or shall make a bona fide attempt to pay or tender, as hereinafter stated) to Lessor or to the credit of Lessor in **South Texas National Bank** Bank at **Laredo**, Texas, (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of **Thirteen Thousand Four Hundred Eighty and NO/100** Dollars ($**13,480.00**), (herein called rentals), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term...

6. If prior to discovery and production of oil, gas or other mineral on said land or on acreage pooled therewith, Lessee should drill a dry hole or holes thereon, or if after discovery and production of oil, gas or other mineral, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences operations for drilling or reworking within sixty (60) days thereafter or if it be within the primary term, commences or resumes the payment or tender of rentals or commences operations for drilling or reworking on or before the rental paying date next ensuing after the expiration of sixty days from date of completion of dry hole or cessation of production. If at any time subsequent to sixty (60) days prior to the beginning of the last year of the primary term and prior to the discovery of oil, gas or other mineral on said land, or on acreage pooled therewith, Lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term. If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith. Any pooled unit designated by Lessee in accordance with the terms hereof may be dissolved by Lessee by instrument filed for record in the appropriate records of the county in which the leased premises are situated at any time after the completion of a dry hole or the cessation of production on said unit. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and drilling the leased premises, or acreage pooled therewith, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

7. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent.

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns; but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U. S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part, liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. In the event of the death of any person entitled to rentals hereunder, Lessee may pay or tender such rentals to the credit of the deceased or the estate of the deceased until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with evidence satisfactory to it as to the heirs or devisees of the deceased and that all debts of the estate have been paid. If at any time two or more persons be entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of said rentals to which each participant is entitled may be paid or tendered to him separately or to his separate credit in said depository; and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

9. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument. After the discovery of oil, gas or other mineral in paying quantities on said premises, Lessee shall develop the acreage retained hereunder as a reasonably prudent operator, but in discharging this obligation it shall in no event be required to drill more than

10. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land, either in whole or in part, and in event Lessee does so, it shall be subrogated to such lien with right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties, delay rental and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided. Should any one or more of the parties named above as Lessors fail to execute this lease, it shall nevertheless be binding upon the party or parties executing the same. Failure of Lessee to reduce rental paid hereunder shall not impair the right of Lessee to reduce royalties.

11. Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises; and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

The attached addendum dated November 1, 1987, is attached hereto and made a part hereof for all intents and purposes.

STATE OF_____  }     **TEXAS SINGLE ACKNOWLEDGMENT**

COUNTY OF_____ }

Before me, the undersigned authority, a Notary Public in and for said County and State, on this day

personally appeared_____

Known to me to be the person whose name_____subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this the_____day of_____, A. D. 19_____

Notary Public in and for_____County, _____

STATE OF_____  }     **TEXAS JOINT ACKNOWLEDGMENT**

COUNTY OF_____ }

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally

appeared_____and_____ husband and wife, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and consideration therein expressed. And the said wife, having been examined by me privily and apart from her husband, and having had said instrument fully explained to her, she, the said wife, acknowledged the same to be her act and deed, and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this the_____day of_____, A. D. 19_____

Notary Public in and for_____County, _____

Oil, Gas and Mineral Lease

Producers 88 (7-68)
With 640 Acres Pooling Provision

No._____

FROM

TO

Printed Printing & Stationery Co., Houston, Texas

68

12.  Should Lessee be prevented from complying with covenants of this lease by reason of conditions or acts set forth in Paragraph '11' hereof, then Lessee agrees annually to pay to Lessor an amount equal to the delay rentals herein provided for during such period of prevention, whether same be during or subsequent to the primary term, and such payment shall be made at the end of each year of prevention either to Lessor or to the depository above named for credit to the account of Lessor.

13.  This lease does not cover or include any right or privilege of hunting or fishing on any part of the above described land, and Lessee agrees with Lessor that neither he nor his assigns or agents or employees of his assigns, will bring firearms or dogs upon the leased premises, and should this provision against hunting and fishing be violated by any agents, servants, employees or contractors of Lessee's assigns, any such person so violating same shall have no further right to enter upon the leased premises, and such person shall be regarded as and shall be a trespasser on the premises of Lessor and be subject to the penalties imposed upon trespassers under the laws of the State of Texas.

14.  It is expressly agreed and understood that after production of oil and gas in commercial quantities is obtained from the leased premises, the minimum annual income to Lessor from payment of rentals, shut-in royalty and royalty on production shall be sum of not less than Two ($2.00) Dollars per acre on the total acreage retained and then covered by this lease, but this provision shall not impair the right and privilege of Lessee, his successors and assigns, to release and surrender any part of the above described leased premises as herein provided.  Lessee, his successors and assigns, shall determine within 90 days from the expiration of any lease year during which royalties have been paid on actual production the amount of any deficiency, and shall within said 90-day period pay such deficiency to Lessor or deposit same to Lessor's credit at

GWB2/dm 124(7)

the depository hereinabove designated. Default in the payment of such deficiency shall not operate to terminate this lease or any part hereof, but Lessee, his successors and assigns, agrees to personally pay such deficiency to Lessor at Laredo in Webb County, Texas, together with any reasonable cost, including attorney's fees, incurred by Lessor in collecting such deficiency if not paid within the 90-day period hereinabove provided for.

15. Nothwithstanding any other provision herein contained, this oil, gas and mineral lease is limited to oil, gas and sulphur and minerals produced with oil and gas, and does not include minerals other than oil, gas and sulphur and minerals produced with oil and gas, as Lessor herein excludes from the leasehold estate herein granted, and reserves unto himself, his heirs and assigns, all minerals other than oil, gas and sulphur and minerals that may be produced with oil and gas, but it is expressly agreed that 'gas' as used herein includes gas, condensate, distillate or any other gaseous substance or any other mineral produced with oil and gas, including sulphur.

16. The right to pool under Paragraph '4' of this oil, gas and mineral lease shall be limited to lease or leases on land belonging to Lessor herein, or in which Lessor owns an interest in the oil, gas and other minerals.

17. For the purposes of the annual rental payments due under paragraph 5, Lessor and Lessee agree that said payments have been timely paid and received, and that this Lease is perpetuated, without the necessity of further delay rental payments, until the expiration of the primary term.

18. At the end of the primary term hereof, Lessee covenants and agrees to execute and deliver to Lessor a written release of any and all portions of this lease which have not been drilled to a density of at least 40 acres for each producing oil well and 640 acres for each producing or shut-in gas well, except that in case any rule adopted by the Railroad Commission of Texas or other regulating authority for any field on this

lease provides for a spacing or proration establishing different units of acreage per well, then such established different units shall be held under this lease by such production, in lieu of the 40 and 640-acre units above mentioned; provided, however, that if at such date lessee is engaged in drilling or reworking operations the date for the execution and delivery of such release shall be postponed and the entire lease shall remain in force so long as operations on said well or wells are prosecuted with reasonable diligence, and if, after the completion or abandonment of any such well Lessee commences the drilling of an additional well within Ninety (90) days from the completion or abandonment of the preceding well, or continuously conducts drilling operations in good faith and with reasonable diligence on said lease without any cessation for longer than Ninety (90) days, said lease shall remain in full force and effect during such drilling operations and until the end of Ninety (90) days after the completion or abandonment of the final well, at which time Lessee shall execute and deliver to Lessor said written release, releasing all portions of the lease not then so developed. Each retained unit shall contain at least one (1) well producing or capable of producing oil or gas in paying quantities, and the acreage within a unit shall be contiguous.

If, after the date the partial release called for under this Paragraph 18 takes affect, all production from a retained unit around a well or wells cease to produce oil or gas in commercial or in paying quantities, Lessee shall have one hundred eighty (180) days thereafter within which to commence operations to establish or re-establish production therein in commercial or paying quantities, whether such production be from the same wellbore or other wellbore. If such operations result in commercial production, then this lease, as it applies to such unit shall continue until such commercial or paying production again ceases. However, if such operations do not result in commercial production, then Lessee shall have ninety (90) days after completion of such operations within which to commence drilling or reworking operations within such unit, and this lease, as it applies to said unit, shall remain in force so long as operations on said well or for drilling or reworking of any additional well therein are prosecuted with no cessation of more than ninety (90) consecutive days, and if they result in the production of oil or gas therein, so long thereafter

-3-

as oil or gas is produced from said unit. As to any unit upon which commercial production may periodically terminate, the above right to timely resume operations and continue this lease as to such unit shall be reoccurring right.

The stipulation above as to the size of retained tracts around wells shall never be construed as a satisfaction of Lessee's right, duty and obligation to reasonably develop the leasehold held by Conoco or its successors or assigns. After November 1, 1990, Lessee agrees to drill such additional wells on the leased premises or such portions thereof as may be in force and effect from time to time, as may be necessary to reasonable develop the same for the production of oil and/or gas as a reasonable prudent operator.

19. A portion of paragraph 3 has been deleted and the following is in lieu thereof.

(b) on gas, including casinghead gas or other gaseous substances, produced from said land, the Lessors royalty shall be calculated and paid as follows:

a) Sales To Non-Affiliated Third Parties:
In the event Lessee enters into a gas sales contract with a non-affiliated third party, Lessor's royalty shall be one-fifth (1/5) of the gross proceeds received by Lessee from the sale of such gas.

b) Sales To Related Or Affiliated Entities For Resale:
In the event Lessee enters into a gas sales contract to sell gas to a related or affiliated entity, then Lessor's royalty shall be computed on the greater of the following:

1. One-fifth (1/5) of the gross proceeds received by Lessee or any affiliate or related entity from the sale of such gas to the first non-affiliated entity, or

2. One-fifth (1/5) of the highest price reasonably obtainable for gas by Lessee and other producers or operators in the

-4-

GWB2/dm 124(7)

east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity.

In this regard, it is understood that the "highest price reasonably _obtainable_" may be equal to, but is not necessarily, the highest price then being _obtained_ by other producers or operators in the east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity.

c) <u>Taking, Selling Or Delivery Of Gas To Lessee Or Its Related Or Affiliated Entities For Use (Not For Resale)</u>:

In the event Lessee takes gas for its own use, or sells or transfers gas to a related or affiliated entity for use, then Lessor's royalty shall be computed on the greater of the following:

1. One-fifth (1/5) of the highest price reasonably obtainable for gas by Lessee and other producers or operators in the east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity.

   In this regard, it is understood that the "highest price reasonably _obtainable_" may be equal to but is not necessarily the highest price then being _obtained_ by other producers or operators in the east one-fourth of Webb County, Texas, who are producing gas of like kind, quality and quantity, or

2. One-fifth (1/5) of the quarterly weighted average of the prices being paid by "purchasers" (as hereinafter defined) in the east one-fourth of Webb County, Texas, who are purchasing gas of like kind and quality. For the purposes of calculating the average price under this Paragraph c2, prices paid shall be those as reported in the Energy Planning Book publication or as reported to the State of

-5-

GWB2/dm 124(7)

73

Texas for severance tax purposes. "Purchasers" shall mean the three largest purchasers based on volume of gas purchased for such calendar quarter, in the east one-fourth of Webb County, Texas. For an example of the calculation of the quarterly weighted average of such price, see Exhibit "B".

Lessor and Lessee shall meet within eleven (11) months after the end of each calander year. At least thirty (30) days prior to such meeting, Lessee should furnish to Lessor a statement or other documentation of the basis upon which royalties accrued to Lessor under the terms of the Lease for the previous calender year. Any additional royalties calculated by Lessee to be due, if any, shall be paid at such meeting. Within one (1) year from delivery of the above referred to statement or other documentation, Lessor shall notify Lessee of any discrepancies. Failure to notify Lessee timely of any discrepancies shall constitute final acceptance of royalty payments as covered by such statements or other documentation. The first period for which Lessee shall prepare such statements or other documentation shall begin on April 1, 1988 and end on December 31, 1988. Nothing in this paragraph shall preclude Lessor from claiming any royalty which Lessor is entitled to as a result of mistake in computation, oversight in computation, or error in computation of royalty or which may result from the subsequent disclosure of a discrepancy.

LESSOR'S royalty shall be without deduction for any costs, such as, but not limited to, costs of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and otherwise making the oil, gas and associated substances ready for sale or use, except for a) severance and related taxes, and b) reasonable transportation expenses which may be necessary to be paid to non-affiliated third parties or entities to get Lessor's gas to a market or point of sale off the leased premises and which sale or sales will result in a net price equal to or higher than if said gas had been sold at the wellhead.

LESSEE may submit a copy of a proposed gas sales contract to Lessor which is acceptable to Lessee and request that Lessor approve same for

GWB2/dm 124(7)

royalty computation purposes. Lessor shall have thirty (30) days after receipt of a gas contract to approve same. If Lessor approves same or does not timely decline to do so, then Lessor's royalty on gas sold under such gas sales contract shall be based on the gross proceeds received under said contract.

GAS contracts with a term in excess of three (3) years shall contain a provision for price redetermination no later than the end of the 3rd year and subsequent price redeterminations thereafter at intervals no greater than two (2) years apart.

20. Lessee agrees to fill all slush pits and level the same when they have ceased to be used and to restore the land to as near its original state as is practicable and to pay for damages to the surface of the land and the improvements, water wells, growing crops and livestock thereon, and to any other personal property of Lessor, Vaquillas Ranch Company, Ltd., occasioned by, arising out of, or resulting from operations by Lessee, his agents, employees or independent contractors on the land hereby leased to Lessee. Lessee also agrees, when requested in writing by Lessor, to divulge to Lessor true and correct information as requested by Lessor as to all drilling, producing and marketing operations conducted under this lease and to furnish to Lessor copies of all electric well logs taken hereunder; provided, however, Lessee shall not be obligated to release such information until it has been released to the industry.

21. Lessee hereby agrees to ensure that the two exit gates on F.M. 2895 (Forest Gate and Reynolds Gate) are guarded in an efficient and prudent manner during drilling, reworking or plugging operations and at other times as mutually agreed to by Lessee and Lessor. As to the exit gate on the north side of U.S. Highway 59, Lessee agrees to use its best efforts to work out an arrangement with other exploration companies using such gate to ensure that it is guarded in an efficient and prudent manner during drilling, reworking or plugging operations and other times as mutually agreed to by Lessee and Lessor. Further, Lessee agrees to use its best efforts to work out an arrangement with TransAmerican Natural Gas Corporation or its successors or assigns to ensure that the exit gate

-7-

GWB2/dm 124(7)

75

located 9 miles north of Aguilares, Texas, on F.M. 2895 is guarded in an efficient and prudent manner during drilling, reworking or plugging operations and at other times as mutually agreed to by Conoco and Lessor. In regard to gates used by Lessee and other exploration companies, Lessee agrees to pay its share of the cost of guarding such gates when such gate guards are required under this agreement. Lessee shall not be obligated to furnish a gate guard on any gate which has been abandoned or is not being used by Lessee.

22. Lessee agrees that before abandoning any well drilled on said lease for oil or gas purposes, it will notify the owner or the surface estate in person or by telephone of its intention to do so, and it will allow said owner of the surface estate a reasonable time, not exceeding twenty-four (24) hours thereafter, within which to elect to take over the hole for the purpose of attempting to make and complete a water well. Lessee agrees to consult with such surface owner as to the location of a potential water zone, without any liability or warranty for such consultation. Upon the owner of the surface estate election, within the specified time, to attempt to complete the well as a water well and complying with all rules and regulations of the Railroad Commission of Texas and applicable statutes, Lessee will, at its expense, set all plugs to just below the designated water sand as may be required by the Railroad Commission and thereafter deliver the well to said owner of the surface estate, leaving in such well all surface casing and such intermediate casing as may have been run and set to at least the depth of the designated water sand and thereafter the owner of the surface state shall own the well and shall be responsible for all subsequent matters in connection with the well and for compliance with the applicable statutes and regulations of all regulatory agencies having jurisdiction. Lessee shall have no liability to Lessor in connection with any of the operations which may be conducted by the owner of the surface estate who shall thereafter bear all responsibility and liability with respect thereto. It is expressly understood that Lessee shall not be required to furnish any additional casing or other equipment for any well plugged back at the request of the owner of the surface estate under this paragraph. Should the owner of the surface estate elect not to attempt to make a producing water well out of

-8-

GWB2/dm 124(7)

any such hole, Lessee shall plug the well in accordance with all applicable rules, regulations and statutes.

23. It is expressly agreed and understood that for the purposes of this lease the following definitions shall apply:

"Commences" - A well shall be deemed commenced on the date which the drilling bit enters the earth for the drilling of a well.

"Abandoned" - A well shall be deemed abandoned on the day when it is finally plugged as a dry hole.

"Completed" - A well shall be deemed completed thirty (30) days after the day the Lessee sets production casing.

24. Lessor and Lessee agree to limit the commencement of actual Aoλ drilling during deer hunting season to 1) those wells drilled in areas which would not disturb deer hunting, and 2) offset wells. If Lessee must commence a well during deer hunting season to perpetuate said lease, then Lessor will either a) not object to the drilling of such well during deer hunting season or b) agree to extend the commencement date for such well to a mutually agreeable date after deer hunting season ends. For the purposes of this paragraph "deer hunting season" shall be that period defined by State law.

25. Nothwithstanding anything contained herein to the contrary, the Lessor at any time and from time to time, upon not less than ninety (90) days notice to the holder of this lease, may elect to require the payment of any royalties accruing to such royalty owner under this lease to be made in kind; provided that any expenses incident to the exercise of such election shall be borne by Lessor and such election shall be for periods of not less than twelve (12) months. Lessor shall only be allowed to take in kind when Lessee is producing for his own account. In the event of such an election by Lessor, Lessee shall cooperate fully with Lessor in allowing Lessor to take their royalty in kind, including permitting Lessor to use Lessee's wellhead equipment and, to the extent that Lessee has assignable rights, the use of Lessee's purchaser's transportation facilities in good faith and not to exceed prevailing charges for similar services in the industry at the time if Lessee or its affiliates are transporting the gas,

-9-

but if Lessee has a third party contract for the transport of said gas, Lessor will be bound by said contract. Should Lessee desire to enter into a gas purchase contract having a term of more than one (1) year, then (a) Lessee shall include in such contract a provision that allows Lessor to elect to take its gas in kind and be released from such contract one hundred twenty (120) days after notice, or (b) Lessor may approve of such contract in writing, in which event, Lessor may elect to take its gas in kind either at the end of such gas contact or one (1) year after notice to Lessee, whichever happens sooner. Any equipment installed by Lessor necessary to take in kind must be approved by Lessee and maintained according to Lessee's specifications.

If Lessee is unable to obtain a more favorable gas contract because of Lessor's reservation of this election to take in kind, then Lessee may elect to give notice of its intention to sign a gas contract acceptable to Lessee and request that Lessor join in signing same, and if Lessor elects to sign same, then Lessor's royalty share of revenue shall be bound by such contract and Lessor may not elect to take its royalty in kind during the term of such gas purchase contract.


DATED this ___9th___ day of January, 1988.


VAQUILLAS RANCH COMPANY, LTD.

By: _____
     J. O. Walker, Jr.

By: _____
     E. Walker Quiros

By: _____
     Gene S. Walker

By: _____
     Evan B. Quiros


VAQUILLAS UNPROVEN MINERAL TRUST

By: _____
     J. O. Walker, Jr., Trustee

By: _____
     E. Walker Quiros, Trustee

By: _____
     Gene S. Walker, Trustee

By: _____
     Evan B. Quiros, Trustee


-10-

GWB2/dm 124(7)

VAQUILLAS PROVEN MINERAL TRUST                    CONOCO INC.

By: _____
    J. O. Walker, Jr., Trustee

By: _____
    E. Walker Quiros, Trustee

By: _____
    Gene S. Walker, Trustee

By: _____
    Evan B. Quiros, Trustee

By: _____
    Attorney-In-Fact

-11-

GWB2/dm 124(7)

79

| SURVEY | | ABSTRACT | CERTIFICATE | GRANTEE | ACRES |
|--------|---|----------|-------------|---------|-------|
| 1652 | | 2876 | 1159 | W. H. TAYLOR | 640.0 |
| 1661 | | 1122 | 1164 | CCSD & RGNG | 640.0 |
| 1663 | | 1123 | 1165 | CCSD & RGNG | 640.0 |
| 1633 | | 1323 | 4/808 | GC & SF | 640.0 |
| 1634 | | 2252 | 4/808 | GC & SF | 659.96 |
| 1665 | | 1124 | 1166 | CCSD & RGNG | 640.0 |
| 1635 | | 1797 | 17 | TC RY. | 640.0 |
| 2060 | (SE/4 only) | 3329-30 | 303 | CT & M | 160.0 |
| 1953 | (E 1/2) | 1329 | 4527 | GC & SF | 320.0 |
| 1627 | (pt. only) | 1324 | 4683 | GC & SF | 160.0 |
| 1629 | (pt. only) | 1275 | 4682 | GC & SF | 264.65 |
| 1662 | (W 1/2) | 2230 | 1164 | CCSD & RGNG | 329.31 |
| 1648 | (E 1/2) | 2441 | 1157 | CCSD &- RGNG | 325.75 |
| 1648 | (W 1/2) | 3301 | 1157 | CCSD & RGNG | 325.75 |
| 2335 | | 3025 | SCHOOL | W. BROWN | 27.3 |
| 1956 | (E 1/2) | 2560 | 4526 | GC & SF | 327.34 |

The following parts of surveys are expressly excluded herefrom, viz.:

(1) The SE 1/4 of SW 1/4, SW 1/4 of NE 1/4 (80 acs.) and N 1/2 of SW 1/4 and SW 1/4 of SW 1/4 (120 acs.) of CT & M Survey 2060.

(2) The W. 3/4 of GC & SF Survey 1627 described in O&G Lease to Daniel A. Pedrotti dated September 24, 1973, as amended.

(3) All of the W. 320 acres of Survey 1629 described and included in O&G Lease to Daniel A. Pedrotti dated September 24, 1973, as amended.

80

Calculation of royalty to be paid on gas delivered to Lessee or Affiliates for use (and not for resale) in accordance with paragraph 19.

Principal: Pay Lessor royalty based on the greater of the weighted average price paid by the three largest volumetric purchasers for the calendar quarter in the east quarter of Webb County or the weighted average of the prices used by the Lessor for royalty payment purposes;

Calculation: Determine additional royalty payments, if any.

Data Source: Energy Planning Book publication or as reported to the State of Texas for severence tax purposes.

Step 1. Calculate the weighted average price for the month for each of the three largest volume purchases for the quarter from the tax records.

### Month-January 1988

| Purchases from Company A | MCFD | $/MCF | $ |
|---|---|---|---|
| Lease 1 | 100,000 | 2.00 | 200,863 |
| Unit 14 | 80,000 | 1.51 | 120,800 |

| Purchases from Company B | | | |
|---|---|---|---|
| Well 42 | 180,821 | 1.62 | 291,733 |

| TOTAL United Texas Transmission | 360,821 | Calculate | 613,396 |
|---|---|---|---|

Monthly Weighted Average Price    613,396/360,821 = $1.70/MMBtu

Repeat procedure for remaining two months for this purchaser and for remaining two purchasers.

Step 2. Calculate the weighted average price of the three largest volumetric purchasers for the quarter using monthly values from Step 1.

| Purchaser | Month-January 1988 | | | Month - February 1988 | | | Month - March 1988 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ |
| United Texas Transmission | 360,821 | 1.70 | 613,396 | 397,130 | 1.58 | 627,465 | 320,306 | 1.58 | 506,083 |
| UTRADE | 400,223 | 1.55 | 620,346 | 350,723 | 1.60 | 561,157 | 500,126 | 1.35 | 775,195 |
| South Gulf | 375,000 | 1.60 | 600,000 | 299,156 | 1.62 | 484,633 | 301,000 | 1.58 | 475,580 |
| Totals | 1,136,044 | -- | 1,833,742 | 1,047,009 | -- | 1,673,255 | 1,121,432 | -- | 1,756,858 |

| | Sum of Volumes | Sum of Extensions | Weighted Average Price |
|---|---|---|---|
| Totals | 3,304,485 | 5,263,855 | 1.59 |

Step 3. Calculate weighted average price used by Lessee to calculate royalty payments on gas delivered to Lessee or affiliates and not for resale.

| Month-January 1988 | | | Month-February 1988 | | | Month-March 1988 | | |
|---|---|---|---|---|---|---|---|---|
| Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ | Volume MCF | Price $/MCF | Extension $ |
| 155,000 | 1.60 | 248,000 | 140,000 | 1.62 | 226,800 | 155,000 | 1.58 | 244,900 |

| Sum of Volumes | Sum of Extensions | Weighted Average Price |
|---|---|---|
| 650,000 | 719,700 | 1.60 |

Step 4. Compare weighted average price calculated in Step 2 to the weighted average Lessee price calculated in Step 3.

$1.60/MCF is greater than $1.59/MCF so no additional royalty payments are required for this quarter.

Note: Volumes and prices used in this example are used for illustration and may not be reflective of actual conditions.

81

THE STATE OF TEXAS §
                   §
COUNTY OF WEBB §

       This instrument was acknowledged before me on the 9th day of January, 1988, by J. O. WALKER, JR., General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.



Laura Ballew
Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.


THE STATE OF TEXAS §
                   §
COUNTY OF WEBB §

       This instrument was acknowledged before me on the 9th day of January, 1988, by E. WALKER QUIROS, General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Laura Ballew
Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.


THE STATE OF TEXAS §
                   §
COUNTY OF WEBB §

       This instrument was acknowledged before me on the 9th day of January, 1988, by GENE S. WALKER, General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Laura Ballew
Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.


THE STATE OF TEXAS §
                   §
COUNTY OF WEBB §

       This instrument was acknowledged before me on the 9th day of January, 1988, by EVAN B. QUIROS, General Partner of Vaquillas Ranch Co., Ltd., A Texas Limited Partnership, on behalf of said partnership.

Laura Ballew
Notary Public in and for
The State of Texas.
My Commission Expires 7-3-89

LAURA BALLEW
Printed/stamped name of Notary.

GWB2/dm 130(1)

-12-









THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by J. O. WALKER, JR., Trustee for The Vaquillas Unproven Mineral Trust.



_Laura Ballew_
Notary Public in and for
The State of Texas.
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by E. WALKER QUIROS, Trustee for the Vaquillas Unproven Mineral Trust.



_Laura Ballew_
Notary Public in and for
The State of Texas.
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by GENE S. WALKER, Trustee of the Vaquillas Unproven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.

THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by EVAN B. QUIROS, Trustee of Vaquillas Unproven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.

-13-

GWB2/dm 130(1)

84









THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by J. O. WALKER, JR., Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by E. WALKER QUIROS, Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by GENE S.WALKER, Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.


THE STATE OF TEXAS §
§
COUNTY OF WEBB §

This instrument was acknowledged before me on the _9th_ day of January, 1988, by EVAN B. QUIROS, Trustee of Vaquillas Proven Mineral Trust.

_Laura Ballew_
Notary Public in and for
The State of Texas
My Commission Expires: _7-3-89_

_LAURA BALLEW_
Printed/stamped name of Notary.

-14-

GWB2/dm 130(1)

86









THE STATE OF TEXAS §
                   §
COUNTY OF WEBB     §

    This instrument was acknowledged before me on the ___8th.___ day of January, 1988, by _____*H. C. Sager*_____, Attorney-in-Fact for CONOCO INC., a Delaware corporation, on behalf of said corporation.

<br>

_____
Notary Public in and for
The State of Texas
My Commission Expires: *9-18-88*

_____
Printed/stamped name of Notary.

DELLA MARKERT
Notary Public, State of Texas
My Commission Expires Sep. 18, 1988.

GWB2/dm 130(1)

**RAILROAD COMMISSION OF TEXAS**
**OFFICE OF GENERAL COUNSEL**

**OIL AND GAS DOCKET**
**NO. 04-0217435**

**FINAL ORDER**
**CONSOLIDATING VARIOUS FIELDS INTO A NEW FIELD CALLED**
**THE VAQUILLAS RANCH (LOBO CONS.) FIELD AND**
**ADOPTING FIELD RULES FOR THE**
**VAQUILLAS RANCH (LOBO CONS.) FIELD**
**WEBB COUNTY, TEXAS**

The Commission finds that after statutory notice in the above-numbered docket heard on October 8, 1997, the presiding examiner has made and filed a report and recommendation containing findings of fact and conclusions of law, for which service was not required; that the proposed application is in compliance with all statutory requirements; and that this proceeding was duly submitted to the Railroad Commission of Texas at conference held in its offices in Austin, Texas.

The Commission, after review and due consideration of the examiner's report and recommendation, the findings of fact and conclusions of law contained therein, hereby adopts as its own the findings of fact and conclusions of law contained therein, and incorporates said findings of fact and conclusions of law as if fully set out and separately stated herein.

Therefore, it is ordered by the Railroad Commission of Texas that the following fields located in Webb County, Texas, are hereby combined into a new field called the Vaquillas Ranch (Lobo Cons.) Field (No. _93215 400_ ):

| | |
|---|---|
| BALTAZAR (LOBO 6 10470) FIELD | 05357 400 |
| BARNSLEY (LOBO 10900) FIELD | 05791 800 |
| BARNSLEY (LOBO) FIELD | 05791 400 |
| BONEBRAKE (LOBO 6) FIELD | 10419 500 |
| BONEBRAKE (UPPER LOBO) FIELD | 10419 800 |
| CALICHE CREEK (LOBO) FIELD | 14735 225 |
| CARR (LOBO 10100) FIELD | 15874 350 |
| CARR (LOBO 8300) FIELD | 15874 235 |
| CARR (LOBO 8600) FIELD | 15874 250 |
| CARR (LOBO 8700) FIELD | 15874 275 |
| CARR (LOBO) FIELD | 15874 200 |
| CARR (WILCOX 8200) FIELD | 15874 600 |
| CARR (WILCOX 8300) FIELD | 15874 700 |
| CARR (WILCOX) FIELD | 15874 500 |
| CATTO (LOBO 9900) FIELD | 16405 400 |
| CATTO (LOBO 10200) FIELD | 16405 500 |

**EXHIBIT**

A-4
~~245~~

| | |
|---|---|
| DESPARADO (LOBO 6) FIELD | 24394 500 |
| DIAMONDBACK (LOBO 3) FIELD | 24574 400 |
| GATO CREEK (9800) FIELD | 34238 400 |
| GATO CREEK (LOBO 1) FIELD | 34238 300 |
| GATO CREEK (LOBO 1-SEGA) FIELD | 34238 325 |
| GATO CREEK (LOBO 3) FIELD | 34238 350 |
| GATO CREEK (LOBO 6 SEGMENT A) FIELD | 34238 375 |
| GATO CREEK, SE (9800) FIELD | 34242 980 |
| GATO CREEK, SE (LOBO 1) FIELD | 34242 500 |
| GATO CREEK, SE (UP. LOBO STRAY) FIELD | 34242 750 |
| HIRSCH (LOBO 9746) FIELD | 41659 075 |
| JURASCHEK (LOBO) FIELD | 47740 500 |
| JURASCHEK (WILCOX 11600) FIELD | 47740 600 |
| LUNDELL (LOBO 9200) FIELD | 55755 180 |
| LUNDELL (LOBO) FIELD | 55755 175 |
| MCLEAN (LOBO) FIELD | 59725 500 |
| MUJERES CREEK (LOBO 1) FIELD | 63668 300 |
| MUJERES CREEK (LOBO 3) FIELD | 63668 400 |
| MUJERES CREEK (LOBO 6) FIELD | 63668 500 |
| MUJERES CREEK (LOBO) FIELD | 63668 250 |
| MUJERES CREEK, SOUTH (LOBO) FIELD | 63670 500 |
| NICHOLSON (LOBO 3) FIELD | 65469 020 |
| NORDAN (LOBO) FIELD | 65934 500 |
| POZO (LOBO) FIELD | 72838 500 |
| RANCHO VIEJO, S. (LOBO 6) FIELD | 74570 100 |
| RANCHO VIEJO (LOBO 3) FIELD | 74568 680 |
| RANCHO VIEJO (LOBO 6) FIELD | 74568 700 |
| VAQUILLAS RANCH (LOBO 8100) FIELD | 93215 450 |
| VAQUILLAS RANCH (UP. LOBO STRAY) FIELD | 93215 600 |
| VAQUILLAS RANCH (WALKER 8300) FIELD | 93215 680 |
| VAQUILLAS RANCH (WALKER 8600) FIELD | 93215 690 |
| VAQUILLAS RANCH (WALKER, N.) FIELD | 93215 670 |
| VAQUILLAS RANCH (WILCOX 11,100) FIELD | 93215 700 |
| VAQUILLAS RANCH (WILCOX 11,600) FIELD | 93258 750 |
| VAQUILLAS RANCH (WILCOX 11,900) FIELD | 93215 725 |
| VAQUILLAS RANCH (YARSA) FIELD | 93258 900 |
| VENADA (9800) FIELD | 93436 800 |
| VENADA (LOBO) FIELD | 93436 300 |
| VERGARA (LOBO 9300) FIELD | 93537 750 |
| VERGARA (LOBO) FIELD | 93537 500 |

It is further ordered that the following rules are adopted for the Vaquillas Ranch (Lobo Cons.) Field:

RULE 1:     The entire Lobo Formation from the Lobo Unconformity to the top of the Wills Point (Midway Shale) and including the above listed fields in Webb County, Texas, shall be designated as a single reservoir for proration purposes and be designated as the Vaquillas Ranch (Lobo Cons.) Field.

RULE 2:  No gas well shall hereafter be drilled nearer than FOUR HUNDRED SIXTY SEVEN (467) feet to any property line, lease line or subdivision line and no well shall be drilled nearer than ONE THOUSAND TWO HUNDRED (1,200) feet to any applied for, permitted or completed well in the same reservoir on the same lease, pooled unit or unitized tract.  The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well, and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each drilling and proration unit.  Provided however, that the Commission will grant exceptions to permit drilling within shorter distances and drilling more wells than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property.  When exception to these rules is desired, application therefore shall be filed and will be acted upon in accordance with the provisions of Commission Statewide Rule 37 and 38, which applicable provisions of said rule are incorporated herein by reference.  Provided however, that persons who are presumed to be affected by a request for an exception to the between-well spacing requirement shall be limited to the operators and owners/lessees of tracts, lease or units within one mile or less of the proposed well.

In applying this rule the general order of the Commission with relation to the subdivision of property shall be observed.

RULE 3:  The daily allowable production of gas from individual wells completed in the subject field shall be determined by allocating the allowable production, after deductions have been made for wells which are incapable of producing their gas allowables, among the individual wells in the following manner:

TEN percent (10%) of the total field allowable shall be allocated equally among the individual wells producing from this field.

NINETY percent (90%) of the total field allowable shall be allocated among the individual wells in the proportion that the deliverability of such well, as evidenced by the most recent G-10 test filed with the Railroad Commission bears to the summation of the deliverability of all proratable wells producing from this field.

It is further ordered by the Railroad Commission of Texas that the allocation formula for the Vaquillas Ranch (Lobo Cons.) Field be suspended.  The allocation formula may be reinstated administratively if the market demand for gas in the Vaquillas Ranch (Lobo Cons.) Field drops below 100% of deliverability.  If the market demand for gas in the Vaquillas Ranch (Lobo Cons.) Field drops below 100% of deliverability while the allocation formula is suspended, the operator shall immediately notify the Commission and the allocation formula shall be immediately

reinstated. Failure to give such notice to the Commission may result in a fine (as provided for in Tex. Nat. Res. Code §86.222) for each day the operators fail to give notice to the Commission.

Effective this 24th day of February, 1998.

RAILROAD COMMISSION OF TEXAS

CHAIRMAN

COMMISSIONER

COMMISSIONER

ATTEST:

Secretary

CERTIFICATION NO.

105376 AUG -5 14

Railroad Commission
OF TEXAS

RAILROAD COMMISSION OF TEXAS

STATE OF TEXAS

COUNTY OF TRAVIS

I hereby certify that the information on the reverse side hereof, and on the securely attached additional 3 pages identified by certification # 105376 are true and correct copies of documents on file with Railroad Commission of Texas, and I further certify that I am the legal custodian of the records, files and seal of the Railroad Commission of Texas.

august 5, 2014 _____ Kathy _____

SECRETARY

# RAILROAD COMMISSION OF TEXAS
## OFFICE OF GENERAL COUNSEL

OIL AND GAS DOCKET
NO. 04-0265630

IN THE VAQUILLAS RANCH (LOBO
CONS.) FIELD, WEBB COUNTY, TEXAS

## FINAL ORDER
## AMENDING FIELD RULES FOR THE
## VAQUILLAS RANCH (LOBO CONS.) FIELD
## WEBB COUNTY, TEXAS

The Commission finds that after statutory notice in the above-numbered docket heard on September 23, 2010, the presiding examiner has made and filed a report and recommendation containing findings of fact and conclusions of law, for which service was not required; that the proposed application is in compliance with all statutory requirements; and that this proceeding was duly submitted to the Railroad Commission of Texas at conference held in its offices in Austin, Texas.

The Commission, after review and due consideration of the examiner's report and recommendation, the findings of fact and conclusions of law contained therein, hereby adopts as its own the findings of fact and conclusions of law contained therein, and incorporates said findings of fact and conclusions of law as if fully set out and separately stated herein.

Therefore, it is ordered by the Railroad Commission of Texas that Rule 2 of the field rules adopted in Final Order No. 04-0217435, effective February 24, 1998, for the Vaquillas Ranch (Lobo Cons.) Field, Webb County, Texas, is amended as hereafter set out:

**RULE 2**: No well shall hereafter be drilled nearer than FOUR HUNDRED SIXTY SEVEN (467) feet to any property line, lease line or subdivision line and no well shall be drilled nearer than ONE THOUSAND TWO HUNDRED (1,200) feet to any applied for, permitted or completed well in the same reservoir on the same lease, pooled unit or unitized tract. Provided, however, there is no minimum between-well spacing requirement between a well being permitted at least 660 feet from the nearest property line, lease line or subdivision line, and the other wells permitted, drilled or completed on the same lease, pooled unit or unitized tract. A well being permitted at a distance less than SIX HUNDRED SIXTY (660) feet from the nearest property line, lease line or subdivision line must be a minimum of ONE THOUSAND TWO HUNDRED (1,200) feet from any applied for, permitted or completed well in the same reservoir on the same lease, pooled unit or unitized tract, or an exception to Rule 37 must be obtained.

The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well, and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each drilling and proration unit. Provided however, that the Commission will grant exceptions to permit drilling within

EXHIBIT

A-5  254

shorter distances and drilling more wells than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to these rules is desired, application therefore shall be filed and will be acted upon in accordance with the provisions of Commission Statewide Rule 37 and 38, which applicable provisions of said rule are incorporated herein by reference. Provided however, that persons who are presumed to be affected by a request for an exception to the between-well spacing requirement shall be limited to the operators and owners/lessees of tracts, lease or units within one mile or less of the proposed well.

In applying this rule the general order of the Commission with relation to the subdivision of property shall be observed.

Done this 2nd day of November, 2010.

**RAILROAD COMMISSION OF TEXAS**

**(Order approved and signatures affixed by OGC Unprotested Master Order dated November 2, 2010)**

Filed
10/29/2014 9:51:53 AM
Esther Degollado
District Clerk
Webb District
2014 CVQ000 438 D4

<<Prev Rule

# Texas Administrative Code

Next Rule>>

| | |
|---|---|
| **TITLE 16** | ECONOMIC REGULATION |
| **PART 1** | RAILROAD COMMISSION OF TEXAS |
| **CHAPTER 3** | OIL AND GAS DIVISION |
| **RULE §3.38** | **Well Densities** |

(a) Definitions. The following words and terms, when used in this section, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Commission designee--Director of the Oil and Gas Division or any Commission employee designated in writing by the director or the Commission.

(2) Drilling unit--The acreage assigned to a well for drilling purposes.

(3) Proration unit--The acreage assigned to a well for the purpose of assigning allowables and allocating allowable production to the well.

(4) Substandard acreage--Less acreage than the smallest amount established for standard or optional drilling units.

(5) Surplus acreage--Substandard acreage within a lease, pooled unit, or unitized tract that remains unassigned after the assignment of acreage to each applied for, permitted, or completed well in a field, in an amount equaling or exceeding the amount established for standard or optional drilling units. Surplus acreage is distinguished from the term "tolerance acreage,"in that tolerance acreage is defined in context with proration regulation, while surplus acreage is defined by this rule only in context with well density regulation.

(6) Tolerance acreage--Acreage within a lease, pooled unit, or unitized tract that may be assigned to a well for proration purposes pursuant to special field rules in addition to the amount established for a prescribed or optional proration unit.

(b) Density requirements.

(1) General prohibition. No well shall be drilled on substandard acreage except as hereinafter provided.

(2) Standard units.

(A) The standard drilling unit for all oil, gas, and geothermal resource fields wherein only spacing rules, either special, country regular, or statewide, are applicable is hereby prescribed to be the following.

Attached Graphic

(B) The spacing rules listed in subparagraph (A) of this paragraph are not exclusive. If any spacing rule not listed in subparagraph (A) of this subsection is brought to the attention of the commission, it will be given an appropriate acreage assignment.

(c) Development to final density. An application to drill a well for oil, gas, or geothermal resource on a drilling unit composed of surplus acreage, commonly referred to as the "tolerance well," may be granted as

EXHIBIT

3

regular when the operator seeking such permit certifies to the commission in a prescribed form the necessary data to show that such permit is needed to develop a lease, pooled unit, or unitized tract to final density, and only in the following circumstances:

(1) when the amount of surplus acreage equals or exceeds the maximum amount provided for tolerance acreage by special or county regular rules for the field, provided that this paragraph does not apply for a lease, pooled unit, or unitized tract that is completely developed with optional units and the special or county regular rules for the field do not have a tolerance provisions expressly made applicable to optional proration units;

(2) if the special or county regular rules for the field do not have a tolerance provision expressly made applicable to optional proration units, when the amount of surplus acreage equals or exceeds one-half of the smallest amount established for an optional drilling unit; or

(3) if the applicable rules for the field do not have a tolerance provision for the standard drilling or proration unit, when the amount of surplus acreage equals or exceeds one-half the amount prescribed for the standard unit.

(d) Applications involving the voluntary subdivision rule.

(1) Density exception not required. An exception to the minimum density provision is not required for the first well in a field on a lease, pooled unit, or unitized tract composed of substandard acreage, when the leases, or the drillsite tract of a pooled unit or unitized tract:

(A) took its present size and shape prior to the date of attachment of the voluntary subdivision rule (§3.37(g) of this title (relating to Statewide Spacing Rule)); or

(B) took its present size and shape after the date of attachment of the voluntary subdivision rule (§3.37(g) of this title (relating to Statewide Spacing Rule)) and was not composed of substandard acreage in the field according to the density rules in effect at the time it took its present size and shape.

(2) Density exception required. An exception to the density provision is required, and may be granted only to prevent waste, for a well on a lease, pooled unit, or unitized tract that is composed of substandard acreage and that:

(A) took its present size and shape after the date of attachment of the voluntary subdivision rule (§3.37(g) of this title (relating to the Statewide Spacing Rule)); and

(B) was composed of substandard acreage in the field according to the density rules in effect at the time it took its present size and shape.

(3) Unit dissolution.

(A) If two or more separate tracts are joined to form a unit for oil or gas development, the unit is accepted by the Commission, and the unit has produced hydrocarbons in the preceding twenty (20) years, the unit may not thereafter be dissolved into the separate tracts with the rules of the commission applicable to each separate tract if the dissolution results in any tract composed of substandard acreage for the field from which the unit produced, unless the Commission approves such dissolution.

(B) The Commission shall grant approval only after application, notice, and an opportunity for hearing.

410

The applicant seeking the unit dissolution shall provide a list of the names and addresses of all current lessees and unleased mineral interest owners of each tract within the joined or unitized tract at the time the application is filed. The Commission shall give notice of the application to all current lessees and unleased mineral interest owners of each tract within the joined or unitized tract. Additionally, if one or more wells on the unitized tract has produced from the field within the 12-month period prior to the application, the applicant shall include on the list all affected persons described in subsection (h)(1)(A) of this section, and the Commission shall give notice of the application to these affected persons.

(C) A Commission designee may grant administrative approval if the Commission designee determines that granting the application will not result in the circumvention of the density restrictions of this section or other Commission rules, and if either:

(i) written waivers are filed by all affected persons; or

(ii) no protest is filed within the time set forth in the notice of application.

(e) Application involving unitized areas with entity for density orders. An exception to the minimum density provision is not required for a well in a unitized area for which the commission has granted an entity for density order, if the sum of all applied for, permitted, or completed producing wells in the field within the unitized area, multiplied by the applicable density provision, does not exceed the total number of acres in the unitized area. The operator must indicate the docket number of the entity for density order on the application form.

(f) Exceptions to density provisions authorized. The Commission, or Commission designee, in order to prevent waste or, except as provided in subsection (d)(2) of this section, to prevent the confiscation of property, may grant exceptions to the density provisions set forth in this section. Such an exception may be granted only after notice and an opportunity for hearing.

(g) Filing requirements.

(1) Application. An application for permit to drill shall include the fees required in §3.78 of this title (relating to Fees and Financial Security Requirements) and shall be certified by a person acquainted with the facts, stating that all information in the application is true and complete to the best of that person's knowledge.

(2) Plat. When filing an application for an exception to the density requirements of this section, in addition to the plat requirements in §3.5 of this title (relating to Application to Drill, Deepen, Reenter, or Plug Back) (Statewide Rule 5), the applicant shall attach to each copy of the application a plat that:

(A) depicts the lease, pooled unit, or unitized tract, showing thereon the acreage assigned to the drilling unit for the proposed well and the acreage assigned to all current applied for, permitted, or completed oil, gas, or oil and gas wells in the same field or reservoir which are located within the lease, pooled unit, or unitized tract;

(B) on large leases, pooled units, or unitized tracts, if the established density is not exceeded as shown on the face of the application, outlines the acreage assigned to the well for which the permit is sought and the immediately adjacent wells on the lease, pooled unit, or unitized tract;

(C) on leases, pooled units, or unitized tracts from which production is secured from more than one field, outlines the acreage assigned to the wells in each field that is the subject of the current application;

411

(D) corresponds to the listing required under subsection (g)(1)(A) of this section.

(E) is certified by a person acquainted with the facts pertinent to the application that the plat is accurately drawn to scale and correctly reflects all pertinent and required data.

(3) Substandard acreage. An application for a permit to drill on a lease, pooled unit, or unitized tract composed of substandard acreage must include a certification in a prescribed form indicating the date the lease, or the drillsite tract of a pooled unit or unitized tract, took its present size and shape.

(4) Surplus acreage. An application for permit to drill on surplus acreage pursuant to subsection (c) of this section must include a certification in a prescribed form indicating the date the lease, pooled unit, or unitized tract took its present size and shape.

(5) Certifications. Certifications required under paragraphs (3) and (4) of this subsection shall be filed on Form W-1A, Substandard Acreage Certification.

(A) The operator shall file the Form W-1A with the drilling permit application and shall indicate the purpose of filing. The operator shall accurately complete all information required on the form in accordance with instructions on the form.

(B) The operator shall list the field or fields for which the substandard acreage certification applies in the designated area on the form. If there are more than three fields for which the certification applies, the operator shall attach additional Forms W-1A and shall number the additional pages in sequence.

(C) The operator shall file the original Form W-1A with the Commission's Austin office and a copy with the appropriate district office, unless the operator files electronically through the Commission's Electronic Compliance and Approval Process (ECAP) system.

(D) The operator or the operator's agent shall certify the information provided on the Form W-1A is true, complete, and correct by signing and dating the form, and listing the requested identification and contact information.

(E) Failure to timely file the required information on the appropriate form may result in the dismissal of the application.

(h) Procedure for obtaining exceptions to the density provisions.

(1) Filing requirements. If a permit to drill requires an exception to the applicable density provision, the operator must file, in addition to the items required by subsection (g) of this section:

(A) a list of the names and addresses of all affected persons. For the purpose of giving notice of application, the Commission presumes that affected persons include the operators and unleased mineral interest owners of all adjacent offset tracts, and the operators and unleased mineral interest owners of all tracts nearer to the proposed well than the prescribed minimum lease-line spacing distance. The Commission designee may determine that such a person is not affected only upon written request and a showing by the applicant that:

(i) competent, convincing geological or engineering data indicate that drainage of hydrocarbons from the particular tracts subject to the request will not occur due to production from the proposed well; and

412

   (ii) notice to the particular operators and unleased mineral interest owners would be unduly burdensome or expensive;

   (B) engineering and/or geological data, including a written explanation of each exhibit, showing that the drilling of a well on substandard acreage is necessary to prevent waste or to prevent the confiscation of property;

   (C) additional data requested by the Commission designee.

  (2) Notice of application. Upon receipt of a complete application, the Commission will give notice of the application by mail to all affected persons for whom signed waivers have not been submitted.

  (3) Approval without hearing. If the Commission designee determines, based on the data submitted, that a permit requiring an exception to the applicable density provision is justified according to subsection (f) of this section, then the Commission designee may issue the exception permit administratively if:

   (A) signed waivers from all affected persons were submitted with the application; or

   (B) notice of application was given in accordance with paragraph (2) of this subsection and no protest was filed within 21 days of the notice; or

   (C) no person appeared to protest the application at a hearing scheduled pursuant to paragraph (4)(A) of this subsection.

  (4) Hearing on the application.

   (A) If a written protest is filed within 21 days after the notice of application is given in accordance with paragraph (2) of this subsection, the application will be set for hearing.

   (B) If the application is not protested and the Commission designee determines that a permit requiring an exception to the applicable density provision is not justified according to subsection (f) of this section, the operator may request a hearing to consider the application.

(i) Duration. A permit is issued as an exception to the applicable density provision shall expire two years from the effective date of the permit; unless drilling operations are commenced in good faith within the two year period.

---

**Source Note:** The provisions of this §3.38 adopted to be effective November 1, 1989, 14 TexReg 5255; amended to be effective April 21, 1997, 22 TexReg 3404; amended to be effective July 10, 2000, 25 TexReg 6487; amended to be effective June 11, 2001, 26 TexReg 4088; amended to be effective February 13, 2002, 27 TexReg 906; amended to be effective September 1, 2004, 29 TexReg 8271

Next Page       Previous Page

List of Titles       Back to List

413

Figure: 16 TAC §3.38(b)(2)(A)

| Spacing Rule | Acreage Requirement |
|---|---|
| (1) 150 - 300 | 2 |
| (2) 200 - 400 | 4 |
| (3) 330 - 660 | 10 |
| (4) 330 - 933 | 20 |
| (5) 467 - 933 | 20 |
| (6) 467 - 1200 | 40 |
| (7) 660 - 1320 | 40 |

# HYPERLINKED MATERIAL

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**



Supreme Court of Texas.
Mildred Mitchell JONES et vir, Petitioners,
v.
S. H. KILLINGSWORTH et al., Respondents.

No. A—10243.
Dec. 8, 1965.
Rehearing Denied and Dissenting Opinion Filed April 20, 1966.

Action by oil, gas, and mineral lessors against lessee's assignee and of owners of neighboring leases to obtain judgment declaring lease terminated at expiration of primary term, to remove cloud on title, and to obtain title to and possession of leased premises. The District Court, Henderson County, Jack Y. Hardee, J., entered judgment for defendants, and the lessors appealed. The Tyler Court of Civil Appeals, Twelfth Supreme Judicial District, 379 S.W.2d 362, affirmed the judgment, and the lessors brought error. The Supreme Court, Smith, J., held that lease pooling clause limiting units pooled for oil to area not substantially exceeding 40 acres but permitting units to conform with size of those prescribed by governmental regulations if government prescribes or permits larger units did not authorize a 170.86 acre unit where rule governing field provided that no proration unit should consist of more than 80 acres but permitted operators to elect to assign an additional 80 acres, and that lease habendum clause permitting extension based on pooling could not be used to extend lease beyond primary term where lands had been pooled without authority.

Judgments reversed, and judgment terminating lease and awarding title and possession rendered.

Hamilton, Pope, and Griffin, JJ., dissented.

West Headnotes

**[1] Mines and Minerals 260 ⊃79.1(5)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k79 Rent or Royalties
            260k79.1 In General
               260k79.1(5) k. Community Leases, Unitization, or Pooling Arrangements. Most Cited Cases
   (Formerly 260k79(1))

Ascertainment of parties' true intention under oil, gas, and mineral lease as to lessee's authority to pool leased land into oil unit containing 170.86 acres would require consideration of all pooling provisions contained in lease and rules and regulations governing field in which leased land was located.

**[2] Mines and Minerals 260 ⊃79.1(5)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k79 Rent or Royalties
            260k79.1 In General
               260k79.1(5) k. Community Leases, Unitization, or Pooling Arrangements. Most Cited Cases
   (Formerly 260k79(1))

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

Oil, gas, and mineral lease pooling clause limiting units pooled for oil to area not substantially exceeding 40 acres but permitting units to conform in size with those prescribed by government regulations if government prescribes or permits larger units did not authorize a 170.86 acre unit, where rule governing field provided that no proration unit should consist of more than 80 acres but permitted operators to elect to assign an additional 80 acres and receive allowable credit of not more than 160 acres.

**[3] Mines and Minerals 260 🔑92.79**

260 Mines and Minerals
    260III Operation of Mines, Quarries, and Wells
        260III(A) Statutory and Official Regulations
            260k92.78 Unitization
                260k92.79 k. In General; Procedure.
Most Cited Cases
    (Formerly 260k92.78)

Oil and gas well field rules adopted by Railroad Commission require a proration unit of at least 80 acres but permit larger units of not more than 160 acres.

**[4] Mines and Minerals 260 🔑79.1(5)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k79 Rent or Royalties
                260k79.1 In General
                    260k79.1(5) k. Community Leases, Unitization, or Pooling Arrangements. Most Cited Cases
    (Formerly 260k79(1))

Absent express authority, oil, gas, and mineral lessee has no power to pool interests in estate retained by lessor with those of other lessors.

**[5] Mines and Minerals 260 🔑73.5**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
              260k73.5 k. Term. Most Cited Cases
    (Formerly 260k731/2, 260k73)

Oil, gas, and mineral lease habendum clause describing term of lease as 10 years and so long thereafter as oil was produced from land with which leased land was pooled could not be used to extend term of lease beyond 10-year primary term where lands had been pooled without authority.

**[6] Mines and Minerals 260 🔑92.79**

260 Mines and Minerals
    260III Operation of Mines, Quarries, and Wells
        260III(A) Statutory and Official Regulations
             260k92.78 Unitization
                260k92.79 k. In General; Procedure.
Most Cited Cases

Railroad Commission's orders cannot compel pooling agreements not agreed upon by parties to oil, gas, and mineral lease; the commission has no power to determine property rights.

**\*326** John A. Pace, Edward Kliewer, Jr., Dallas, for petitioners.

Ralph Shank, Prentice Wilson, Dallas, Murph Wilson, F. Wilbert Lasater, Ramey, Brelsford, Hull & Flock, Frank L. McClendon, with above firm, Tyler, for respondents.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

SMITH, Justice.

ON MOTION FOR REHEARING

Our opinion delivered on June 23, 1965, is withdrawn and the following opinion is substituted therefor.

The question presented for our determination is whether or not the lands owned by the petitioner, Mildred Mitchell Jones, and described in an oil, gas and mineral lease executed by Mildred Mitchell Jones and her husband, Harry C. Jones, as lessors, to S. S. Long, as lessee (later assigned to S. H. Killingsworth), on August 16, 1951, were effectively pooled into what is known as the Hunt Oil Company et al.—West Poynor Unit. The trial court, without a jury, held that Killingsworth effectively pooled the acreage covered by the lease in accordance with authority granted in the lease, and for that reason the lease did not terminate on August 16, 1961, the date of the expiration of the primary term. A take-nothing judgment rendered against the petitioners has been affirmed by the Court of Civil Appeals. 379 S.W.2d 362.

The judgments of both the trial court and the Court of Civil Appeals are reversed and judgment is rendered for the petitioners.

Mildred Mitchell Jones and her husband filed this suit against S. H. Killingsworth and owners of leases in the immediate vicinity of the Mitchell-Long lease. These owners will be referred to as 'Hunt Petroleum Corporation.' On July 12, 1961, at a time when the Mitchell-Long lease was in effect and was owned by and the title thereto was vested in S. H. Killingsworth, subject to certain overriding royalty interests, Killingsworth, joined by the above-mentioned owners of other leases, entered into a pooling agreement establishing a unit hereinafter referred to as the 'West Poynor Unit.' The two tracts of land described in the Mitchell-Long lease were included within this unit designation. These tracts contained, in the aggregate, 20.55 acres. It was stipulated that the created unit contained 170.86 acres. However, the parties deal with this unit as though it contains only 160 acres.

It was stipulated that the unit owners commenced drilling operations on the West Poynor Unit and completed a producing oil well on or about August 16, 1961, which 'unit well' has continued to produce oil in paying quantities. It was agreed that 'no well in search of oil, gas or other minerals has been drilled by S. H. Killingsworth and the other defendants on the lands actually described by metes and bounds in the Long lease, and that no oil, gas or other minerals in paying quantities has been produced from any well actually located on the lands actually described in the Long lease.'

Although lessors contend that they are not bound by the terms of the Unit Declaration and the Amended Unit Declaration, it is agreed that Killingsworth and the other unit owners in the unit acted in good faith in forming the unit, in securing a permit to drill and in drilling the well on the unit.

The habendum clause of the Mitchell-Long lease provides that:

'Subject to the other provisions herein contained, this lease shall be for a term of ten (10) years from this date * * * And as long thereafter as oil * * * is produced from * * * land with which said land is pooled hereunder.'

The pertinent pooling provisions of the lease are to be found in the first two sentences of paragraph 4 of the Mitchell-Long lease. These sentences read as follows:

'Lessee, at its option, is hereby given the right and power to pool or **327** combine the acreage covered by this lease, or any portion thereof as to oil and gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent, hereinafter stipulated, when in Lessee's judgment it is necessary

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

or advisable to do so in order properly to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of 10% Thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations.'

[1][2][3][4][5] The issue in this case is not whether the pooling clause granted authority to pool the Jones' land into an oil unit consisting of more than 40 acres. The issue, properly defined, is whether the pooling clause granted authority pool the Jones' land into an oil unit containing 170.86 acres. The lessors take the position that authority to pool their land into an oil unit consisting of 170.86 acres was not granted by the lease, and that the attempt to pool did not effectively extend the term of the lease beyond the terminal date provided therein. We agree with the lessee that the pooling provision confers authority on the lessee to pool the lessors' land, but, we do not agree that the Extent to which the power to pool may be exercised is entrusted solely to the lessee's judgment. The lessors' land may be pooled only to the extent stipulated in the lease. The second sentence of the pooling provision provides that 'units pooled for oil * * * shall not substantially exceed 40 acres each in area, and units pooled for gas * * * shall not substantially exceed in area 640 acres each plus a tolerance of 10% Thereof. * * *' However, this provision must be construed in the light of the further provisions which is to the effect that in the event a governmental authority having jurisdiction should 'prescribe or Permit the creation of units larger than those specified units thereafter created may conform substantially in size

with those Prescribed by governmental regulations.' (Emphasis added.) Absent this proviso, perhaps it could well be said that the lessee was given authority to pool the lessor's land for oil only in units not substantially exceeding 40 acres in area for either the purpose of complying with spacing rules or to promote the conservation of oil, the two situations mentioned in the first sentence wherein the power to pool is left exclusively to lessee's judgment. In order to ascertain the true intention of the parties to this lease, the Court should take into consideration all of the pooling provisions contained therin, as well as the rules and regulations governing the Fairway (James Lime) Field in which lessors' land is located. (The rules adopted by the Railroad Commission governing that field have the express purpose of 'permitting only one well to each eighty (80) acre proration unit.' The field rules only encourage larger units by Permitting an operator 'to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres.') It is argued that these Railroad Commission rules provide for proration units of not less than 80 acres more than 160 acres, and that by reading the rules into the lease contract, paragraph 4 of the lease would read: 'the size of the units thereafter created may not be substantially less than 80 acres nor substantially more than 160 acres.' We disagree with this construction of the lease **\*328** contract. The lessors did not consent to enlarge an oil proration unit to any size Permitted by governmental regulations. They gave their consent to enlarge a unit of substantially 40 acres, but only to the extent of the size of units Prescribed by the regulatory authority. The fact that the Railroad Commission may Permit a much larger unit cannot be read into the lease contract when, as here, the authority to create larger oil units is expressly limited to units of the size Prescribed by the Railroad Commission. The Commission Prescribed a unit of 80 acres. (The field rules clearly say that there Must be a proration unit of at least 80 acres, and there May be larger units of not more than 60 acres.) It is true that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

the pooling provision contains the word 'permit' as well as the word 'prescribe.' It is not unreasonable to assume that the parties to the lease contract intended, by the use of both words, to give each a distinctly different meaning. The parties obviously knew when the lease contract was executed that a Permitted oil proration unit could conceivably be much larger in area than one Prescribed by governmental authority. To say that a lessee can pool lessors' land with units of any size Permitted by the Railroad Commission would defeat the intention of the parties to restrict the size of the units to the size Prescribed by governmental authority. Absent express authority, a lessee has no power to pool interests in the estate retained by the lessor with those of other lessors. See Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943); Gulf Oil Corporation v. Marathon Oil Co., 137 Tex. 59, 152 S.W.2d 711 (1941); Knight v. Chicago Corporation, 144 Tex. 98, 188 S.W.2d 564 (1945). Since the lands were pooled without authority, the habendum clause in the Mitchell-Long lease cannot be used to extend the term of the lease beyond August 16, 1961, the terminal date of the primary term of the lease.

[6] Killingsworth and the Hunt Petroleum Corporation contend that the pooling clause in the Mitchell-Long lease created a relationship of principal and agent, or at least created a relationship similar to the of principal and agent, and that performance by the lessee is to be measured by the standard of good faith. It is true that the lessee acted in good faith. It is true that the lessee was given authority to pool. It is equally true that the permit granted by the Railroad Commission is unquestionably valid. Even so, the acts of the Railroad Commission cannot be said to operate effectively to extend the restrictive terms of the lease. The orders of the Railroad Commission cannot compel pooling agreements that the parties themselves do not agree upon. The Railroad Commission has no power to determine property rights. See Ryan Consolidated Petroleum Corp. v. Pickens, 155 Tex. 221, 285 S.W.2d 201 (1955); Magnolia Petroleum Co. v. Railroad Commission, 141 Tex. 96, 170 S.W.2d 189 (1943); Nale v. Carroll, 155 Tex. 555, 289 S.W.2d 743 (1956).

(The judgments of the trial court and the Court of Civil Appeals are both reversed and judgment is rendered declaring the Mitchell Long lease terminated as of August 16, 1961, and the title and possession of the lands described in said lease is awarded to Mildred Mitchell Jones. Respondents' motion for rehearing is overruled. A second motion for rehearing may be filed within fifteen days.)

GRIFFIN, HAMILTON and POPE, JJ., dissenting.

HAMILTON, Justice (dissenting).
I withdraw the dissenting opinion heretofore filed in this cause on June 23, 1965, and file the following opinion, respectfully dissenting:

I disagree with the Court's construction of the pooling agreement in the oil and gas lease under consideration and with the application of the pooling agreement to the rules and regulations adopted by the Railroad Commission. Construing the pooling**\*329** agreement in its entirety simply means that the lessee was given authority to pool the lessor's land with other land in units, the size of which are controlled by the rules and regulations of the Railroad Commission.

The applicable rules and regulations for the development of the Fairway (James Lime) Field, in which the pooling unit in question is located, are set out in Railroad Commission Order No. 6—45, 322. Rules 1 and 2 of that order are as follows:

'RULE 1: No well for oil or gas shall hereafter be drilled nearer than eighteen hundred fifty (1850) feet to any well completed in or drilling to the same reservoir on the same lease, unitized tract or farm, and no well shall be drilled nearer than six hundred sixty (660) feet to any property line, lease line or subdivision line; provided, however, that the Commission

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

will, in order to prevent waste or to prevent the confiscation of property grant exceptions to permit drilling within shorter distances than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to this rule is desired, application therefor shall be filed and will be acted upon in accordance with the provisions of Commission Statewide Rules 37 and 38, which applicable provisions of said rules are incorporated herein by reference.

'The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well, and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each eighty (80) are proration unit.

'In applying this rule, the general order of the Commission with relation to the subdivision of property shall be observed.

'RULE 2: The acreage assigned to the individual oil well for the purpose of allocating allowable oil production thereto shall be known as a proration unit. No proration unit shall consist of more than eighty (80) acres except as hereinafter provided, and the two farthermost points in any proration unit shall not be in excess of forty two hundred (4200) feet removed from each other; provided, however, that in the case of long and narrow leases or in cases where because of the shape of the lease such is necessary to permit the utilization of tolerance acreage the Commission may after proper showing grant exceptions to the limitations as to the shape of proration units as herein contained. All proration units, however, shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of oil.

'Provided, however, that operators may elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres.

'Operators shall file with the Commission certified plats of their properties in said field, which plats shall set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well; provided that if the acreage assigned to any proration unit has been pooled, the operator shall furnish the Commission with such proof as it may require as evidence that interests in and under such proration unit have been so pooled.'

The petitioner does not contend, nor does the opinion say, that the proration unit in **\*330** question does not comply with the regulations of the Railroad Commission. The opinion simply assumes, without giving a reason why, that the regulations of the Railroad Commission under which the unit in question was created were not Prescribed by governmental regulations.

The court, in discussing the provisions of the regulations, does not fully cover all the size units provided in said regulations. Since the authority given by lessor to pool is governed largely by these regulations, it is thought that it well be helpful to more fully analyze them.

At the time the unit in question was formed, Railroad Commission Order No. 6—45, 322 was in effect and governed the Fairway (James Lime) Field. One of the Commission's preliminary findings set out in the order, preceding the adoption of field rules, was an express finding to the effect that certain observations and calculations made with reference to the discovery well in the field had indicated that the well was producing oil in an area outside the radius of a 160-acre circle around the well. From this and other findings the Commission proceeded to adopt proration rules which established a maximum proration unit of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

160 acres for which full acreage allowable credit would be given. Thus, it was implicit that the Commission had determined that the basic drainage pattern for the field was 160 acres or, in other words, that a 160-acre unit would be reasonably drained by a single well.

The Commission order did something more. It expressly recognized that smaller units would also be given full acreage allowable credit, if they met certain requirements. One of the provisions of the rules established, in effect, that if an operator had as much as 80 acres in a single lease, 80 acres would then be considered as the minimum proration unit, the inclusion of additional acreage, up to the total maximum of 160 acres, being optional with the operator. But another provision, relating to distance spacing, also established that, still without the necessity of any hearing or exception, any square tract of 40 acres or more would also serve as an acceptable proration unit, if that were all the acreage the operator possessed in the particular property, and if there had been no illegal subdivision. The 40-acre minimum standard was implicit in the rule that no well be drilled nearer than 660 feet from any property line. Thus, the Commission Order in effect recognized that, without special hearing and exception, the maximum standard proration unit, i.e., the area which could reasonably be drained by a single well, was 160 acres, while the minimum standard unit, i.e., the smallest to be allowed, was 40 acres. Pickens v. Railroad Commission, 387 S.W.2d 35, 38, 39 (Tex.Sup.Ct.1965).

The court's opinion says 'The Commission prescribed a unit of 80 acres', inferring that all other size units provided for in said regulations were permitted by the Railroad Commission or permitted by the regulations, I am not sure which. To be sure, an 80-acre unit is prescribed by the regulations. But I do not agree that it is the only unit prescribed. As shown above, the regulations provide for units from 40 acres to 160 acres in size.

The pooling unit in question comes squarely within the limits as to size with the provisions of the governmental regulations just as much so as does the 80-acre unit referred to above.

This brings us to a discussion of the interpretation to be given the proviso of the pooling unit, which we here quote:

'* * * provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations.'

The first clause of the proviso governs the condition under which the lessee may create units larger than those specified, **\*331** (40 acres), that is, when government authority has prescribed rules and regulations for the creation of larger units or when governmental authority has permitted the creation of larger units. Under the facts of this case the governmental authority has prescribed rules and regulations providing for the creation of larger units, but it has not permitted the creation of larger units. No permit was requested nor was one needed. As a general rule the Railroad Commission permits the creation of units only as exceptions to established rules and regulations. The last clause of the proviso governs the size of units created under either prescribed regulations or governmental authority permission. As said above, it is not questioned but that this unit was created in compliance with the established regulations and not by permission of the Railroad Commission as an exception to the regulation.

It has been argued before this court that since the first clause in said proviso uses the term 'permit' and the second clause does not use the term, that 'prescribed' must necessarily have a special meaning of 'required' in order to leave room for permissive units to be formed, and since the last clause did not establish

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

a size for permissive units, no authority was given to form any permissive units. This reasoning seems to be the basis of the court's holding. Under this line of reasoning we wonder why the parties used the term 'permit' at all in the first clause of the proviso. It is fundamental that in contracts all the terms used should be given meaning if possible. Should a governmental authority lay down rules and regulations for the creation of larger units, it is reasonable to say the governmental authority has Prescribed. If the governmental authority allows the creation of a larger unit as an exception to the prescribed rules and regulations it can be said that governmental authority has Permitted the creation of larger units. In fact, the term 'permit' is the universal term applied to authority granted as an exception to regular rules and regulations governing the development of oil and gas fields. The fact that the word 'permit' is not used in the second clause of the proviso does not destroy the import of the word 'permit' in the first clause.

This construction of the proviso allows us to give the usual and ordinary meaning to the word 'prescribe' as defined by Webster:

'prescribe (L. praescribere, praescriptum, fr.prae before—scribere to write, see scribere.) * * *

'2. To lay down authoritatively as a guide direction or rule of action; to impose as a peremptory order; to dictate; direct; ordain; as, to prescribe regular hours of study. 3. To keep within limits or bounds; to restrain; to confine * * *.

'Syn.—Limit, control, order, guide.'

I think that the authority granted by the lessor for pooling necessarily had to be stated in broad and general terms because it could not be foreseen what the circumstances in the future might be, what the regulations of the Railroad Commission might be nor in what terms they might be stated. For that reason a liberal interpretation should be given to the pooling provision to accomplish the purpose for which it was intended, that is, to promote conservation beneficial both to the lessor and the lessee. It can be reasonably concluded that from said pooling provision the parties intended for the authority to pool to extend to any unit size substantially conforming to any unit standard officially established by the Railroad Commission in the exercise of its spacing proration function.

This court, in construing an oil and gas lease in the recent case of Grady L. Fox et al. v. Julia Thoreson, 9 Tex.Sup.Ct.J. 26 (1965), used the following language:

'* * * Another sound rule of interpretation is that language used by **\*332** the parties to an oil and gas lease will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal in nature that it can reasonably be given no other meaning.'

The court's opinion in the instant case has given a narrow and restricted meaning to the pooling provision in question when there is no language in said pooling provision which compels such construction to be placed thereon. So long as the lessor's pooling unit is confined to the size of the pooling units authorized by the rules and regulations of the Railroad Commission, it can reasonably be said that the unit complies in size with the prescribed regulations. This would be a reasonable construction of the pooling provision rather than a strained one.

In Texaco, Inc. v. Letterman, 343 S.W.2d 726, 732 (Tex.Civ.App.1961), the court in construing a pooling provision in an oil and gas lease said:

'That pooling or unitizing of oil and gas leases is a standard practice in the industry can not be questioned. It is equally recognized that unitization is often a more feasible method of operation from an engi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

neering and scientific point of view. Unitization can be said to be advantageous to both lessors and lessees. We think these facts lead to the conclusion that in the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense.'

And in Tiller v. Fields, 301 S.W.2d 185, 187 (Tex.Civ.App.1957), the court said:

'Anticipatory provisions in leases for the commitment by the lessee of such leases to unitization, of necessity must be in general terms. Neither the lessor nor the lessee has any way of knowing at the time the lease is taken the facts with respect to which it will be necessary for the lessee to apply his power. It is not practicable for the lessee to await the ascertainment of such facts. He knows from experience that because of the possibility of many changes in ownership of the lessor's interest as time goes on, it may be difficult to effect an agreement if the right to unitize is not included in the lease itself. Phillips Petroleum Co. v. Peterson, 10 Cir., 218 F.2d 926. The Texas courts, as well as other courts, have recognized these basic facts, and have consistently sustained the basic validity of lease pooling provisions and units formed under their authority.'

In Phillips v. Petroleum Co. v. Peterson, 218 F.2d 926, 933, (10th Cir. 1954), the court reasoned as follows:

'Thus, it will be seen that unitization is a conservation measure which benefits both lessor and lessee and tends to prevent waste of a natural resource. * * *

'The practice of unitization by a power granted the lessee in advance, if faithfully carried out, will be fair and profitable both to the lessor and lessee, and is vital to the oil and gas industry in the interests of the conservation of both natural and material resources. It

should be upheld, although the grant of power is in general terms, because it is subject to implied terms that will prevent arbitrary and unfair dealing, will require compliance with the implied covenants in the lease for the benefit of the lessor and will impose a rigid standard of good faith on the part of the lessee.'

In construing this pooling provision of the oil and gas lease we should recognize that this does not only affect the litigants involved here, but affects the oil industry as a whole for the simple reason that the form of the pooling unit used is in wide **\*333** use in Texas and has been for many years. [FN1]

> FN1. The form of pooling provision is in lease forms in Walker, Cases on Oil and Gas, Vol. 2, Second form following page 895, publication 1948, lease form dated April, 1946; Stayton Texas Forms, 1960, Sec. 4026, Vol. 7, p. 254; Huie, Walker and Woodward, Oil & Gas, American Casebook Series, 1960, first form in the Appendix, p. 807, offered by the authors as a form 'selected for the purpose of acquainting the student with the general nature of the instruments discussed in the cases,' and printed by permission of Pound Printing & Stationery Co., Houston; Williams, Oil & Gas Law, 1962, Vol. 4, p. 635, Sec. 699.7.

The pooling clause which we have before us for construction has been in use in Texas for many years. Tolerance type proration units have been prescribed for various oil and gas fields in Texas for many years. The result has been the creation of many pooled units in numerous fields which are now shadowed. The confusion, uncertainty, and possible title failure is not limited to the lessee who may have formed the unit. It extends to royalty owners in the unit, overriding royalty owners, and to some extent to the purchasers of production and the financial institutions which furnish capital for the development and enjoyment of the mineral resources. Furthermore, there is affected by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

403 S.W.2d 325
**(Cite as: 403 S.W.2d 325)**

the court's opinion the new Texas Compulsory Pooling Act by the Legislature, Art. 6008c, Rev.Civ.Stat.Ann. (1965). See discussion by Ernest E. Smith, Tex.Law Rev. Vol. 43 pp. 1003—1021.

I think a reasonable's construction of the pooling clause does not require that we strike it down, and I would affirm the judgments of the trial court and Court of Civil Appeals.

GRIFFIN, J., joins in this dissent.POPE, Justice (dissenting).

The fault that I find with our holding in this case is that we are trying to fit the meaning of terms used by private parties to a lease into a supposed technical terminology used by the Railroad Commission in making its rules and orders. This is the sequence of events. First the parties made the oil and gas lease and in it they provided:

'Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres plus a tolerance of 10% Thereof, provided that should governmental authority having jurisdiction Prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those Prescribed by governmental regulations.'

Several years later the Commission order was passed which stated:

'* * * No proration unit shall consist of more than eighty (80) acres except as hereinafter provided, * * * 'Provided, however, that operators may elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres.'

The thrust of our opinion is that the Commission 'prescribes' certain things, and it also 'permits' certain things. The majority then tries to determine which the Commission did in this instance and holds that the Commission 'prescribed' eighty acres but did not 'prescribe' 160 acres. The fact is that the Commission passed its rules without regard to whether it was 'prescribing' or 'permitting,' as those terms are used by the private contracting parties. The term 'permitted' actually does two things: It permits but it also prohibits all that is beyond that which is permitted. Every permit carries an inherent prescription, proscription, and prohibition of things beyond the permit. What the Commission did in passing its Rule 2 was to authorize certain units. Those units could be formed **\*334** without any further recourse to the Commission. To the extent that Rule 2 was complied with, a unit was authorized. To the extent that it was beyond what Rule 2 authorized, it was prohibited. To the extent that it was prohibited, it was 'prescribed,' if we want to squeeze the Commission order into the contractual mold. In my opinion the word 'prescribed' is more applicable to the 160-acre unit than the 80-acre unit because the only prohibition or direction is against creating a unit of more than 160 acres.

I respectfully dissent.

TEX 1966.
Jones v. Killingsworth
403 S.W.2d 325

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


694 S.W.2d 441
**(Cite as: 694 S.W.2d 441)**

C

Court of Appeals of Texas,
Eastland.

J.E. TOMLIN et ux., Appellants,
v.
PETROLEUM CORPORATION OF TEXAS, Appellee.

No. 11–85–039–CV.
June 13, 1985.

Lessors of oil and gas lease brought declaratory judgment action concerning their rights and status under the lease. The 90th District Court, Stephens County, R.E. Thornton, J., granted lessee oil company's motion for summary judgment, and lessors appealed. The Court of Appeals, McCloud, C.J., held that paragraph of lease which began by stating that "each producing oil well drilled on said land * * * shall hold forty (40) acres * * *" contained no reference to producing gas well and did not apply to acreage held by gas well, and thus, did not operate as amendment to habendum clause so as to prevent gas well from maintaining the lease in force beyond end of primary term of the lease.

Affirmed.

West Headnotes

**[1] Contracts 95 🔑152**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k151 Language of Instrument
            95k152 k. In General. Most Cited Cases

Language used by parties to a contract should be given its plain grammatical meaning unless it definitely appears that intention of the parties would thereby be defeated.

**[2] Mines and Minerals 260 🔑73**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k73 k. In General; General Rules of Construction. Most Cited Cases
   (Formerly 260k73(1))

Language used by parties to oil and gas lease will not be held to impose special limitation on the grant unless it is clear and precise and so unequivocal in nature that it can reasonably be given no other meaning.

**[3] Mines and Minerals 260 🔑73**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k73 k. In General; General Rules of Construction. Most Cited Cases
   (Formerly 260k73(1))

In oil and gas lease in which specific things are followed by some general term, such general term must refer to things of the same kind.

**[4] Mines and Minerals 260 🔑78.1(7)**

694 S.W.2d 441
**(Cite as: 694 S.W.2d 441)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k78 Testing or Working
                    260k78.1 Construction, Breach, and Penalties
                        260k78.1(7) k. Place or Portion Developed; Pooled or Unitized Tracts. Most Cited Cases

Paragraph of oil and gas lease stating that "each producing oil well drilled on said land * * * shall hold forty (40) acres * * *" contained no reference to a producing gas well and did not apply to acreage held by gas well, and thus, did not operate as amendment to habendum clause so as to prevent gas well from maintaining the lease in force beyond end of primary term of the lease.

**\*441** John R. Cook, Thompson & Cook, Breckenridge, for appellants.

Frank L. Jennings, Jennings, Dies, Turner & Knight, Graham, for appellee.

McCLOUD, Chief Justice.

J.E. Tomlin and his wife, Betty Tomlin, lessors, sued Petroleum Corporation of Texas (PETCO), lessee, seeking a declaratory judgment under the Uniform Declaratory Judgment Act, TEX.REV.CIV.STAT.ANN. art. 2524–1 (Vernon 1965) concerning their rights and status under an oil, gas, and mineral lease entered into by the parties. The Tomlins alleged that the lease terminated for failure to produce "oil." Alternatively, they contended that the lease is ambiguous and the case should be reversed and remanded so that parol evidence may be introduced to show that the parties intended that upon expiration of the primary term, the lease would be perpetuated as to only forty (40) acres around any producing well, whether oil or gas.

Both parties filed motions for summary judgment. The trial court granted summary judgment to PETCO, stating that the subject lease remains in full force and effect. The Tomlins appeal. We affirm.

The December 3, 1974, oil, gas, and mineral lease consists of a printed form, together with a typed rider containing five (5) additional paragraphs relating to PETCO's operations under the lease. The granting clause grants PETCO the right to "(produce) oil, gas, and all other minerals" found in the covered 326.5 acres of leased land. The habendum clause states that **\*442** "(S)ubject to the other provisions herein contained, this lease shall remain in force for a term of three (3) years ... (called 'primary term'), and so long thereafter as oil, gas, or other mineral is produced from said land." Paragraph 16, one of the five paragraphs contained in the typed rider, states the following:

At the end of the primary term hereof each producing *oil well* drilled on said land by Lessee shall hold 40 acres, to be designated by Lessee, and the balance of the acreage shall be released to Lessor; and after the primary term hereof, any acreage so held by a producing well shall be considered as covered by a separate lease from any other acreage held by any other producing well, so that production from any such well shall not thereafter continue this lease in effect as to acreage which was held by another producing well at the expiration of the primary term hereof. (Emphasis added)

PETCO drilled a gas well on the premises, which was producing gas at the expiration of the primary term of the lease.

The Tomlins argue that paragraph 16 operates as an amendment to the habendum clause, the effect of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

694 S.W.2d 441
**(Cite as: 694 S.W.2d 441)**

which is to prevent a gas well from maintaining the lease in force beyond the end of the primary term. They contend that only a producing "oil well" will hold any acreage of the lease beyond the primary term, with "the balance of the acreage," including that surrounding a gas well, to be "released to Lessor." We disagree.

[1][2] In determining proper construction of a contract, the court usually examines the entire document. Language used by the parties should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. Language used by the parties to an oil and gas lease will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal in nature that it can reasonably be given no other meaning. *Fox v. Thoreson,* 398 S.W.2d 88 (Tex.1966).

[3][4] Paragraph 16 begins by stating that "each producing *oil well* drilled on said land ... shall hold forty (40) acres...." (Emphasis added) The provision contains no reference to a producing *gas well*. Where specific things are followed by some general term, such general term must refer to things of the same kind. *Fleming Foundation v. Texaco,* 337 S.W.2d 846 (Tex.Civ.App.—Amarillo 1960, writ ref'd n.r.e.). Phrases such as "any acreage so held by a producing well" and "any such well" refer only to any *oil wells* which are producing at the expiration of the primary term of the subject lease. Paragraph 16 does not apply to acreage held by a gas well. The language urged by the Tomlins as imposing a special limitation on the grant is not clear, precise, and "so unequivocal in nature that it can reasonably be given no other meaning." *Fox v. Thoreson,* supra at 92.

Therefore, the habendum clause alone governs the right of the parties when a gas well is producing at the end of the primary term. Accordingly, the gas well maintains the lease in full force and effect as to all 326.5 acres.

The Tomlins' conditionally submitted second point of error, seeking a remand of this case, is overruled. We hold that the lease is not ambiguous. Only a question of law is involved; no genuine issue of fact exists. Therefore, the trial court's rendition of summary judgment in favor of PETCO was proper.

The judgment of the trial court is affirmed.

Tex.App. Eastland 1985.
Tomlin v. Petroleum Corp. of Texas
694 S.W.2d 441

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**



Supreme Court of Texas.
ANADARKO PETROLEUM CORPORATION,
Petitioner,
v.
Phillip THOMPSON, et al., Respondents.

No. 01–0261.
Argued March 6, 2002.
Decided July 3, 2002.
Opinion Denying Rehearing Jan. 30, 2003.

Lessor sought declaration that gas lease had terminated, and sought damages. The District Court, Moore County, Ron Enns, J., granted partial summary judgment for lessor, and after a bench trial, awarded damages to lessor for lessee's post-termination conversion of gas. Lessee appealed. The Court of Appeals, Quinn, J., 60 S.W.3d 134, affirmed. After granting lessee's petition for review, the Supreme Court, Baker, J., held that: (1) gas mining lease did not terminate when actual production ceased longer than 60 days but well was still actually capable of producing gas, and (2) well is "capable of production" if it is capable of producing in paying quantities without additional equipment or repairs.

Reversed and remanded.

West Headnotes

**[1] Landlord and Tenant 233 ⚷611**

233 Landlord and Tenant
   233II Leases and Agreements in General
     233II(B) Construction and Operation
      233k611 k. Questions of law or fact. Most Cited Cases

(Formerly 233k37)

Construing an unambiguous lease is a question of law for the court.

**[2] Appeal and Error 30 ⚷893(1)**

30 Appeal and Error
   30XVI Review
     30XVI(F) Trial De Novo
      30k892 Trial De Novo
       30k893 Cases Triable in Appellate Court
        30k893(1) k. In general. Most Cited Cases

Appellate court reviews lease-construction questions de novo.

**[3] Landlord and Tenant 233 ⚷593**

233 Landlord and Tenant
   233II Leases and Agreements in General
     233II(B) Construction and Operation
      233k593 k. Intention of parties. Most Cited Cases

(Formerly 233k37)

In construing an unambiguous lease, court's primary duty is to ascertain the parties' intent as expressed within the lease's four corners.

**[4] Landlord and Tenant 233 ⚷596**

233 Landlord and Tenant
   233II Leases and Agreements in General
     233II(B) Construction and Operation
      233k596 k. Ordinary or technical language.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

Most Cited Cases
(Formerly 233k37)

Court gives a lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions.

**[5] Landlord and Tenant 233 ☞598**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(B) Construction and Operation
           233k598 k. Construction as a whole. Most Cited Cases
(Formerly 233k37)

Court examines the entire lease and attempts to harmonize all its parts, even if different parts appear contradictory or inconsistent, because court presumes that the parties to a lease intend every clause to have some effect.

**[6] Landlord and Tenant 233 ☞590**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(B) Construction and Operation
           233k590 k. In general. Most Cited Cases
(Formerly 233k37)

Court will not hold a lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that court can reasonably give it no other meaning.

**[7] Mines and Minerals 260 ☞62.1**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)2 Construction and Operation of Mining Leases
           260k62.1 k. Premises demised and rights acquired. Most Cited Cases

**Mines and Minerals 260 ☞73.1(3)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)3 Construction and Operation of Oil and Gas Leases
           260k73.1 Premises Demised and Rights Acquired
           260k73.1(3) k. Interest in real estate. Most Cited Cases

A mineral lease grants a fee simple determinable to the lessee.

**[8] Mines and Minerals 260 ☞63**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)2 Construction and Operation of Mining Leases
           260k63 k. Term. Most Cited Cases

**Mines and Minerals 260 ☞73.5**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)3 Construction and Operation of Oil and Gas Leases
           260k73.5 k. Term. Most Cited Cases

Lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

**[9] Mines and Minerals 260 ⬤➞63**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)2 Construction and Operation of Mining Leases
                260k63 k. Term. Most Cited Cases

**Mines and Minerals 260 ⬤➞73.5**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k73.5 k. Term. Most Cited Cases

Mineral estate will automatically terminate if the event upon which it is limited occurs.

**[10] Mines and Minerals 260 ⬤➞63**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)2 Construction and Operation of Mining Leases
                260k63 k. Term. Most Cited Cases

**Mines and Minerals 260 ⬤➞73.5**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k73.5 k. Term. Most Cited Cases

Lease's habendum clause defines the mineral estate's duration.

**[11] Mines and Minerals 260 ⬤➞78.1(8)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k78 Testing or Working
                    260k78.1 Construction, Breach, and Penalties
                      260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

A typical Texas mineral lease that lasts "as long as oil or gas is produced" automatically terminates if actual production permanently ceases during the secondary term.

**[12] Mines and Minerals 260 ⬤➞63**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)2 Construction and Operation of Mining Leases
                260k63 k. Term. Most Cited Cases

**Mines and Minerals 260 ⬤➞73.5**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)3 Construction and Operation of Oil and Gas Leases
                260k73.5 k. Term. Most Cited Cases

Although the habendum clause generally controls the mineral estate's duration, other clauses may extend the habendum clause's term.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

**[13] Landlord and Tenant 233 &#x21A6;890**

233 Landlord and Tenant
   233IV Particular Kinds of Tenancies and Attributes Thereof
      233IV(F) Termination
       233IV(F)1 In General
         233k890 k. In general. Most Cited Cases
(Formerly 233k93)

When a lease terminates is always a question of resolving the intention of the parties from the entire instrument.

**[14] Mines and Minerals 260 &#x21A6;78.1(8)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
       260II(C)3 Construction and Operation of Oil and Gas Leases
         260k78 Testing or Working
          260k78.1 Construction, Breach, and Penalties
           260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

Gas mining lease, which contained habendum clause stating that lease would remain in force as long as "gas is or can be produced," did not terminate when actual production ceased longer than 60 days but well was still actually capable of producing gas, despite cessation-of-production clause providing for 60-day period to resume operations after cessation of production; cessation-of-production clause only applied if well holding lease became incapable of production.

**[15] Mines and Minerals 260 &#x21A6;78.1(8)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
       260II(C)3 Construction and Operation of Oil and Gas Leases
         260k78 Testing or Working
          260k78.1 Construction, Breach, and Penalties
           260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

Completion of a gas well capable of producing in paying quantities but shut-in due to lack of pipe line facilities or for other reasons is not considered "production" and therefore does not sustain a mineral interest that lasts as long as oil or gas "is produced."

**[16] Mines and Minerals 260 &#x21A6;78.1(8)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
       260II(C)3 Construction and Operation of Oil and Gas Leases
         260k78 Testing or Working
          260k78.1 Construction, Breach, and Penalties
           260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

A well is "capable of production" if it is capable of producing in paying quantities without additional equipment or repairs.

**[17] Mines and Minerals 260 &#x21A6;78.1(8)**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
       260II(C)3 Construction and Operation of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

Gas well was still "capable of production in paying quantities" under mineral lease terms, even though there were periods during which there was no production, where the well was connected to pipeline facilities, and there was no question that well was capable of producing in paying quantities.

**[18] Mines and Minerals 260 ⬤➔78.1(8)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

For a gas well to produce in paying quantities, or to be capable of producing in paying quantities, there must be facilities located near enough to the well that it would be economically feasible to establish a connection so that production could be marketed at a profit.

**[19] Mines and Minerals 260 ⬤➔78.1(8)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of

Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

In the case of a marginal gas well, the standard by which paying quantities, under a mineral lease, is determined is whether or not under all relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

**[20] Mines and Minerals 260 ⬤➔78.1(8)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

In a mineral lease involving a gas well, the term "paying quantities" involves not only the amount of production, but also the ability to market the gas at a profit.

**[21] Mines and Minerals 260 ⬤➔78.2**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

260k78 Testing or Working

260k78.2 k. Forfeiture for breach in general. Most Cited Cases

**Mines and Minerals 260 ⬅️78.7(6)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.7 Actions

260k78.7(6) k. Judgment and relief; damages. Most Cited Cases

Remedy for breach of implied covenant to market production under oil and gas lease agreement is not forfeiture or termination of lease; breach of implied covenant in oil and gas lease does not automatically terminate the estate, but instead subjects breaching party to liability for monetary damages, or, in extraordinary circumstances, remedy of conditional decree of cancellation.

**[22] Mines and Minerals 260 ⬅️78.1(8)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

In determining whether gas well under mineral lease is producing in paying quantities, test is whether there is a reasonable basis for the expectation of prof-itable returns from the well is the test; if the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost, and operating costs, the production satisfies the term "paying quantities."

**[23] Mines and Minerals 260 ⬅️78.1(8)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) k. Extent of production, paying quantities, and marketing. Most Cited Cases

Gas mining lease, containing clause stating that lease would remain in force as long as "gas is or can be produced," did not mean lease would remain in effect only as long as gas "is produced"; "can be produced" did not mean actual production.

**\*552** Eric Anthony Hillerman, Harlow Sprouse, Charles Wade Miller, Sprouse **\*553** Smith & Rowley, Amarillo, J. Kyle McClain, Anadarko Petroleum Corp., David M. Gunn, Hogan Dubose & Townsend, L.L.P., Houston, for Petitioner.

Joe L. Lovell, Lovell Lovell & Newsom, Amarillo, Donald M. Hunt, Mullin Hoard Brown Langston Carr Hunt & Joy LLP, Lubbock, J.R. Lovell, Lovell & Lyle, Dumas, for Respondents.

Justice BAKER delivered the opinion of the Court.

In this case, we decide whether a gas mining lease terminated when actual production ceased longer than sixty days. The lease expressly states that it lasts for one year and "as long thereafter as gas is or can be

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

produced." The lease also provides that, if production ceases for any reason, the lease "shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation." The lessees began producing gas in 1936. However, in 1981 and again in 1985, actual production ceased longer than sixty days. The court of appeals held that these cessations terminated the lease. 60 S.W.3d 134, 141. We disagree. We conclude that a well that is capable of production sustains this particular lease even if actual production ceases longer than sixty days. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

In 1936, Thompson's and Anadarko's predecessors entered into a lease "for the purpose of mining and operating for and producing gas." The lease allows either production or the lessees' beginning drilling operations to maintain the lease beyond its one-year primary term.

Two provisions in the lease are pertinent here. The lease's "habendum clause" states:

This lease shall remain in force for a term of one (1) year and as long thereafter as gas is or can be produced.

The lease also has a "cessation-of-production clause," which provides:

If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production continues.

Anadarko's predecessors began producing gas in

1936. However, it is undisputed that production totally ceased for sixty-one days in 1981 and ninety-one days in 1985 while the gas purchaser conducted pipeline repairs. In 1997, Thompson sued for a declaration that the lease terminated when production ceased in 1981 and for conversion damages.

On Thompson's motion, the trial court granted partial summary judgment that the lease terminated due to one or more cessations of production. After a bench trial, the court rejected Anadarko's affirmative defenses of limitations, laches, quasi-estoppel, unjust enrichment, adverse possession, revivor, judicial estoppel, and promissory estoppel. Accordingly, the trial court awarded damages and attorney's fees to Thompson.

Anadarko appealed. After considering the lease's implicit and explicit objectives, language in the lease's continuous operations clause, and other jurisdictions' case law, the court of appeals construed the lease's habendum clause to require actual production in paying quantities. 60 S.W.3d at 140–41. Accordingly, it affirmed the trial court's partial summary judgment that the lease terminated when **\*554** actual production ceased longer than sixty days. 60 S.W.3d at 141. The court of appeals also determined that the evidence supported the trial court's denying Anadarko's affirmative defenses. 60 S.W.3d at 145.

We granted Anadarko's petition to consider whether the court of appeals properly construed the lease to conclude that it terminated.

## II. APPLICABLE LAW
## A. LEASE CONSTRUCTION

[1][2][3][4][5][6] Construing an unambiguous lease is a question of law for the Court. *Luckel v. White,* 819 S.W.2d 459, 461 (Tex.1991). Accordingly, we review lease-construction questions *de novo. See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999). In construing an unam-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

biguous lease, our primary duty is to ascertain the parties' intent as expressed within the lease's four corners. *Luckel,* 819 S.W.2d at 461; *see also Yzaguirre v. KCS Resources, Inc.,* 53 S.W.3d 368, 372–73 (Tex.2001). We give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. *Fox v. Thoreson,* 398 S.W.2d 88, 92 (Tex.1966). We examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent. *Luckel,* 819 S.W.2d at 462. That is because we presume that the parties to a lease intend every clause to have some effect. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). However, we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning. *Fox,* 398 S.W.2d at 92.

### B. OIL AND GAS LEASE PROVISIONS

[7][8][9] A Texas mineral lease grants a fee simple determinable to the lessee. *See Texas Co. v. Davis,* 113 Tex. 321, 254 S.W. 304, 309 (1923). Consequently, the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose. *Davis,* 254 S.W. at 306. However, a mineral estate will automatically terminate if the event upon which it is limited occurs. *Gulf Oil Corp. v. Reid,* 161 Tex. 51, 337 S.W.2d 267, 269 (1960).

[10][11] A lease's habendum clause defines the mineral estate's duration. *Gulf Oil Corp. v. Southland Royalty Co.,* 496 S.W.2d 547, 552 (Tex.1973). For instance, a typical habendum clause states that the lease lasts for a relatively short fixed term of years (primary term) and then "as long thereafter as oil, gas or other mineral is produced" (secondary term). *See, e.g., Reid,* 337 S.W.2d at 269 n. 1; *see also* 1 SMITH & WEAVER, TEXAS LAW OF OIL & GAS § 4.3 (1996). In Texas, such a habendum clause requires actual production in paying quantities. *Reid,* 337 S.W.2d at 269–70; *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 512 (1942). Thus, a typical Texas lease

that lasts "as long as oil or gas is produced" automatically terminates if actual production permanently ceases during the secondary term. *See Amoco Prod. Co. v. Braslau,* 561 S.W.2d 805, 808 (Tex.1978).

[12][13] Although the habendum clause generally controls the mineral estate's duration, other clauses may extend the habendum clause's term. *Southland Royalty,* 496 S.W.2d at 552. When a lease terminates "is always a question of resolving the intention of the parties from the entire instrument." *Southland Royalty,* 496 S.W.2d at 552.

### III. ANALYSIS
### A. LEASE CONSTRUCTION

[14] Here, we decide whether the lease terminated when actual production ceased **\*555** longer than sixty days. Both parties' arguments about what triggers the lease's termination rely upon the lease's habendum and cessation-of-production clauses.

Anadarko contends that the habendum clause's plain language allows production *or the capability of production* to sustain the lease. Thus, Anadarko argues, the court of appeals incorrectly concluded that the habendum clause requires actual production. Anadarko urges us to give the clause's "can be produced" language its full effect. *See Fox,* 398 S.W.2d at 92. According to Anadarko, the cessation-of-production clause does not contradict the habendum clause's plain meaning, because the cessation-of-production clause is a savings provision that only applies if the habendum clause's special limitation occurs and threatens to terminate the lease. In other words, the cessation-of-production clause only applies if the well holding the lease becomes incapable of production. Because the well holding the lease has always been capable of production, Anadarko asks us to reverse the partial summary judgment that the lease terminated due to one or more cessations of production.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

In response, Thompson asserts that both the lease's terms and existing Texas law support the court of appeals' conclusion that actual production is required to sustain the lease after the primary term. *See 60 S.W.3d at 140.* According to Thompson, the cessation-of-production clause applies whenever actual production ceases rather than when actual production *and* capability of production cease. Moreover, Thompson argues, allowing the capability of production to sustain the lease indefinitely would render the cessation-of-production clause meaningless.

Here, the habendum clause expressly states that the lease lasts as long as gas "is or can be produced." For several reasons, the court of appeals rejected Anadarko's argument that capability of production sustained the lease and, instead, concluded that the habendum clause requires actual production. *60 S.W.3d at 140.* First, citing *Garcia v. King,* the court of appeals reasoned that the habendum clause must require actual production to further the lease's objective—to reap economic gain. *60 S.W.3d at 140.* Second, the court of appeals construed the habendum clause in light of the lease's continuous operations clause, which sustains the lease so long as drilling operations continue "and if production results therefrom, then as long as production continues." *See 60 S.W.3d at 140.* The court of appeals determined that the continuous operations clause shows that the parties intended that "the continuation of actual production was and is necessary to prolong the life of the lessee's interest." *60 S.W.3d at 140.* And third, the court of appeals relied on decisions from other jurisdictions that have interpreted similar habendum clauses. *60 S.W.3d at 140* (citing *Greer v. Salmon,* 82 N.M. 245, 479 P.2d 294 (1970); *Fisher v. Grace Petroleum Corp.,* 830 P.2d 1380 (Okla.Ct.App.1991)).

We disagree with the court of appeals' lease construction. Here, neither party contends that the lease is ambiguous. Consequently, in construing the lease, we first consider the parties' intentions as expressed in the lease's four corners. *See Yzaguirre,* 53 S.W.3d at 372–73; *Luckel,* 819 S.W.2d at 461. The habendum clause's plain language shows that the parties intended that a well actually produce gas, *or be capable of producing gas,* to sustain the lease. *See Fox,* 398 S.W.2d at 92. This construction does not conflict with our rule that Texas leases generally require actual production. *See Reid,* 337 S.W.2d at 269–70; *Garcia,* 164 S.W.2d at 512. That is because the cases in which **\*556** we recognized the general rule involved leases with typical habendum clauses that sustained the lease as long as oil or gas "is produced." *See Reid,* 337 S.W.2d at 269 n. 1; *Garcia,* 164 S.W.2d at 512. Thus, these cases do not control how to construe a habendum clause that lasts as long as gas "is *or can be* produced."

Additionally, the court of appeals reasoned that allowing the ability to produce gas to prolong the lease would "effectively erase" the cessation-of-production clause from the lease. *60 S.W.3d at 139.* But the court of appeals' analysis incorrectly assumes that the cessation-of-production clause is triggered any time actual production stops. Read as a whole, the cessation-of-production clause combines a sixty-day time limit with a resumption of operations provision. Thus, the clause indicates the parties' intent that the cessation-of-production clause apply only when the circumstances require the lessee "to resume operations for drilling a well." In other words, the cessation-of-production clause only applies if a well holding the lease ceases to be *capable of producing gas.* Indeed, in analyzing a similar cessation-of-production clause, one commentator has observed:

> The fact that the event which is designed to prevent termination is the commencement of drilling or reworking operations gives some indication of the purpose of the clause and the intention of the parties. It indicates that the parties are concerned with a situation where cessation of production is of the type that is remedied by drilling or reworking operations. Thus, the parties must have intended that the clause would become operative if a dry well is drilled or if a producing well ceases to be capable of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

producing in paying quantities. A literal application of the clause to every temporary cessation of production could lead to absurd and unintended results.

> 2 KUNTZ, A TREATISE ON THE LAW OF OIL & GAS 416–17.

Construing the cessation-of-production clause to apply when a well holding the lease ceases to be capable of production—and not simply when actual production ceases—accords with the cessation-of-production clause's plain language. Moreover, this construction avoids imposing an unnecessary limitation on the grant. *See Fox,* 398 S.W.2d at 92. The court of appeals' construction of the cessation-of-production clause would require Anadarko to resume drilling operations within sixty days of any cessation in actual production even if the existing well remained capable of production. Such a construction disregards the habendum clause's "can be produced" language, whereas our construction gives every clause some effect. *See Heritage Res.,* 939 S.W.2d at 121. Accordingly, the court of appeals incorrectly relied upon the cessation-of-production clause to hold that the habendum clause requires actual production to sustain the lease.

The court of appeals also misplaced its reliance on cases from other states. *See* 60 S.W.3d at 140. First, in looking to other states to determine how to interpret the lease here, the court of appeals disregarded our well-established rules about how to interpret oil and gas leases. *See Heritage Res.,* 939 S.W.2d at 121; *Luckel,* 819 S.W.2d at 461–62; *Fox,* 398 S.W.2d at 92. Second, the cases the court of appeals cites actually support our views about this lease. In *Greer,* the New Mexico Supreme Court construed a habendum clause like the one in this case in conjunction with two savings clauses: a cessation-of-production clause and a shut-in royalty clause. *Greer,* 479 P.2d at 296. The New Mexico Court held that a gas well capable of production would only hold the lease if the lessee paid **\*557** an annual shut-in royalty. *Greer,* 479 P.2d at

299. Thus, the New Mexico Court relied on provisions within the lease's four corners to ascertain the habendum clause's meaning.

Furthermore, the court of appeals erroneously relied upon an Oklahoma court of appeals opinion to support its view that the Anadarko habendum clause requires actual production. *See Fisher,* 830 P.2d at 1387–88. In relying on *Fisher,* the court of appeals overlooked the fact that the Oklahoma Supreme Court rejected the *Fisher* court's approach. *See Pack v. Santa Fe Minerals,* 869 P.2d 323, 327 (Okla.1994).

In *Pack,* the Oklahoma Supreme Court considered whether a lease held by a gas well capable of production but shut-in for more than sixty days expired under the cessation-of-production clause. *Pack,* 869 P.2d at 325. In construing both clauses, the Oklahoma Supreme Court concluded that the cessation-of-production clause operates as a savings clause and only applies when production—as defined in the habendum clause—ceases. *Pack,* 869 P.2d at 328. "Any other conclusion would render the habendum clause useless after the primary term expires, a conclusion clearly not intended by the parties to the lease." *Pack,* 869 P.2d at 328. Thus, the Oklahoma Supreme Court's analysis supports our viewpoint rather than Thompson's.

Finally, we reject Thompson's contention that allowing the capability of production to sustain the lease would allow the lessees to sustain the lease indefinitely—without actual production. Rather, the implied duty to manage and administer the lease as a reasonably prudent operator, which encompasses the implied duty to market the gas reasonably, would limit the lessees' ability to sustain the lease based on a well's capability of production. *See Yzaguirre,* 53 S.W.3d at 373.

For these reasons, we hold that a well actually producing or capable of producing gas sustains this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

particular lease under the habendum clause. We also hold that the cessation-of-production clause only applies if the lease would otherwise terminate under the habendum clause. Consequently, the court of appeals erred in holding that, under this lease, "can be produced" means "actual production."

### B. CAPABILITY OF PRODUCTION

Because we conclude that actual production was not necessary to sustain the lease, we next consider whether the 1981 and 1985 cessations terminated the lease. This depends upon whether the well holding the leased premises was capable of production during the two periods when actual production ceased longer than sixty days. According to Anadarko's brief, "[t]he evidence is undisputed here that the well was capable of production during the two periods when no production was shown," because the evidence shows that the well was shut-in for pipeline repairs. In response, Thompson contends that the well was not capable of production, because the well would not have produced if it had been "turned on." *See Hydrocarbon Mgt., Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 433–34 (Tex.App.-Amarillo 1993, no writ).

[15] We have determined that "the completion of a gas well capable of producing in paying quantities but shut-in due to lack of pipe line facilities or for other reasons is not considered production" and therefore does not sustain a mineral interest that lasts as long as oil or gas "is produced." *Peveto v. Starkey,* 645 S.W.2d 770, 771 (Tex.1982) (quoting *Midwest Oil Corp. v. Lude,* 376 S.W.2d 18, 20 (Tex.Civ.App.-Corpus Christi 1964, writ ref'd n.r.e.)); *see also* **\*558***Giles v. McKanna,* 200 S.W.2d 709, 712 (Tex.Civ.App.-Austin 1947, writ ref. n.r.e.) (noting the "marked difference between the capacity to produce in paying quantities and actual production in paying quantities"). However, we have not defined what "capable of production" means.

One court of appeals considered this issue in deciding whether a lessee's paying shut-in royalties

maintained a lease even though actual production had ceased. *Hydrocarbon,* 861 S.W.2d at 433–34. In this context, the *Hydrocarbon* court stated:

> We believe that the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

> *Hydrocarbon,* 861 S.W.2d at 433–34.

[16] We approve the *Hydrocarbon* definition, because it is consistent with existing cases that discuss the difference between actual production and capability of production. *See Peveto,* 645 S.W.2d at 771 (a well is capable of production if it is shut-in because there is no available pipeline); *Stanolind Oil & Gas Co. v. Barnhill,* 107 S.W.2d 746, 749 (Tex.Civ.App.-Amarillo 1937, writ ref'd) (a well is capable of production if it is shut-in because there is no available market); *see also Davis,* 254 S.W. at 309 (a well is incapable of production if the lessee removes the equipment and abandons all efforts to produce); *Pack,* 869 P.2d at 327 (a well is incapable of production if the underlying mineral reserves are depleted). Accordingly, we hold that a well is capable of production if it is capable of producing in paying quantities without additional equipment or repairs.

### IV. CONCLUSION

Here, the lease's habendum clause expressly states that the lease lasts as long as gas "is or can be produced." Based on the habendum clause's plain meaning, we hold that a well actually producing gas *or capable of producing gas* sustains this particular lease. To be "capable of producing gas," we conclude that a well must be capable of producing gas in paying

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

quantities without additional equipment or repairs. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion. *See* TEX.R.APP. P. 60.2(d). Because we resolve this case based on the lease-construction issue, we do not reach Anadarko's affirmative defenses.

Justice O'NEILL did not participate in this opinion.

### ON MOTION FOR REHEARING

PER CURIAM.

We deny the motion for rehearing but write to clarify our decision.[FN1]

> FN1. JUSTICE BAKER, author of the Court's original opinion, resigned effective August 31, 2002, and therefore did not participate on rehearing.

[17][18][19][20][21][22] In defining "capable of production" in our original opinion, we approved this definition from *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 433–34 (Tex.App.-Amarillo 1993, no pet.):

> We believe that the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment**\*559** or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

94 S.W.3d 550, 557. In so doing, we did not overrule or otherwise call into question our prior decisions regarding the proper interpretation of "production in paying quantities." Specifically, we did not overrule or modify the longstanding requirement that for a well to produce in paying quantities, or to be capable of producing in paying quantities, there must

be facilities located near enough to the well that it would be economically feasible to establish a connection so that production could be marketed at a profit. As we explained in *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 691 (Tex.1959), all the relevant circumstances must be considered in determining whether there are "paying quantities":

> In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

> ....

> The term "paying quantities" involves not only the amount of production, but also the ability to market the product (gas) at a profit. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost, and operating costs, the production satisfies the term "in paying quantities". In the *Hanks* case, [24 S.W.2d 5, 6 (Tex. Comm'n App.1930, judgm't adopted)], the trial court found that the well completed by Hanks did not produce in paying quantities within the contemplation of the terms of the lease, and this Court upheld such finding, holding that there was no evidence showing that there were any facilities for marketing the gas or any near-by localities or industries which might have furnished a profitable market therefor. The Court went further and pointed out the complete failure of the evidence to show what the gas could have been sold for at any probable market, and that there was no evidence "tending to show that the well was situated in such proximity to any prospective market which would justify the construction of a pipe line for marketing same."

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

*Id.* at 691 (quoting *Hanks v. Magnolia Petroleum Co.,* 24 S.W.2d 5, 6 (Tex. Comm'n App.1930, judgm't adopted)) (citations omitted); *see also Stanolind Oil & Gas Co. v. Barnhill,* 107 S.W.2d 746, 749 (Tex.Civ.App.-Amarillo 1937, writ ref'd). In the case before us today, the well was connected to pipeline facilities, and there was no question that it was capable of producing in paying quantities even though there were periods during which there was no production.

In our original opinion in this case, we also said,

we reject Thompson's contention that allowing the capability of production to sustain the lease would allow the lessees to sustain the lease indefinitely—without actual production. Rather, the implied duty to manage and administer the lease as a reasonably prudent operator, which encompasses the implied duty to market the gas reasonably, would limit the lessees'**\*560** ability to sustain the lease based on a well's capability of production.

94 S.W.3d at 557–58. But we did not intend to imply that the remedy for breach of an implied covenant to market production would be forfeiture or termination of a lease because we have consistently held that breach of an implied covenant in an oil and gas lease "does not automatically terminate the estate, but instead subjects the breaching party to liability for monetary damages, or in extraordinary circumstances, the remedy of a conditional decree of cancellation." *Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex.1989); *see also Rogers v. Ricane Enters., Inc.,* 884 S.W.2d 763, 767–68 (Tex.1994); *Stanolind,* 107 S.W.2d at 748 (holding that "the failure of the lessee further to develop the property is, under the holdings of the courts, a breach of an implied covenant, the usual remedy for which is an action in damages"); *W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27, 32 (Tex.1929) (refusing "to treat as a limitation or as a condition subsequent the implied covenant for reasonable development of premises leased for the mining of oil and gas"); *Mon–Tex Corp. v. Poteet,* 118 Tex. 546, 19 S.W.2d 32, 34 (Tex.1929)

(holding that a lease did not terminate when an implied covenant was breached but that there would be liability for damages sustained); *Tex. Co. v. Davis,* 113 Tex. 321, 254 S.W. 304, 308 (Tex.1923) (reiterating that the implied covenant to explore and produce is not a condition subsequent that would give rise to the lease's termination if breached). The rationale for these holdings is to promote greater certainty about the continued existence of a lease:

[I]f reasonable diligence in performing every one of the lessee's exploring, developing, producing, and marketing operations was the test, neither lessor nor lessee could at any time have clearly or certainly known whether the estate granted was alive or ended. Such a test must inevitably diminish—if not destroy—the value of the rights of all parties derived from a mineral lease.

*W.T. Waggoner Estate,* 19 S.W.2d at 30–31.

We meant in our original decision that, as a practical matter, a lessee will not sustain a lease based on a well's capability of production without actual production of the well because the payment of damages for the failure to reasonably market the gas would be a strong incentive to connect the well to facilities that would permit actual production. And, in an extraordinary case, when damages would not furnish an adequate remedy, a court could conditionally order termination if a connection and actual production were not commenced within a reasonable time. *See id.* at 32.

[23] Finally, the motion for rehearing contends that several decisions of this Court and other courts compel a different result in this case. We disagree. The cases on which Thompson and the other Respondents rely are distinguishable because they involved different lease provisions, different facts, or both. The leases at issue in many of the cases said that the lease would remain in effect as long as oil or gas "is produced." *See Haby v. Stanolind Oil & Gas Co.,* 228 F.2d 298, 301 (5th Cir.1955); *Samano v. Sun Oil Co.,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039
**(Cite as: 94 S.W.3d 550)**

621 S.W.2d 580, 581 (Tex.1981); *Francis v. Pritchett,* 278 S.W.2d 288, 289 (Tex.Civ.App.-El Paso 1955, writ ref'd); *Sunray DX Oil Co. v. Texaco, Inc.,* 417 S.W.2d 424, 426–27 (Tex.Civ.App.-El Paso 1967, writ ref'd n.r.e.); *Woodson Oil Co. v. Pruett,* 281 S.W.2d 159, 162 (Tex.Civ.App.-San Antonio 1955, writ ref'd n.r.e.); *Hall v. McWilliams,* 404 S.W.2d 606, 607 (Tex.Civ.App.-Austin 1966, writ ref'd n.r.e.); *Wainwright v. Wainwright,* 359 S.W.2d 628, 629 (Tex.Civ.App.-Fort Worth 1962, writ ref'd n.r.e.). But in this case, the lease said "is **\*561** or can be produced." As we explained in our original opinion, "can be produced" does not mean actual production.

Only two decisions relied on by Thompson and the other Respondents involved leases that contained a "can be produced" provision. *Davis,* 254 S.W. at 305; *Hanks,* 24 S.W.2d at 7, *affirming Hanks v. Magnolia Petroleum Co.,* 14 S.W.2d 348, 349 (Tex.Civ.App.-Eastland 1929). But the facts were very different from the facts in the case before us today. In *Davis,* the lessee abandoned all operations on the lease after the wells it had drilled ceased to produce, and there was no production for about fourteen years. 254 S.W. at 305. There was also evidence that the lessee had expressly released the lease. *Id.* This Court held the lease had terminated. *Id.* at 309. In *Hanks,* the lessee drilled a successful well and then capped it. 24 S.W.2d at 5. The court held that there was no evidence that the well could produce in paying quantities because "[t]he record is wholly devoid of evidence showing that there were any facilities for marketing the gas or any nearby localities or industries which might have furnished a profitable market therefor," and "[n]o attempt was made to show what the gas could have been sold for at any probable market, nor was there any evidence tending to show that the well was situated in such proximity to any prospective market which would justify the construction of a pipe line for marketing same." *Id.* at 6. As noted above, that is not the situation in this case.

Accordingly, we deny the motion for rehearing.

Justice O'NEILL, Justice SMITH and Justice WAINWRIGHT did not participate in the decision on rehearing.

Tex.,2002.
Anadarko Petroleum Corp. v. Thompson
94 S.W.3d 550, 161 Oil & Gas Rep. 550, 45 Tex. Sup. Ct. J. 1039

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**



Court of Appeals of Texas,
El Paso.
CHESAPEAKE EXPLORATION, L.L.C., Chesapeake Operating, Inc., Anadarko Petroleum Corporation, and Swepi, L.P., Appellants,
v.
ENERGEN RESOURCES CORPORATION, Kaiser Francis Oil Company, Pride Energy Company, Crown Oil Partners, IV, L.P., Crump Energy Partners, L.L.C., Dalton H. Cobb, Jr., Michael B. Cobb, Bill Hightower, and Hightower Exploration, L.L.C., Appellees.

No. 08–13–00266–CV.
Oct. 1, 2014.

**Background:** Plaintiff oil companies brought action against defendant oil companies after each side requested that the other cease operations in 560–acre portion of section that had been pooled with an 80–acre portion of another section. The District Court, Ward County, Bob Parks, J., entered summary judgment in favor of plaintiffs. Defendants appealed.

**Holding:** The Court of Appeals, Yvonne T. Rodriguez, J., held that retained acreage clauses confirmed that production anywhere on certain section, or land pooled with it, was sufficient to maintain the leases as to the entirety of the section.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⚷893(1)**

30 Appeal and Error
  30XVI Review

    30XVI(F) Trial De Novo
      30k892 Trial De Novo
        30k893 Cases Triable in Appellate Court
          30k893(1) k. In general. Most Cited Cases

The standard of review for construction of an unambiguous oil and gas lease is de novo.

**[2] Mines and Minerals 260 ⚷73**

260 Mines and Minerals
  260II Title, Conveyances, and Contracts
    260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
        260k73 k. In general; general rules of construction. Most Cited Cases

The primary duty of the court in interpreting an oil and gas lease is to ascertain the parties' intent as expressed within the four corners of the lease.

**[3] Mines and Minerals 260 ⚷73**

260 Mines and Minerals
  260II Title, Conveyances, and Contracts
    260II(C) Leases, Licenses, and Contracts
      260II(C)3 Construction and Operation of Oil and Gas Leases
        260k73 k. In general; general rules of construction. Most Cited Cases

In seeking to ascertain the parties' intent, the court must attempt to harmonize all parts of the oil and gas lease, even if different parts of the lease appear contradictory or inconsistent.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

**[4] Mines and Minerals 260 ⟜73**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)3 Construction and Operation of Oil and Gas Leases
                260k73 k. In general; general rules of construction. Most Cited Cases

Construing the oil and gas lease to give effect to all of its provisions honors the parties' intent that every clause has some effect and in some measure evidences their agreement; accordingly, the court should not strike down any part of the lease, unless there is an irreconcilable conflict wherein one part of the lease destroys in effect another part thereof.

**[5] Mines and Minerals 260 ⟜78.1(7)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)3 Construction and Operation of Oil and Gas Leases
                260k78 Testing or Working
                    260k78.1 Construction, Breach, and Penalties
                      260k78.1(7) k. Place or portion developed; pooled or unitized tracts. Most Cited Cases

Retained acreage clauses in oil and gas lease did not provide for rolling termination of non-producing proration units, and instead, the leases confirmed that production anywhere on certain section, or land pooled with it, was sufficient to maintain the leases as to the entirety of the section, where the habendum clauses in both leases provided for continuation beyond the primary term as long as oil, gas, or other mineral was produced from said land or land with which said land was pooled, and pooling clause, which stated that drilling operations and production on any part of the pooled acreage would be treated as if such drilling operations were upon or such production was from the land described in the lease whether the well or wells be located on the land covered by this lease or not, ensured that production anywhere on a pooled unit maintained the lease in effect as to all lands covered by the lease, both within and outside the unit, unless the lease expressly provided otherwise, and the plain, grammatical language of the retained acreage clause did not expressly provide for rolling termination of proration units as they ceased to exist.

**[6] Mines and Minerals 260 ⟜78.1(7)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)3 Construction and Operation of Oil and Gas Leases
                260k78 Testing or Working
                  260k78.1 Construction, Breach, and Penalties
                      260k78.1(7) k. Place or portion developed; pooled or unitized tracts. Most Cited Cases

A habendum clause referring to "said land" extends the lease as to all the leased property while production of oil or gas occurs anywhere on the property during the second term; thus, in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby.

**[7] Mines and Minerals 260 ⟜73**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
           260II(C)3 Construction and Operation of Oil and Gas Leases
                260k73 k. In general; general rules of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

construction. Most Cited Cases

When an oil and gas lease terminates is always a question of resolving the intention of the parties from the entire instrument; however, Court of Appeals will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that Court can reasonably give it no other meaning.

**[8] Mines and Minerals 260 ⚷⟶78.1(7)**

260 Mines and Minerals
 260II Title, Conveyances, and Contracts
  260II(C) Leases, Licenses, and Contracts
   260II(C)3 Construction and Operation of Oil and Gas Leases
    260k78 Testing or Working
     260k78.1 Construction, Breach, and Penalties
      260k78.1(7) k. Place or portion developed; pooled or unitized tracts. Most Cited Cases

The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit; additionally, production from the pooled gas unit provides the lessors with an economic benefit in the form of royalty income.

**\*879** Shannon H. Ratliff, Lisa A. Paulson, Ratliff Law Firm, PLLC, Austin, William E. Berry, Jr., Cotton, Bledsoe, Tighe & Dawson, P.C., for Appellees.

Jane M.N. Webre, Scott, Douglass & McConnico, LLP, Austin, for Appellants.

Before McCLURE, C.J., RIVERA (Not Participating), and RODRIGUEZ, JJ.

*OPINION*
YVONNE T. RODRIGUEZ, Justice.

This case involves the construction of two oil and gas leases executed in 1976 (hereinafter, "the 1976 leases") and their effect on a 640–acre section of land covered by the leases—Section 25. Section 25 was pooled with an adjacent section of land not covered by the 1976 leases—Section 18–to form two pooled gas units. One of the pooled units continues to produce to this day, but the other ceased producing completely in 1988 when its well was plugged and abandoned. That particular well was completed in March 1979, and its operator designated all of Section 25 as the well's proration unit in paperwork filed with the Texas Railroad Commission (hereinafter, "RRC"). Approximately two months thereafter, continuous development ended on the leased premises. The leases provide that when continuous development ends, the lease terminates as to all acreage except for:

> [E]ach proration unit established under ... [the] rules and regulations [of the RRC ...] upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities ....

The issue is whether, under the above-quoted "retained acreage" clause, the 1976 leases remain in effect as to all of Section 25, as urged by Plaintiffs–Appellees [FN1] **\*880** (hereinafter "Energen"), or only as to an 80–acre portion of Section 25, as urged by Defendants–Appellants [FN2] (hereinafter, "Chesapeake"). On cross-motions for summary judgment, the trial court ruled in favor of Energen and against Chesapeake. We affirm.

> FN1. Appellees are Energen Resources Corporation, Kaiser Francis Oil Company, Pride Energy Company, Crown Oil Partners, IV, L.P., Crump Energy Partners, L.L.C., Dalton H. Cobb, Jr., Michael B. Cobb, Bill Hightower, and Hightower Exploration, L.L.C. We refer to Appellees collectively as Energen, for we see nothing that requires us

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

to distinguish among them.

FN2. Appellants are Chesapeake Exploration, L.L.C., Chesapeake Operating, Inc., Anadarko Petroleum Corp., and SWEPI, L.P. We refer to Appellants collectively as Chesapeake because, again, we see nothing that requires us to distinguish among them.

## FACTUAL AND PROCEDURAL BACKGROUND

The 1976 leases cover acreage located in Ward County, Texas, including the aforementioned Section 25 of Block 1, W & NW Ry. Co. Survey. Each lease contains a "pooling" clause, which states in pertinent part:

5. Lessee is hereby granted the right to pool or unitize this lease, the land covered by it or any part thereof with any other land, lease, leases, mineral estates or parts thereof for the production of oil, gas, or any other minerals. ... Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not. The entire acreage pooled into a unit shall be treated for all purposes ... as if it were included in this lease.

Pursuant to this provision, an 80–acre portion of Section 25 was pooled with a 560–acre portion of Section 18 to form a 640–acre pooled gas unit named the Cadenhead No. 1 Pooled Gas Unit. This pooled unit's well, the Cadenhead No. 1 Well, was drilled and completed on the 560–acre portion of Section 18 in 1978, and it has continually produced gas in commercial quantities since then. The next year, the Cadenhead No. 2 Well was completed on Section 25. This well was included in a 640–acre pooled gas unit named the Cadenhead No. 2 Pooled Gas Unit, which consisted of 560 acres from Section 25 and 80 acres

from Section 18. As mentioned earlier, the designated proration unit for the Cadenhead No. 2 Well included all of Section 25. Each lease also contains a provision requiring termination if the leased premises are not continuously developed as set forth in the leases' "continuous development" clauses. Those clauses provide in relevant part:

[12]D. Lessee shall continuously develop the above described land by commencing operations for the drilling of a well on or before the expiration of the primary term of this lease and thereafter shall allow not more than sixty (60) days to elapse between the completion or abandonment of one well and the commencement of the next until the above described land is drilled to the density necessary to obtain the maximum allowable per well under the rules and regulations of the Railroad Commission of Texas (or other governmental authority having jurisdiction), or this lease shall terminate as to all of the above described land ....

As indicated earlier, after the Cadenhead No. 2 Well was completed in March 1979, no additional wells were drilled on the leased premises. The Cadenhead No. 2 well was subsequently plugged back and recompleted in a shallower field in 1984. Four years later, it was abandoned.

Through subsequent transactions not relevant to this appeal, Energen and Chesapeake acquired their respective interests in Section 25. In 2011, Energen drilled a well on the 560–acre portion of Section 25 that had been pooled with the 80–acre **\*881** portion of Section 18 and obtained a permit to drill another well. Chesapeake too obtained a permit to drill a well on the 560–acre portion of Section 25. Each party requested that the other cease operations. Neither did, and the present action ensued.

In the trial court, both parties agreed with the principle that production anywhere on the pooled

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

premises is sufficient to maintain the entire lease unless the lease provides otherwise. They disagreed, however, on whether the retained acreage clause in each lease provided otherwise. Chesapeake argued the retained acreage clause provided otherwise because it applied "equally to 'all' of the lands under lease, even if pooling has occurred and even as to pooled lands." According to Chesapeake, the clause expressly provides for continuous and automatic termination, *i.e.,* "rolling" termination, of proration units as they cease to produce. Thus, when the proration unit for the Cadenhead No. 2 Well ceased to exist in 1988, the 1976 leases terminated as to the 560–acre portion of Section 25 on which that well had been drilled, irrespective of continued production from the Cadenhead No. 1 Pooled Gas Unit.

Energen urged a different construction. According to Energen, the retained acreage clause did not provide for "rolling" termination because the clause operated once and only once—when continuous development ceased. Under Energen's interpretation, all acreage included in a designated proration unit was retained if a well capable of producing in commercial quantities existed on the leased premises or on acreage pooled with the leased premises when continuous development ended. Thus, "[b]ecause the Cadenhead No. 2 Well was then capable of producing in commercial quantities, the lease was preserved as to its designated proration unit, all of Section 25, a portion of which had previously been pooled with Section 18."

In essence, both parties agreed the retained acreage applied, but disagreed on its scope and temporal application.

## THE RETAINED ACREAGE CLAUSE DOE NOT PROVIDE FOR "ROLLING" TERMINATION

In one issue, Chesapeake argues the trial court erred in concluding the 1976 leases did not require "rolling" termination of non-producing proration units

"to maintain the lease[s] in effect throughout the secondary term—not just at the moment that continuous development ends." In so arguing, Chesapeake takes the position that the proration unit designated for the Cadenhead No. 2 Well was retained only while the well was producing, and when it ceased to produce in 1988, the proration unit reverted to the lessors and was no longer subject to the 1976 leases. We disagree.

### Standard of Review

[1] The trial court's summary judgment concerns the construction of an unambiguous oil and gas lease.[FN3] The standard of review is therefore *de novo*. See *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.,* 253 S.W.3d 184, 192 (Tex.2007) (reviewing grant of summary judgment *de novo* ); *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex.2002) (reviewing lease-construction questions *de novo* ).

> FN3. The parties agree the lease is not ambiguous, and we do not hold otherwise. The parties also agree the resolution of this appeal hinges on the law, not on disputed facts.

### Applicable Law

[2][3][4] The primary duty of the court in interpreting an oil and gas lease is to **\*882** ascertain the parties' intent as expressed within the four corners of the lease. *Luckel v. White,* 819 S.W.2d 459, 461 (Tex.1991). In seeking to ascertain the parties' intent, the court must attempt to harmonize all parts of the lease, even if different parts of the lease appear contradictory or inconsistent. *Id.* at 461–62. Construing the lease to give effect to all of its provisions honors the parties' intent that every clause has some effect and in some measure evidences their agreement. *Luckel,* 819 S.W.2d at 462. Accordingly, the court should not strike down any part of the lease, unless there is an irreconcilable conflict wherein one part of the lease destroys in effect another part thereof. *Id.*

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

### *Discussion*

[5] When read in harmony with other portions of the leases, the retained acreage clauses do not provide for "rolling" termination of non-producing proration units as argued by Chesapeake. Instead, the language of the 1976 leases confirms that production anywhere on Section 25, or land pooled with it, is sufficient to maintain the leases as to the entirety of Section 25.

[6] The habendum clauses in both leases provide for continuation beyond the primary term "as long ... as oil, gas, or other mineral is produced from said land or land with which said land is pooled." Under Texas law, a habendum clause referring to "said land" extends the lease as to all the leased property while production of oil or gas occurs anywhere on the property during the second term. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 149 (Tex.2004). Thus, "in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby." *Mathews v. Sun Oil Co.,* 425 S.W.2d 330, 333 (Tex.1968).

Concordant with this general principle, the lease's pooling clauses provide that: "Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not." Accorded its plain, grammatical meaning, this clause ensures that production anywhere on a pooled unit maintains the lease in effect as to all lands covered by the lease, both within and outside the unit, unless the lease expressly provides otherwise. *Key Operating & Equip., Inc. v. Hegar,* 435 S.W.3d 794, 798 (Tex.2014); *Scott v. Pure Oil Co.,* 194 F.2d 393, 395 (5th Cir.1952); *Texaco, Inc. v. Lettermann,* 343 S.W.2d 726, 733 (Tex.Civ.App.-Amarillo 1961, writ ref'd n.r.e.).

As indicated earlier, Chesapeake and Energen disagree on whether operations conducted within the pooled gas units serve to maintain the 1976 leases as to the entirety of Section 25. However, they agree the answer to their dispute lies in the proper interpretation of the retained acreage clauses, which control the termination of the leases after cessation of continuous development. "Retained acreage clauses were originally drafted to prevent the lessee from losing those portions of a lease that had productive wells located thereon if the rest of the lease terminated ... [but] ... [t]he term has expanded its meaning to include clauses that require the release of all acreage that, at the end of the primary term, is not within a drilling, spacing, or proration unit." Bruce M. Kramer, *Oil and Gas Leases and Pooling: A Look Back and A Peek Ahead,* 45 TEX. TECH L.REV. 877, 881 n. 28 (2013).

[7] Here, the leases' retained acreage clauses, in conjunction with the continuous development clauses, provide that the lessee's failure to continuously develop the **\*883** leased premises terminates the leases as to all unproductive acreage except for:

> [E]ach proration unit established under ... [the] rules and regulations [of the RRC ...] upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities ....

When a lease terminates "is always a question of resolving the intention of the parties from the entire instrument." *Thompson,* 94 S.W.3d at 554. "However, we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Thompson,* 94 S.W.3d at 554.

The plain, grammatical language of the retained acreage clause does not expressly provide for rolling termination of proration units as they cease to exist. Instead, the plain, grammatical language shows that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

the parties intended the leases to continue as to each designated proration unit if the unit had a well capable of producing gas in commercial quantities when continuous development ceased. That the parties chose to maintain the lease as to each proration unit when continuous drilling stopped based on the ability of that unit's well to produce gas, rather than actual production, indicates they did not intend the retained acreage clause to be triggered any time actual production stops. To conclude otherwise would promote uncertainty about the continued existence of a lease. Moreover, adopting the construction urged by Chesapeake imposes an unnecessary limitation on the kind and character of the estate the parties chose to convey, *i.e.,* an expansive one maintained by production from any part of pooled lands unless limited by language so clear, precise, and unequivocal that no other conclusion could be reached. That type of language is absent from the retained acreage clauses.

Chesapeake contends that the retained acreage clauses must be read to modify the habendum clauses to require "rolling" termination of non-producing proration units, as designated by the Texas Railroad Commission, such that production from a pooled unit will not maintain the leases as to proration units that ceased to exist. It makes two arguments in support of this construction, one of which finds no support in the leases, and the other of which finds no support in Texas case law.

Chesapeake first argues that "[t]he parties' use of a specific regulatory term—[RRC-designated] proration unit—to define the extent to which the 1976 leases would be maintained after continuous development" signals their intent "that the leases would only be maintained as to lands within proration units for so long as such proration units existed." Chesapeake thus asserts that because "[p]roration units are designed on a well-by-well basis and only exist for so long as the well for which the proration unit is designated produces [,]" the proration unit for the Cadenhead Well No. 2 ceased to exist when it was plugged.

But this construction is belied by the plain, express language of the retained acreage clauses. The language in these clauses makes clear that: (1) proration units, as recognized by the state agency having regulatory jurisdiction over oil and gas development, are the portions of the leased premises maintained after continuous development ceases; and (2) each proration unit is maintained, not by the existence on the unit of a producing well, but by the existence on the unit of a well capable of producing in paying quantities. The use of the specific regulatory term in the retained acreage clause merely serves to identify with reasonable certainty the **\*884** property that remains under lease when continuous development ceases. In other words, the term "RRC-designated proration unit" functions as a mere descriptor in the clause, not as a normative one in the sense that it prescribes what ought to be the outcome based on the application of RRC regulations. If the parties to the 1976 leases had wished to provide for continual relinquishment of non-producing proration units, so that a proration unit would no longer be subject to the lease once production had ceased on that particular unit, they could have done so by including such language. But they did not, and it is not within our purview to rewrite the leases and alter the parties' contract. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 162 (Tex.2003) ("But we may neither rewrite the parties' contract nor add to its language.").

[8] Chesapeake also argues that the parties to the 1976 leases could not have intended for production on a single unit to maintain the entire lease indefinitely after continuous development ceased. Although this argument has some equitable appeal, it is refuted by language of the lease, as demonstrated above. Moreover, maintaining the leases during the secondary term to acreage outside of producing proration units but within a pooled unit would not be novel. "The primary legal consequence of pooling is that 'production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit.'

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

" *Hegar,* 435 S.W.3d at 798. Additionally, production from the pooled gas unit provides the lessors with an economic benefit in the form of royalty income. Granted, the lessors could have achieved an additional economic benefit by expressly stating that production on each proration unit is required to maintain the leases as to each of those units during the secondary term. However, they failed to do so. Absent proof of fraud or mutual mistake, neither of which was pled by the parties, we are not at liberty to rewrite the economic bargain struck by the parties to the 1976 leases. *See Eagle Life Ins. Co. v. G.I.C. Ins. Co.,* 697 S.W.2d 648, 651 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.) ("Courts are not at liberty to rewrite the contract between the parties without pleading and proof of fraud or mutual mistake."). Accordingly, we decline Chesapeake's invitation to construe the retained acreage clauses—decades after the fact—as expressly stating "that the leases would only be maintained as to lands within proration units for so long as such proration units existed" in the absence of clear, precise, and unequivocal language to that effect. *See Lettermann,* 343 S.W.2d at 732 ("[I]n the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense.").

Chesapeake next argues that "Texas case law directly on point confirms that the 1976 leases terminated as to the disputed acreage." In support of this argument, Chesapeake relies chiefly on *Nafco Oil & Gas, Inc. v. Tartan Res. Corp.,* 522 S.W.2d 703 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e). According to Chesapeake, *Nafco* stands for the proposition that "even where a retained acreage provision is silent as to whether a lease terminates as to a retained tract once the retained tract's well stops producing later in the life of the lease, the fee simple determinable nature of an oil and gas leases requires courts to imply such an intent ...." But Chesapeake's reliance on *Nafco* is misplaced. Although *Nafco* is distinguishable, the court's opinion in that case actually supports our conclusion. In *Nafco,* the court held that the habendum clause, as modified by the retained

acreage clause, operated independently upon each tract and that production on one 160–acre tract would not maintain the lease as to **\*885** another 160–acre tract on which production had ceased. 522 S.W.2d at 707–08. The retained acreage clause there provided that upon the lessee's failure to comply with the continuous drilling program, the lease terminated as to the entire premises except as to "the gas and gas rights ... in 160 acres ... around each well theretofore completed as a gas well, down to and including the sand from which such well produced gas." *Id.* at 705. When continuous drilling ceased in 1954, four wells were producing oil. *Id.* at 705. The two oil wells at issue ceased producing in 1968. *Id.* Relying on the habendum clause, the appellants argued that continued production from an oil well was sufficient to maintain the lease as to the oil wells even though those wells were not located on the same 160–acre tract of land on which the producing well was located. *Id.* at 705–06. The court disagreed, concluding that, "[i]n light of the provisions of this lease discussed above, *it is evident that the well must be producing oil, or gas, at the date that lessee ceases permanent drilling operations* required in paragraph 6, as amended, and the mineral (oil or gas) produced as of that date determines the acreage and mineral rights therein which said well will hold under the lease." *Id.* at 708 [Emphasis added].

*Nafco* is distinguishable in that there is no indication the lease in that case contained a pooling clause. *Nafco* is also distinguishable because the retained acreage clause there expressly required actual production on each 160–acre tract when continuous development ceased. But significantly, the *Nafco* court did not construe the retained acreage clause there to mean it operated continuously over the life of the lease. Rather, as the italicized language quoted above demonstrates, the *Nafco* court construed that clause to mean it operate once and only once—"at the date that lessee ceases permanent drilling operations ...." That interpretation comports with ours.

Like *Nafco,* the court's opinion in *Humphrey v.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

445 S.W.3d 878
**(Cite as: 445 S.W.3d 878)**

*Seale,* 716 S.W.2d 620 (Tex.App.-Corpus Christi 1986, no writ), supports our conclusion. In *Seale,* the court held that, in the absence of language in the retained acreage clause calling for a continual relinquishment on non-producing lease acreage, the general rule provides that production anywhere on the leased premises maintains the lease. 716 S.W.2d at 622. The retained acreage clause there provided that upon the lessee's failure to comply with the continuous drilling program, the lease terminated as to the entire premises except as to "forty (40) acres designated as a well block around such producing well, and said well block designation shall be filed of record immediately after said block has been designated by Lessee ...." *Id.* at 621. When appellant acquired his interest in the leased premises in April 1982, two of the wells in dispute were no longer producing, but the other disputed well continued to produce until appellant ceased operations on it when he filed suit. *Id.* The appellees took "the position that 40 acres was retained around the well only while a well produced, and upon the cessation of production of a particular well, the 40 acres surrounding that well reverted to the landowner and was no longer subject to the ... [l]ease." *Seale,* 716 S.W.2d at 621 The court disagreed, concluding:

> [The retained acreage clause] *does not require the lessee to relinquish additional acreage from the lease after the initial release is accomplished 'within 180 days of the first oil well.'* As all three of the 40–acre tracts are under the same lease and lease terms, production on one will keep the lease in effect for all.

*Seale,* 716 S.W.2d at 622 [Emphasis added].

**\*886** The retained acreage clause in *Seale,* like the one in *Nafco,* is not identical to the ones here. However, that difference is immaterial because the *Seale* court, like the *Nafco* court, did not construe the retained acreage clause there to mean it operated continuously over the life of the lease. Rather, as the italicized language quoted above demonstrates, the *Seale* court construed that clause to mean it operates once and only once—when the initial release of acreage occurred after continuous drilling ceased.

Chesapeake argues *Seale* does not support our conclusion because termination of the lease under the retained acreage clause there "was not automatic but rather required an affirmative action by the lessee," and thus, it was not surprising that "the [c]ourt declined to imply a continuing release obligation that would effectuate 'rolling' lease termination." But that was not the reason why the *Seale* court declined to construe the retained acreage clause in that case to mean it operated continuously over the life of the lease. Rather, the court declined to construe the clause in that manner because the clause did not provide for rolling termination in clear, precise, and unequivocal language. As the court was quick to note, "[i]f the parties to the lease had wished to provide for a continual relinquishment of nonproducing acreage, so that a 40–acre tract would no longer be subject to the lease once production had ceased on that particular 40–acre tract, it would have been simple to include such language." *Seale,* 716 S.W.2d at 622.

For the foregoing reasons, Chesapeake has not shown the trial court erred in concluding that the 1976 leases failed to provide for rolling termination of non-producing proration units.

### CONCLUSION

The trial court's order granting Energen's motion for summary judgment is affirmed.

Tex.App.–El Paso,2014.
Chesapeake Exploration, L.L.C. v. Energen Resources Corp.
445 S.W.3d 878

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2006 WL 1748584 (Tex.App.-San Antonio)
**(Cite as: 2006 WL 1748584 (Tex.App.-San Antonio))**



Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
San Antonio.
CONOCOPHILLIPS COMPANY and Kaiser-Francis
Oil Company, Appellants
v.
Maria Eva U. RAMIREZ and El Refugio, Ltd., Appellees.

No. 04-05-00488-CV.
June 28, 2006.

From the 49th Judicial District Court, Webb County, Texas, Trial Court No. 2005-CVQ-000823-D1; Manuel R. Flores, Judge Presiding.
Michael V. Powell, Chrysta L. Castaneda, Locke Liddell & Sapp L.L.P., Dallas, Adolfo Campero, Jr., Campero & Becerra, P.C., Laredo, for Appellant.

Ricardo E. Morales, Person, Whitworth, Borchers & Morales, L.L.P., Laredo, for Appellee.

Sitting: SARAH B. DUNCAN, Justice KAREN ANGELINI, Justice SANDEE BRYAN MARION, Justice.

**MEMORANDUM OPINION**

Opinion by SARAH B. DUNCAN, Justice.

**\*1** On February 10, 1975, the predecessor-in-interest of ConocoPhillips and Kaiser-Francis Oil Company (collectively "Conoco") leased 1053 acres in Zapata County from the predecessors-in-interest of Maria Eva U. Ramirez and El Refugio, Ltd. (collectively "Ramirez") for a primary term of five years. After the expiration of the primary term, the acreage the lessee is entitled to hold is governed by paragraph 18 of the lease, which provides in part as follows:

At the end of five years after the expiration of the primary term hereof, Lessee covenants and agrees to execute and deliver to Lessor a written release of any and all portions of this lease which have not been drilled to a density of at least forty (40) acres for each producing oil well and three hundred and twenty (320) acres for each producing or shut-in gas well from depths above 5,000 feet from the surface of the ground and 640 acres for each producing or shut-in gas well from depths below 5,000 feet from the surface of the ground except that in case any rule adopted by the Railroad Commission of Texas or other regulating authority for any field on this lease provides for a spacing or proration establishing different units of acreage per well, then such established different units shall be held under this lease by such production, in lieu of the units above mentioned....

In short, paragraph 18 provides that, at the end of five years after the expiration of the primary term, the lessee is entitled to hold 640 acres for each gas well drilled below 5,000 feet unless the Railroad Commission has "adopted" a rule "for" the field in which the gas well is drilled; if the Railroad Commission has "adopted" a rule "for" a field, the lessee is entitled to the acreage specified in that rule.

The parties agree the lease's primary term expired on February 10, 1980; and, five years later, on February 10, 1985, two wells were producing gas from a depth greater than 5,000 feet: the Serafin No. 1 gas well and the Serafin No. 4 gas well. The parties further

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2006 WL 1748584 (Tex.App.-San Antonio)
**(Cite as: 2006 WL 1748584 (Tex.App.-San Antonio))**

agree that the Railroad Commission "adopted" a rule "for" the field in which the Serafin No. 4 gas well was drilled; and that field rule entitles Conoco to 176 acres surrounding the Serafin No. 4 gas well. But the parties disagree on whether the Railroad Commission "adopted" a rule "for" the field in which the Serafin No. 1 gas well was drilled. Ramirez argues the Railroad Commission "adopted" two rules-statewide Rules 37 [FN1] and 38 [FN2]-"for" this field and, under these rules, the lessee is entitled to only forty acres around the well. Conoco argues statewide rules are not "adopted" "for" a field and therefore do not trigger the "except clause" in paragraph 18; accordingly, Conoco argues, it is entitled to 640 acres around the well. The trial court rendered judgment in Ramirez's favor, ruling that Conoco is entitled to only forty acres around the Serafin No. 1 gas well in accordance with the statewide rules. Conoco appealed. Because we agree with Conoco that statewide rules are not "adopted" "for" a field, we reverse the trial court's judgment and render judgment in Conoco's favor.

> FN1. Rule 37, the Statewide Spacing Rule, provides in relevant part:
>
> > The distances mentioned in subsection (a) [-1200 feet between wells and 467 feet between any well and a property line-] are minimum distances to provide standard development on a pattern of one well to each 40 acres in areas where proration units have not been established.
>
> 16 TEX. ADMIN. CODE § 3.37(b) (2006) (Tex.R.R. Comm'n, Statewide Spacing Rule). Because this part of statewide Rule 37 remains unchanged since 1985, we cite to the current rule.
>
> FN2. In 1985, Texas Railroad Commission Rule 38, Well Densities, provided in relevant part:

> > No well shall be drilled on less, but may be drilled on more, acreage than that hereafter prescribed as the proper amount for all oil and gas fields wherein only spacing rules, either special or statewide, are applicable ... 467-1200 [feet] ... 40 [acres].
>
> 16 TEX. ADMIN. CODE § 3.38(b)(1), adopted effective Jan. 1, 1976 (repealed and replaced 1989) (current version at 16 TEX. ADMIN. CODE § 3.38(b)(1) (Tex.R.R. Comm'n, Well Densities) (hereinafter cited as Former Rule 38(b)(1)).

**\*2** "To regulate oil and gas production, the Railroad Commission of Texas has adopted general rules applicable throughout the State...." *R. R. Comm'n of Tex. v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 70 (Tex.2003). However, "because these general rules cannot adequately address the widely varying conditions found in the thousands of oil and gas reservoirs in Texas, the Commission may issue orders with detailed regulations for a specific field, which the Commission calls field rules." *Id.* Because the general rules apply statewide, they must be promulgated in accordance with the rulemaking provisions of the Texas Administrative Procedure Act; field rules, on the other hand, apply to a specific field and a specific group of operators and must therefore be adopted under the adjudication provisions of the TAPA. *See id.* at 71. These differences make clear that a statewide rule is not a field rule. [FN3] Accordingly, we hold that, because statewide Rule 37(b) and Former Rule 38(b)(1) were not "adopted" "for" the field in which the Serafin gas well No. 1 was drilled, they are not field rules and therefore do not trigger the "except" clause in paragraph 18.

> FN3. *See, e.g., Browning Oil Co. v. Luecke,* 38 S.W.3d 625, 633 n. 5 (Tex.App.-Austin

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2006 WL 1748584 (Tex.App.-San Antonio)
**(Cite as: 2006 WL 1748584 (Tex.App.-San Antonio))**

2000, pet. denied) ("Field rules are special rules that modify the Railroad Commission's [statewide regulations affecting] well spacing, density, prorationing, and casing requirements for designated fields to deal with differences in reservoir conditions."); *Seagull Energy E & P, Inc. v. R.R. Comm'n of Tex.,* 99 S.W.3d 232, 235-36 (Tex.App.-Austin 2003, pet. granted) (distinguishing statewide and field rules).

Ramirez makes three arguments to the contrary. First, she argues paragraph 18 is ambiguous and points to the testimony of her expert that it was the Railroad Commission's policy for a proration analyst to "adopt" statewide rules "for a particular field when the field is discovered and application is made to the [Commission] by the operator." However, parol evidence is not admissible to vary the terms of an unambiguous contract [FN4]; and a contract is ambiguous only if it is susceptible to more than one reasonable interpretation. *See Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951). In light of the longstanding distinction in Texas jurisprudence between statewide and field rules, we hold paragraph 18 is unambiguous: it clearly provides that, if the Railroad Commission does not "adopt" a rule "for" a field, the lessee is entitled to 640 acres around a gas well drilled below 5,000 feet; if the Railroad Commission does "adopt" a rule "for" a field, the lessee is entitled to the acreage specified in that rule. Ramirez's ambiguity argument, as well as her interpretation of paragraph 18 and her expert's testimony, also erroneously equates the quite different concepts of "adoption" and "application." To "adopt" means "to accept formally and put into effect," while to "apply" means "to put into operation or effect." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 58, 97 (1984). Under Texas law, an operator's application for a permit does not cause the Railroad Commission to "adopt" statewide rules; rather, the Commission promulgates statewide rules through a formal rule-making procedure. The Commission "adopts" specific field rules

following a formal adjudicative proceeding-a type of proceeding that indisputably did not occur before statewide Rule 37(b) and Former Rule 38(b)(1) were applied to the field in which the Serafin No. 1 gas well was drilled. In short, although these statewide rules apply to the field in which the Serafin No. 1 gas well was completed, these rules were not "adopted" "for" the field. Accordingly, the "except" clause in paragraph 18 does not apply as a matter of law; and parol evidence from Ramirez's expert is irrelevant.

> FN4. *See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995) (per curiam).

**\*3** Ramirez next argues that paragraph 18 is inconsistent with and trumped by the statewide rules. However, the statewide rules merely establish minimum spacing and density requirements. *See* 16 TEX. ADMIN. CODE § 3.37(b) ("The distances mentioned in subsection (a) [-1200 feet between wells and 467 feet between any well and a property line-] are minimum distances to provide standard development on a pattern of one well to each 40 acres in areas where proration units have not been established."); Former Rule 3.38(b)(1) ("No well shall be drilled on less, but may be drilled on more, acreage than that hereafter prescribed as the proper amount for all oil and gas fields wherein only spacing rules, either special or statewide, are applicable ... 467-1200 [feet] ... 40 [acres]"). Paragraph 18, on the other hand, establishes the acreage the lessee is entitled to hold five years after the expiration of the primary term. Indeed, if we were to construe statewide Rule 37(b) and Former Rule 38(b)(1) as determining the amount of acreage the lessee is entitled to hold five years after the expiration of the primary term, it would render the part of paragraph 18 that applies in the absence of a field rule meaningless. The statewide rules would always control.

Ramirez also argues the drafters intended paragraph 18 to protect against the remote contingency

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2006 WL 1748584 (Tex.App.-San Antonio)
**(Cite as: 2006 WL 1748584 (Tex.App.-San Antonio))**

"that spacing or proration rules by a governing body may not exist at the time Paragraph 18 is triggered," so that a lessee could hold the entire acreage with just one well. However, this construction of paragraph 18 ignores its plain language and structure: the first proviso states the general rule (in the absence of a field rule, the lessee will hold 640 acres around a gas well drilled deeper than 5,000 feet), while the second proviso states the exception (if a field rule is adopted, the lessee will hold the acreage specified in the field rule). Under Ramirez's construction, the structure of paragraph 18 is turned on its head: the first clause would never apply, while the second "except" clause would state both the general rule (fields governed by the statewide rules) and the exception (fields governed by field rules). This construction would be not only nonsensical but contrary to general rules of construction. *Cf. Knight v. Chicago Corp.,* 144 Tex. 98, 188 S.W.2d 564, 566-67 (1945) ("Immediately following the above clause and in the same sentence is a proviso introduced by the words '*provided, however,*' which are followed by the restrictive provisions. That proviso must be construed as a limitation or restraint upon the authority defined in the clause immediately proceeding it.... The parties undertook only to restrict the powers defined and not to enlarge thereon. To hold otherwise would be to make a restriction upon a power cover a broader field than the power itself.").

In sum, although statewide Rule 37(b) and Former Rule 38(b)(1) apply to the field in which the Serafin No. 1 gas well was drilled, they were not "adopted" "for" this field. Accordingly, pursuant to the plain language of paragraph 18, Conoco is entitled to hold 640 acres surrounding the Serafin No. 1 gas well. The trial court therefore erred in ruling to the contrary. Therefore, we reverse the trial court's judgment to the extent it declares that, as of February 10, 1985, Conoco held forty acres located around the Serafin No. 1 gas well and render judgment that, as of February 10, 1985, Conoco held 640 acres located around the Serafin No. 1 gas well.

Tex.App.-San Antonio,2006.
ConocoPhillips Co. v. Ramirez
Not Reported in S.W.3d, 2006 WL 1748584 (Tex.App.-San Antonio)

END OF DOCUMENT